## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES of AMERICA; STATE of CALIFORNIA; STATE of COLORADO; STATE of CONNECTICUT; STATE of DELAWARE; DISTRICT of COLUMBIA; STATE of FLORIDA; STATE of GEORGIA; STATE of HAWAII; STATE of ILLINOIS; STATE of INDIANA; STATE of IOWA; STATE of LOUISIANA; STATE of MARYLAND; COMMONWEALTH of MASSACHUSETTS; STATE of MICHIGAN; STATE of MINNESOTA; STATE of MONTANA; STATE of NEVADA; STATE of NEW JERSEY; STATE of NEW MEXICO; STATE of NEW YORK; STATE of NORTH CAROLINA; STATE of OKLAHOMA; STATE of RHODE ISLAND; STATE of TENNESSEE; STATE of TEXAS; COMMONWEALTH of VIRGINIA; STATE OF WASHINGTON and STATE of WISCONSIN, ex rel. MICHAEL BAWDUNIAK, AND FERNANDO VILLEGAS,**<br><br>Plaintiffs–Relators,<br><br>v.<br><br>**BIOGEN IDEC INC**.,<br><br>Defendant | Civil Actions<br>No. 12-10601-IT<br>No. 14-10420-IT<br><br><br><br>**PLAINTIFFS–RELATORS DEMANDS A TRIAL BY JURY ON ALL COUNTS** |

## RELATORS' THIRD AMENDED COMPLAINT
## (LEAVE TO AMEND GRANTED ON JUNE 15, 2016)

On behalf of the United States of America, 28 States,[*] and the District of Columbia (collectively, the "States"), Plaintiffs–Relators Michael Bawduniak and Fernando Villegas (collectively, the "Relators") hereby file this Third Amended Complaint against Defendant Biogen Idec, Inc. ("Biogen") under the False Claims Act.

---

[*] The States on whose behalf the Plaintiffs–Relators bring this action are:  California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington and Wisconsin.

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

PARTIES ................................................................................................................7

JURISDICTION & VENUE ........................................................................................8

NATURE OF ACTION ..............................................................................................9

FACTUAL ALLEGATIONS ......................................................................................13

    A.  Multiple Sclerosis ................................................................................13

    B.  The Market for MS Drugs in the United States ...................................14

    C.  Biogen's MS Products and Their Competition ....................................16

    D.  A Small Number of Physicians Determine the Treatments that MS Patients
        Receive ................................................................................................20

    E.  Biogen Uses Kickbacks to Secure its Market Position .......................24

      1.  Biogen Conducts Hundreds of Sham Consulting Events ................... 25
      2.  Biogen's Use of Sham Speaking Payments..................................... 50

    F.  Analysis of Biogen's Kickbacks..........................................................59

      1.  Biogen Violates its Own Rules to Pay Large Kickbacks to High Volume
          Prescribers .................................................................................. 63
      2.  Biogen Violates Its Own Rules Limiting the Fair Market Value of Individual
          Payments to Physicians ................................................................ 66
      3.  Biogen Rewards One of Its Highest Prescribers with the Ultimate Kickback, a
          Lucrative Job ............................................................................... 71
      4.  Biogen Broadly Distributes Its Kickbacks....................................... 76

    G.  Biogen Caused the Presentation of False Claims to the United States...................78

      1.  Federal Reimbursement for Avonex & Tysabri................................. 78
      2.  Biogen's Kickbacks Induced Medicare, Medicaid and the Federal Programs to
          Pay For Thousands of Prescriptions........................................... 80

FIRST CAUSE OF ACTION:  United States False Claims Act ...........................110

SECOND CAUSE OF ACTION:  District of Columbia False Claims Act........................112

THIRD CAUSE OF ACTION: California False Claims Act ...............................................113

FOURTH CAUSE OF ACTION:  Colorado Medicaid False Claims Act...........................114

FIFTH CAUSE OF ACTION:  Connecticut False Claims Act............................................115

SIXTH CAUSE OF ACTION: Delaware False Claims And Reporting Act .....................116

SEVENTH CAUSE OF ACTION: Florida False Claims Act ...............................................118

EIGHTH CAUSE OF ACTION: Georgia State False Medicaid Claims Act ....................119

NINTH CAUSE OF ACTION: Hawaii False Claims Act....................................................120

TENTH CAUSE OF ACTION:  Illinois Whistleblower Reward And Protection Act .....121

ELEVENTH CAUSE OF ACTION:  Indiana False Claims and Whistleblower Protection
Act ..................................................................................................................................122

TWELFTH CAUSE OF ACTION:  Iowa Medicaid False Claims Act................................123

THIRTEENTH CAUSE OF ACTION: Louisiana False Claims Act/Medical Assistance
Programs Integrity Law ...........................................................................................124

FOURTEENTH CAUSE OF ACTION:  Maryland False Health Claims Act...................125

FIFTEENTH CAUSE OF ACTION:  Massachusetts False Claims Law ...........................126

SIXTEENTH CAUSE OF ACTION:  Michigan Medicaid False Claim Act .....................127

SEVENTEENTH CAUSE OF ACTION:  Minnesota False Claims Act .............................128

EIGHTEENTH CAUSE OF ACTION:  Montana False Claims Act ...................................129

NINETEENTH CAUSE OF ACTION:  Nevada False Claims Act......................................130

TWENTIETH CAUSE OF ACTION: New Jersey False Claims Act ..................................130

TWENTY-FIRST CAUSE OF ACTION:  New Mexico False Claims Act.........................132

TWENTY-SECOND CAUSE OF ACTION:  New York False Claims Act........................133

TWENTY-THIRD CAUSE OF ACTION:  North Carolina False Claims Act ..................134

TWENTY-FOURTH CAUSE OF ACTION:  Oklahoma Medicaid False Claims Act......135

TWENTY-FIFTH CAUSE OF ACTION:  Rhode Island False Claims Act.......................136

TWENTY-SIXTH CAUSE OF ACTION:  Tennessee Medicaid False Claims Act ...........137

TWENTY-SEVENTH CAUSE OF ACTION: Texas Medicaid Fraud Prevention Law ...138

TWENTY-EIGHTH CAUSE OF ACTION:  Virginia Fraud Against Taxpayers Act ......139

TWENTY-NINTH CAUSE OF ACTION:  Washington Medicaid Fraud False Claims Act
.............................................................................................................................140

THIRTIETH CAUSE OF ACTION:  Wisconsin False Claims For Medical Assistance Law
.............................................................................................................................141

CONCLUSION ..................................................................................................142

## **INTRODUCTION**

1.      The allegations in this Third Amended Complaint concern false and fraudulent Medicare and Medicaid reimbursement claims that Biogen caused through a massive scheme to pay millions of dollars in kickbacks to influence health care providers to prescribe three of Biogen's multiple sclerosis ("MS") products.  The goal of this kickback scheme was three fold: to preserve the eroding market share of Biogen's oldest biological product Avonex; increase the market share of its biological product Tysabri, and to ensure that its new oral MS drug, Tecfidera , once approved, would be prescribed at a high rate.  Biogen knowingly identified the top prescribers and paid them millions of dollars to keep their prescriptions at profitable levels.  The return on Biogen's investment in this kickback scheme was significant, and came largely at the expense of federal and state coffers.

2.      Biogen's kickback scheme was and continues to be massive.  In 2009 and 2010, for example, the company paid a total of $18 million to 1,500 doctors and nurses, who collectively write prescriptions totaling approximately 60% of the MS market.  Rather than waste its time and money marketing to the other 16,000 neurologists who only account for 40% of the market, Biogen found it more cost effective and profitable to simply buy commercial loyalty from the minority that writes a majority of the prescriptions.

3.      This multimillion dollar kickback scheme capitalized on the unique nature of multiple sclerosis.  MS is an incurable disease which can lead to complete debilitation.  A small group of products known as immunomodulating agents (IMA)

are approved to treat MS.  Not surprisingly, given the severe and incurable nature of the disease, these treatments are enormously expensive.  The annual cost of an IMA drug for a single patient is between $35,000 to $70,000.  Thus, once a patient is placed on one drug company's MS drug, that company stands to receive hundreds of thousands of dollars over the course of the patient's life.  And because there are a relatively small number of neurologists who treat MS, each prescriber has the ability to direct millions of dollars in revenue to one company's benefit or another.  The obvious temptation is to influence these decisions through kickbacks.

        4.      Due to the nature of the disease and its treatment, a high percentage of Avonex, Tysabri, Tecfidera (also known as BG-12), and other MS drugs are paid for by federal health care programs.  MS frequently disables its sufferers and those who are totally disabled can qualify for Medicare, even if they are not yet 65 years old.  Nearly a quarter of all non-cancer enrollees in Medicare were MS patients and approximately 30% of all MS drug payments are paid for by Medicare.  MS therapies represent Medicare's second largest drug expenditure, after cancer treatments.  In 2006 and 2007, Medicare spent more than $500 million on MS treatments; Avonex alone accounted for roughly $170 million of these expenditures for those two years.  Others who are unable to work or who cannot afford the expensive care are enrolled in the Medicaid program, a joint program of the federal government and the states.  A 2007 study found that an additional 10.5% of MS patients were covered by Medicaid.  Thus the federal government and the individual states pay for close to half of all funds paid for multiple sclerosis drugs.

5.      Prior to 2010, six different IMAs were used to treat MS, and for most patients these biological products were highly interchangeable.  All carried essentially the same FDA-approved indication.  Five of the six products were injected, and four of those contained indistinguishable proteins called interferons.  But the problem with interferon is that it commonly produces flu-like side-effects.  This left Teva's Copaxone, which did not contain interferon, as the emerging market leader.  By early 2008, Copaxone surpassed Avonex in sales, dealing a tremendous blow to Biogen, which claimed to be a market leader in MS.

6.      Even with the addition of Tysabri to its portfolio, Biogen could do little to reclaim its former position at the top of the market.  If anything, Biogen's two existing MS products at the time – Avonex and Tysabri - were at a slight disadvantage.  Of the injectable products, Avonex was the only one that required injection deep into muscle tissue, rather than the more convenient injection just under the skin.  Avonex also had the lowest perception of efficacy among doctors.  Tysabri was even less convenient because it is only administered by infusion and has the possibility of a more severe and potentially fatal side effect called PML.

7.      Biogen had a plan.  It had been studying the MS market since Avonex's approval in 1996, and knew the most important fact: a relatively small number of prescribers dominate the entire market.  Six thousand doctors write over 90% of the prescriptions for MS drugs, and just 1,200 doctors wrote 60% of the IMA prescriptions.  The economics and demographics of multiple sclerosis make it a fertile ground for a kickback scheme.  Pharmaceutical companies, over the years, have recognized that

occasional payments of a few thousand dollars (or, alternatively, the granting of expense paid trips to resorts) have strongly motivated the recipients to prescribe the payor's drug for their patients.

8.      Kickbacks, however, are illegal.  By 2008, enhanced enforcement and revised industry guidelines had curtailed the use of this tactic in most of the industry. Over the years, however, Biogen had honed its ability to distribute large amounts of money to large numbers of physicians without appearing to have engaged in illegal kickback activity.  Biogen exploited two mechanisms for making payments to physicians—retaining them as consultants and hiring them as speakers—that were permissible if performed in a reasonable and limited fashion.  Biogen expanded these exceptions well beyond permissible boundaries so that its sham consulting and speaking schemes were mere conduits for the channeling of illegal payments to the maximum number of high prescribers.

9.      Pursuant to the sham consulting scheme, the Department of Regional Marketing discerned that "consultation" was needed on a number of similar topics relating to the marketing of its well-established drugs.  The documented need for such consulting was purely imaginary, as neither the company's market research department (which was responsible for holding legitimate consultant meetings) nor its brand managers had ever made inquiries on the topics that supposedly required consultation. Biogen then held dozens of consultant meetings that required the attendance of hundreds of doctors across the country, liberally paying consulting fees to the physicians who attended.  Unsurprisingly, "consultants" were effectively selected by

local sales officials, who based their selection on the consultant's prescribing volume as opposed to their supposed expertise on the topic of the meeting.  From any legitimate perspective, the meetings made little sense.  The average consultant attended more than one consultant event a year.  It would have been more cost effective for Biogen to ask all of its questions to a particular consultant at just one meeting, rather than at two or three.  Nor was it necessary to ask the same questions in 15 different cities.  Biogen hired so many consultants that it could not have acted on the advice it received even if it had intended to do so.

10.     The illegal purpose of these payments was manifest.  Biogen did not pay doctors to consult unless they were high prescribers; academic affiliations, educational pedigree, and published works were irrelevant.  The only criteria that mattered were the physician's prescribing volume and ability to influence peers.  Not surprisingly, the sales force routinely suggested that certain doctors be selected as consultants.  Biogen carefully documented its purported need for such consulting to make the consultations appear legitimate on paper.  But ultimately it retained far more consultants than required, and never did anything with the expensive "consulting product" that it received.

11.     A second method of funneling funds was the training of "speakers" to talk to other physicians about Biogen's drugs.  Speakers are paid when they obtain training and paid again when they are supposed to present, even if no one attends the scheduled meeting.  Biogen constantly trained speakers for both Avonex and Tysabri, even though most speakers would only present twice (or less) a year and many presented to only a

single person—often someone they already worked with.  Given that there was no demand for additional presentations about both established drugs and that there were many experienced speakers who could handle what little demand existed, the expansion of the speaking program was a complete sham operated solely to pay physicians to remain loyal to Biogen.  Biogen resorted to the sham speaking program again to ensure that Tecfidera, once approved, was prescribed at a high rate.  Importantly, Biogen selected all speakers based on their prescribing ability, not their speaking ability.

12.     The scope of the kickback scheme was staggering.  In 2009 alone, Biogen paid 820 physicians a total of $8.8 million to speak or consult, $10,600 per physician.  Faced with the market entry of the first oral treatment for MS, Gilenya, Biogen expanded these programs in 2010.  In that year, Biogen paid 1,200 physicians a total of $9.1 million to speak or consult.  From February 2012 through December 2013, Biogen made at least 1,064 payments to physicians for over $3 million in consultant fees - solely in connection with its Tecfidera product.  Biogen's kickback payments were distributed fairly evenly between excessive, duplicative, and redundant consultant meetings on the one hand, and training an excessive number of unnecessary speakers on the other.

13.     Biogen's internal Compliance Department, which was responsible for preventing the payment of kickbacks, had no ability to stop them.  The Compliance Department often criticized the suspect nature of these payments but was overruled by marketing executives.  Compliance reviewed every single proposal and routinely expressed concerns that there were too many meetings, too many consultants, and too

many payments.  Each time, these concerns were disregarded by Tony Kingsley, Senior Vice President of US Commercial Operations or a marketing vice president.

14.     The kickback program was a success.  Avonex was able to stop its loss of market share and hold sales constant, despite FDA approval of the oral MS drug Gilenya.  With price increases, Biogen pushed its US sales of Avonex to $1.5 billion annually.  And Tysabri sales continued to grow, despite a black box warning of deadly side effects.  The kickback program was so successful that Biogen continues to use sham consulting meetings and unnecessary speaking engagements to pay favored physicians.

15.     Biogen has now introduced its own oral MS medication, Tecfidera, to the market and has once again turned to its proven strategy of paying kickbacks to physicians to motivate them to prescribe its product.  Since 2011 Biogen has paid physicians millions of dollars to speak and consult on Tecfidera, resulting in Tecfidera far surpassing its forecasted revenue total in 2013.

## PARTIES

16.     Relator Michael Bawduniak is an individual who resides in New Hope, Pennsylvania.  He began working for Biogen in 2004.  Between 2004 and 2006, he was an Area Business Manager ("ABM"), the title given to Biogen sales representatives. From 2007 to 2009, he was a Regional Senior Marketing Manager (RSMM).  He was promoted to the position of Director of Regional Marketing on an interim basis in 2009. In 2011, after he attempted to halt the payment of kickbacks to physicians that Biogen feared would transfer their brand loyalty to Gilenya, he was demoted to his former position, now known as Thought Leader Liaison.  Mr. Bawduniak left Biogen in 2012.

17.     Relator Fernando Villegas is an individual who resides in the state of New York.  Mr. Villegas has over thirteen years of experience in the pharmaceutical industry.  From 2001-2011, Mr. Villegas held various marketing positions at Pfizer Inc.  He began working for Biogen on November 1, 2011, as a Senior Product Manager for the Tecfidera marketing brand.  As Senior Product Manager for Tecfidera, Mr. Villegas was tasked with running the "HCP [Health Care Provider] Engagement Program."  Under the guise of gathering feedback on Tecfidera from neurologists, the HCP Engagement Program was a means through which Biogen paid cash kickbacks to doctors to induce prescriptions of Tecfidera.

18.     Defendant Biogen Idec Inc. ("Biogen") is a Delaware corporation with a principal place of business in Cambridge, Massachusetts.  Biogen conducts business in each and every state in the United States on a daily basis.

## JURISDICTION & VENUE

19.     Pursuant to 28 U.S.C. § 1331, this District Court has original jurisdiction over the subject matter of this civil action since it arises under the laws of the United States, in particular the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA").  In addition, the FCA specifically confers jurisdiction upon the United States District Court. 31 U.S.C. § 3732(b).

20.     Pursuant to 28 U.S.C. § 1367, this District Court has supplemental jurisdiction over the subject matter of the claims brought pursuant to the false claims acts of the States on the grounds that the claims are so related to the claims within this

{00033378}                                    8

Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

21.     This District Court has personal jurisdiction over Biogen pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process and Biogen has sufficient minimum contacts with the United States of America.

22.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Biogen's corporate headquarters are located in this judicial district and it transacts business here on a daily basis.

23.     The Relators are unaware of any public disclosure of the information or allegations that are the basis of their Complaints or Amended Complaints.  In the event that there has been a public disclosure, Relators are the original source of the information and allegations contained in this Third Amended Complaint.  Prior to the filing of this action, Relators voluntarily provided the United States Government with information regarding the false claims that are the subject of this Third Amended Complaint as early as November 18, 2011.

## NATURE OF ACTION

24.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim.

25.     The False Claims Act makes "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim.

26.     The False Claims Act makes any person who conspires to commit a violation of the FCA liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim.

27.     The False Claims Act defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient.  Any claim submitted by a Medicare or a Medicaid provider for a payment constitutes a claim under the False Claims Act.  Any claim submitted by a provider for payment by a federal insurance plan, such as Tricare, is also a "claim" for purposes of the False Claims Act.

28.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), makes it a felony to pay or receive gifts or remuneration that can influence healthcare decisions. Specifically, the Anti-Kickback Statute prohibits anyone from:

> knowingly and willfully…pay(ing) any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . .order, or arrange for or recommend …any

good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

29.     A transaction may violate the Anti-Kickback Statute even when a payor's unlawful intent is not its exclusive intent.  It is enough that "*any one purpose* of the remuneration may be to induce or reward the referral or recommendation of business payable in whole or in part by a Federal health care program." OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731 (May 3, 2003) (emphasis added). In other words, even "a lawful purpose will not legitimize a payment that also has an unlawful purpose."

30.     Every provider who enters into a contract with Medicare agrees to comply with Medicare's laws, regulations and program instructions.  Each provider specifically acknowledges in its provider contract that the provider understands "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider]'s compliance with all applicable conditions of participation in Medicare."  Upon information and belief, each of the States' provider agreements in their respective Medicaid programs contains comparable provisions agreeing to comply with the Anti-Kickback statute and acknowledging that their receipt of payment is conditioned upon compliance with such provisions.

31.     Medicare and Medicaid claims for reimbursement of any goods or services that were the subject of a kickback constitute false claims. This is because

compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under a Government Health Care Program, including Medicare and the state Medicaid programs. Moreover, compliance with the Anti-Kickback Statute is a condition of payment for any goods or services reimbursed by Medicare or Medicaid, including drugs and, in the case of MS drugs, office or outpatient visits to inject or infuse such drugs.

32.     Additionally, a recent amendment to the Anti-Kickback Statute, effective on March 23, 2010, states: "In addition to the penalties provided for in this section or section 1320a-7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]." Consequently, any kickbacks paid by Biogen on or after March 23, 2010 constitute False Claims regardless of the provisions of any provider agreement or state Medicaid statute.

33.     When a kickback has been paid, the measure of damages is the full amount of the claim caused by the kickback—such as the amount of payments billed to Medicare or Medicaid as a result of an Avonex, Tysabri, or Tecfidera prescription induced by a kickback. Every Avonex, Tysabri, or Tecfidera prescription written by a physician to whom Biogen paid a kickback is tainted, and the full cost of all amounts paid due to such prescriptions is owed back to the government. From 2009 through the present, Medicare and the state Medicaid programs have paid hundreds of millions of dollars for Avonex, Tysabri, and Tecfidera prescriptions written by physicians to whom Biogen had knowingly paid kickbacks.

## FACTUAL ALLEGATIONS

### A.    Multiple Sclerosis

34.    Multiple Sclerosis is a chronic, autoimmune, inflammatory, demyelinating disease of the central nervous system, which is made up of the brain, spinal cord, and optic nerves.  MS damages the myelin sheath surrounding nerve fibers in the brain and spinal cord, impairing conductivity, and causing visual, sensory, and motor disturbances.  Symptoms may be mild, such as numbness in the limbs, or severe, such as paralysis or loss of vision.  The progress, severity, and specific symptoms of MS are unpredictable and vary from one person to another.  Nevertheless, the disease is chronic, and for many of the 400,000 Americans with MS, the disease is disabling.   MS is the leading cause of disability among young adults.

35.    While the cause of MS is not known, it is thought to be an autoimmune disease where the body's own defense system attacks myelin, the fatty substance that surrounds and protects the nerve fibers in the central nervous system, and often damages the nerve fibers themselves.  The damaged myelin forms scar tissue (sclerosis), which gives the disease its name.  When any part of the myelin sheath or nerve fiber is damaged or destroyed, nerve impulses traveling to and from the brain and spinal cord are distorted or interrupted, producing the variety of symptoms that can occur.

36.    Multiple Sclerosis typically presents in one of four courses, each of which can be mild, moderate, or severe: (1) People with *relapsing-remitting* MS experience clearly defined attacks of worsening neurologic function.  These attacks—which are called relapses, flare-ups, or exacerbations —are followed by partial or complete

recovery periods (remissions), during which no disease progression occurs. Approximately 85% of people are initially diagnosed with relapsing-remitting MS. (2) People with *primary-progressive* MS suffer slowly worsening neurologic function from the beginning—with no distinct relapses or remissions. The rate of progression may vary over time, with occasional plateaus and temporary minor improvements. Approximately 10% of sufferers are diagnosed with primary-progressive MS.  (3) People with *secondary-progressive* MS experience a steadily worsening condition that follows the initial period of *relapsing-remitting* MS.  Before the disease-modifying medications became available, approximately 50% of people with relapsing-remitting MS developed this form of the disease within 10 years. However, long-term data are not yet available to determine whether the use of disease-modifying medications significantly delays this transition. (4) People with *progressive-relapsing* MS, one of the rarest courses of MS, experience steadily worsening disease from the beginning, but with clear attacks of worsening neurologic function along the way. They may or may not experience some recovery following these relapses, but the disease continues to progress without remissions.

> **B.    The Market for MS Drugs in the United States**

37.    There is no cure for MS, but the FDA has approved some drugs, including Avonex, Tysabri, and, most recently, Tecfidera, to treat MS symptoms.  The FDA has approved these drugs for the treatment of patients with relapsing forms of multiple sclerosis to slow the accumulation of physical disability and decrease the frequency of

clinical exacerbations.  All of the approved treatments are biologicals that fall under the class of agents known as immunomodulating agents (IMAs).

38.     All of the IMAs approved for treatment of MS are still under patent protection. Their manufacturers, including Biogen, have priced these medications to maximize their profits at the expense of Medicare, Medicaid, and private insurance programs.  As a result of these pricing policies, the annual mean cost of treating MS is $47,000, nearly all of which goes to drug therapy.  The total annual cost for the United States' health care system is $13 billion.

39.     Because of the inelastic market for MS treatments, increased competition has resulted in increased prices, not lower prices.  The average cost of MS drugs was $60,000 a year in 2013, compared to $8,000 to $11,000 a year in the 1990s.  The price for some MS drugs climbed by an average of 30 percent per year for over two decades.

40.     The following table lists the FDA approved treatments for MS in 2013, and their estimated annual cost at that time:

| Product | Company | FDA approval | Annual price |
|---------|---------|--------------|--------------|
| Betaseron | Bayer | 1993 | $61,529 |
| **Avonex** | **Biogen Idec** | **1996** | **$62,934** |
| Copaxone | Teva | 1996 | $59,158 |
| **Tecfidera** | **Biogen Idec** | **2013** | **$63,315** |
| Rebif | Serono, Inc./Pfizer | 2002 | $66,394 |
| **Tysabri** | **Biogen Idec/Elan** | **2006[2]** | **$64,233** |
| Extavia | Novartis | 2009 | $51,427 |
| Gilenya | Novartis | 2010 | $63,806 |

### C.   Biogen's MS Products and Their Competition

41.   Avonex (interferon beta-1a) was approved by the FDA in May 1996 and is indicated for the treatment of patients with relapsing forms of multiple sclerosis to slow the accumulation of physical disability and decrease the frequency of clinical exacerbations. Avonex is administered through weekly intramuscular injections.  Many patients self-inject the medication, but some require weekly doctor's visits for their therapy.

42.   Interferons such as Avonex are amino acid glycoproteins released by host bodies in the presence of pathogens such as viruses, bacteria, parasites, or tumor cells. Interferon proteins can be derived from various sources.  Those that are derived from mammalian cells—like Avonex and Rebif—are called interferon beta-1a; those that are derived from *E-coli*—like Betaseron and Extavia—are called interferon beta-1b.  It is believed that biological products containing interferon beta are beneficial in treating MS

---

[2] Tysabri was initially approved in 2004, but was withdrawn early in 2005 due to safety concerns.

because of their anti-inflammatory properties.  One of the most common side-effects of interferons such as Avonex is flu-like symptoms.

43.     Avonex sales in the United States have exceeded $1 billion annually for many years.  Between 2009 and 2011, Biogen received more than $4.5 billion in revenue from US sales of Avonex.

44.     Tysabri (natalizumab) was approved by the FDA in November 2004 and is indicated for the treatment of patients with relapsing forms of multiple sclerosis to delay the accumulation of physical disability and reduce the frequency of clinical exacerbations.  Tysabri is generally recommended for patients who have had an inadequate response to, or are unable to tolerate, an alternate MS therapy.  Tysabri is administered through infusion.  Patients being treated with Tysabri must receive treatments at an outpatient infusion therapy clinic once every four weeks.  Tysabri cannot be self-administered or taken in one's home.

45.     Tysabri increases the risk of progressive multifocal leukoencephalopathy (PML), an opportunistic viral infection of the brain that usually leads to death or severe disability.  For this reason, Biogen withdrew Tysabri from the market until such safety concerns could be addressed to the satisfaction of the FDA.  In June 2006, Biogen re-launched Tysabri, with availability restricted to patients enrolled in the TOUCH Risk Minimization Action Plan.  Despite the TOUCH program, there have been 212 PML cases and 46 deaths in Tysabri MS patients as of March 1, 2012.

46.     Tysabri sales in the United States have exceeded $200 million annually for several years, and exceeded $300 million in 2011. Domestic sales between 2009 and 2011 exceeded $840 million.

47.     Tecfidera is an oral medication used to treat relapsing multiple sclerosis. It received FDA approval in March 2013.  Like Tysabri, Tecfidera may cause serious side effects including the potentially deadly PML.  The most common side effects are flushing and stomach problems.  Since approval, Tecfidera has become one of the best-selling MS drugs in the world, taking market share from competitors' drugs.  Tecfidera had sales of $2.9 billion in 2014, helping Biogen's total revenue rise 40% that year. Analysts project Tecfidera sales of $4.15 billion in 2015.

48.     Prior to the launch of the more recent IMAs, Biogen's products dominated the MS market.  In 2004, Avonex had 40% market share, outselling the other three biological products in its class: Betaseron, Copaxone, and Rebif. When Tysabri was re-launched in 2006, Biogen still dominated the MS market. Avonex alone accounted for 37% of US sales, which was more than Copaxone's 32% market share, and more than Betaseron and Rebif's combined 30% market share.

49.     By 2007, Avonex had been on the market for over a decade and was beginning to lose market share to newer competitors.  Tysabri could not protect Biogen's market position because of its safety concerns.  A Yale School of Management analysis predicted Avonex dropping to below a 30% market share by 2010, and freefalling to less than 10% by 2016.  In 2009 a new competitor, Novartis, would enter the market and in 2010 it would introduce the first oral treatment for MS, Gilenya.

Gilenya posed a particularly serious threat to Biogen's market dominance because patients unquestionably preferred taking a daily pill to receiving a weekly shot or a monthly infusion, as the following table from the analysis shows:



50.    By 2008, it was clear that Avonex was losing market share to the other injectibles, which had better perceived efficacy and were more comfortable for patients because they could be injected subcutaneously, rather than intramuscularly. Copaxone in particular had an advantage, because it did not contain interferon and thus lacked the flu-like side-effects associated with those products. In fact, by early 2008, Copaxone surpassed Avonex in sales, knocking it out of the top position it had held for most of the decade.

51.    The gloomy forecast got worse for Biogen in 2009.  In mid-2009, Novartis launched its own interferon called Extavia. While this product had little anticipated impact, its launch was intended to pave the way for Novartis's launch in late 2010 of Gilenya.  Gilenya was expected to cause Biogen's market share to decline even further because it was the first oral treatment for MS.  Assuming comparable safety and efficacy, a patient would naturally opt for a pill over needles.

**D.    A Small Number of Physicians Determine the Treatments that MS Patients Receive**

52.    Most of the 400,000 MS patients in this country receive their treatment from the 13,000 to 17,000 neurologists in the United States.  Just 300 neurologists, however, write 30% of all IMA prescriptions for the treatment of MS. 1,200 prescribers write 60% of IMA prescriptions, and the top 6,000 wrote 90%.  Biogen was well aware of this concentration in the market, as demonstrated by the following slide, and deliberately focused its marketing efforts on the lucrative prescribers—those neurologists who were either in the top 20% of prescribers, or, even better, those in the top 5%:



53.     Biogen devised a way to identify and target the doctors who wrote 60% of prescriptions for MS (depicted in the red boxes above) and thus would provide the "most bang for the buck."  This plan was summarized in the 2008 Physician Segmentation and Call Plan, which called for Biogen to focus only on the top 6,000 prescribing neurologists, and ignore the other roughly 10,000 who offered little return on investment.  Biogen divided these top 6,000 prescribers into four groups based on their prescription volume.  These volume groups were called "key accounts," "high," "medium," and "low."  The "key accounts," as the label implies, were the most coveted prescribers—these were the 300 neurologists whose prescriptions accounted for 30% of the market. When added together with the "high" volume prescribers, Biogen could target 60% of the MS market through just 1,200 physicians.

54.     Biogen then divided these same 6,000 physicians a different way, by product loyalty.  Those already loyal to Biogen were "Avonex advocates," while those trending towards Biogen were "Avonex opportunity."  Those loyal to a competitor—and thus disloyal to Biogen—were labeled "Competitor Advocates"; those trending away from Biogen were labeled "Avonex Risk." In terms of past and present economic value to Biogen, "Avonex Advocates" and "Avonex Risk" were the most valuable, and "Avonex Opportunity" and  "Competitor Advocates" had the least value to Biogen.

55.     Having identified the volume potential and loyalty of each of the top 6,000 physicians, Biogen then overlaid these categorizations, assigning each physician to the 16 resulting groups:

## Number of MDs in Each Avonex Segment

| | Volume Segment | | | | Total |
|---|---|---|---|---|---|
| | Low | Medium | High | Key Accounts | |
| Avonex Advocate | 259 | 237 | 77 | 36 | 609 |
| Competitor Advocate | 388 | 315 | 99 | 34 | 836 |
| Avonex Opportunity | 781 | 998 | 368 | 92 | 2,239 |
| Avonex Risk | 593 | 1,011 | 452 | 117 | 2,173 |
| None* | 17 | 81 | 45 | 0 | 143 |
| Total | 2,038 | 2,642 | 1,041 | 279 | 6,000 |

*None = "Exception" physicians identified by ABMs that are Kaiser, VA/DoD, etc. writers with total volume not fully reported in available data.  The ABMs designated the Volume Segment.

18

biogen idec

56.     The primary goal of paying doctors was to preserve existing market share. Given that every new patient placed on a Biogen MS drug could generate between $30,000 to $70,000 per year for an indeterminate number of years, Biogen further knew that losing even a small percentage of a high writer's prescription share could cause significant revenue loss.  For example, losing just a 2% market share of a key account who placed 500 patients on IMA therapy would translate to an annual loss of 10 patients and more than $300,000 in lost annual revenue.  It was imperative not to allow such a neurologist to transition even a small percentage of his patients from Avonex's weekly intramuscular injections to an oral medication or subcutaneous injection.

### E.      Biogen Uses Kickbacks to Secure its Market Position

57.      It is an open secret that drug companies have routinely used disguised payments to physicians to induce the doctors to prescribe their drugs over those of a competitor.  Under the guise of providing "consulting services," for example, drug companies have frequently provided high-level prescribers all-expenses-paid junkets to expensive resorts where they might attend a program presented by the company while enjoying the sunshine and cuisine.  No *bona fide* effort would be made in these trips to actually obtain the opinions of the "consultants," despite the considerable expense paid, supposedly, to obtain such advice.  There was no question that such largesse was doled out in order to induce prescriptions of Biogen products, a clear violation of the Anti-Kickback Statute.

58.      In recent years, enforcement of the Anti-Kickback Statute has increased, and pharmaceutical company guidelines have closed down the most egregious violations.  But the fact remains that the easiest way to acquire brand loyalty is to purchase it.  For years, Biogen engaged in marketing programs that had no real corporate purpose other than to distribute money to high-level prescribers with the expectation that the physicians would express their gratitude by placing their patients on Biogen's biologicals.

59.      Biogen's kickback strategy focused on two types of payments:  (1) payments for consulting programs, and (2) payments for promotional speaking engagements, which included both payments for speaking and payments for receiving training on how to speak.  Both forms of payment served no other corporate purpose

than to distribute cash to physicians.  Biogen scheduled consulting and speaking engagements at an unnecessarily high frequency.  Given the small number of neurologists that treat MS, Biogen could have conducted legitimate consulting and promotional events for much less money.  Put another way, the company would never have authorized such massive outlays of cash if the money had gone directly to people other than the prescribers of its MS drugs.

60.     Biogen's kickback strategy was approved at the highest levels of corporate headquarters.  On several occasions, the strategy was confirmed and reaffirmed by Tony Kingsley, former Senior Vice President of Commercial Operations, and Executive Vice President.  Mr. Kingsley left Biogen in October 2015.

### 1.     Biogen Conducts Hundreds of Sham Consulting Events

61.     The voluntary guidelines that the pharmaceutical industry adopted in 2006 prohibited drug companies from making excessive payments to physicians and required the companies to receive some feedback or advice when they paid physicians to act as "consultants."  These measures may have eliminated the worst abuses, but they did not, and have not, stopped expenditures that are made solely for the purpose of putting cash into physicians' hands to induce future prescriptions.  Although window dressing may have been added to make Biogen's payments appear to be consideration for traditional consulting services, in reality any consulting arrangement was a sham: the payments purchased advice that was not needed and never used.  Biogen's consulting arrangements at all times were a pretext for kickbacks.

62. The ostensible purpose of the consultant meetings organized by Biogen was to obtain market research regarding physicians' use of its MS products. Biogen maintained a permanent Market Research department whose work was vital in shaping the marketing and sales campaigns that Biogen conducted. But the consultant meetings were not organized, monitored, or even requested by the Market Research department. The physician consultant meetings were initiated and administered by the Regional Marketing department. Relator Bawduniak was the Director of this department between November 2009 and February 2011.

63. As the Director of Regional Marketing, almost 50% of Bawduniak's efforts were devoted to the physician consultant meetings. Consultant meetings were not initiated because Biogen required physician input on specific inquiries. Instead, senior marketing officials decided how many meetings (and how much money it wanted to pay out to doctors) and the Regional Marketing Department was expected to come up with topics and programs. In other words, it was not the need for consulting that drove the process; it was the need to direct cash to physicians who could initiate new prescriptions. The 2010 RSMM Strategic Plan instructed marketing personnel to "drive the meetings that seek feedback." In other words, the meetings—and the payments to physicians that necessarily accompanied the meetings—were more important than any product generated by the meetings.

64. Bawduniak, like prior directors before him, came up with the subjects for the consulting meetings on his own, without any input from Market Research or the marketing managers of the two drugs. His superiors told him the number of programs

the company wanted to hold and how many physicians it wanted to have in
attendance, and he and his staff determined what matters might require consultation.

65.     In theory, Biogen's Compliance Department was supposed to prevent the
abusive use of consultant meetings.  In reality, it was nothing more than a rubber
stamp.  Its requirement for an annual consulting plan, which would have blocked the
proliferation of obviously duplicative consultant meetings, was ignored.  So too were its
concerns that there were too many consultants attending too many meetings.  Examples
of the routine circumventing of Compliance are detailed below.

66.     The only area where Compliance succeeded was in requiring that the
feedback received at these so-called consultant meetings was recorded.  But Compliance
could not require anyone to read or use the opinions, and no one within the company
did.  At the conclusion of each program, a Biogen employee duly summarized the
opinions and an Executive Summary was generated and circulated by rote.  But the
market research generated by these programs had no effect on Biogen's marketing; the
marketing plans for the foreseeable future had already been drafted and were not
affected by the results of the consulting meeting.  Only once or twice did anyone ever
acknowledge that they had received reports from the consulting meetings, much less
use them.  The fact that Biogen spent millions of dollars every year on physician
consulting meetings but never used the product of the meetings is further evidence that
their sole purpose was to be a vehicle to get payments to prescribers.

67.     The selection process Biogen employed to determine which neurologists
would be its paid consultants confirms that the purpose of these programs was to

benefit high prescribers who could direct hundreds of patients to Biogen's MS products.

If the true purpose of the consultant meetings was to obtain information from

knowledgeable practitioners, the most experienced and insightful neurologists would

have been chosen, with teaching hospital physicians likely being overrepresented in the

sample.  But the attendees were almost uniformly the highest volume prescribers.  And

although they were not supposed to have any influence in the selection, in reality senior

sales representatives exerted substantial influence over who would be invited to attend

the meetings.

68.     The physician attendees were aware that the purpose of these meetings

was to pay doctors in exchange for brand loyalty.  An email from a Biogen sales

representative, reporting the concerns of Dr. Robert Giombetti, a neurologist from

Marina Del Rey, California, makes this clear. Dr. Giombetti was "one of our good

doctors" and "our friend."  He wanted to let Biogen know that it "was falling behind on

competitiveness in both number of consultant meeting [sic] held annually and

honorariums paid."  Moreover, Biogen's competitor, Teva, was paying his nurse to

attend meetings twice a year (including one in New Orleans) and was also paying them

both to attend monthly dinner consultants' meetings.  Dr. Giombetti helpfully informed

Biogen of the amounts he was receiving from Teva to attend all of these meetings.  The

not so subtle subtext of Dr. Giombetti's warning was that if Biogen did not match what

Teva was paying, it would lose prescriptions.  As will be discussed below, especially in

connection with the challenge faced by the entry of Gilenya, Biogen had no intention of

allowing that to happen.

69.     Sham consulting meetings were not the brainchild of any of the Relators. For years Biogen had held an annual national consultants' meeting where Biogen invited roughly 200 of its top prescribers to warm weather resorts in places like Miami and San Diego in the middle of winter.  These annual meetings were nothing more than junkets for Biogen's most loyal and lucrative "customers."   The event was highly suspect in an era of enhanced kickback enforcement and there was pressure within Biogen to discontinue the practice.  However, once Biogen decided to implement its strategy to preserve market share through widespread kickbacks, Biogen continued holding them. In 2009 and 2010, despite having recognized that the annual meeting was an indefensible kickback that should be discontinued, Biogen nonetheless invited 200 consultants to a lavish resort, and paid each of them approximately $6,500 each, in addition to hotel, meals, and airfare for the minimal "consulting" provided. Unsurprisingly, just about all of the invitees were either "key accounts" or "high" prescribers.

70.     As the launch of Novartis's Gilenya approached, Biogen saw consultant meetings as key "blunting tactics" to minimize the loss of market share to the new oral medication.  Bawduniak was personally informed by Tony Kingsley, the Senior Vice President of Commercial Operations, that physician consultant meetings would be an important tactic to maintain Biogen's market share in the face of a formidable market entry.  Kingsley wanted Bawduniak and his staff to set up an unprecedented series of consultant meetings across the country that would allow Biogen to pay as many physicians as possible.  Kingsley told the Relator that the purpose was "keep all key

customers busy" during the Gilenya launch. "If customers are busy attending our programs they will not be able to attend the competition's programs." Moreover, if Biogen was paying them to attend lavish conferences, the attendees would be less inclined to switch their patients off of Biogen medications.

71.     Legitimate market research only requires a small number of participants, particularly when the market is as small as the one Biogen served: the 6,000 neurologists who prescribed the vast majority MS medications. Guidelines from the Office of the Inspector General warned firms that consultant meetings with numerous consultants (such as Biogen's annual national consultant meeting) were suspect. But there was no explicit rule against a drug company holding the same type of consultants meeting on multiple occasions in multiple locations. Thus while a single meeting with 150 consultants was generally impermissible, nothing prohibited Biogen from inviting 150 physicians to 10 different meetings held in 10 different locations, with each meeting hosting only 15 invitees. And by holding the meetings across the country it was easier to spread the payments out geographically. This is precisely the type of program that Biogen set up in 2010 to blunt the Gilenya market entry.

72.     For example, in the fall of 2009 Biogen scheduled an MS Franchise Feedback Consultant Meeting for 15 physician attendees. It then repeated the event in 11 additional locations, expecting to pay 180 neurologists in total. In the first and second quarter of 2010, the Relator designed a General Community Neurologist Consultant Meeting for 5-10 consultants. However, it was repeated 24 times, with Biogen seeking to pay as many as 240 community neurologists. A Nurse

Practitioner/Physician Assistant Consultant Meeting was designed by the Relator for 5-10 consultants.  It was repeated in 23 locations.  The most expansive program was the Risk Benefit Decisions Consultant Meeting held in the 2nd and 3rd quarters of 2010.  It sought 140 to 280 consultants for 28 meetings in 28 locations.  And two months after it was approved, Relator Bawduniak sought approval for another 3 meetings and to raise the total of consultants to 310.  The expansion was also approved.

73.     None of the feedback from any of these meetings was ever used by Biogen.  After an Executive Summary was prepared, no one expressed any interest in the opinions of Biogen's expensive consultants.

74.     Physician consulting programs had to be approved by Biogen's Compliance Department, which was supposed to ensure that Biogen complied with all applicable federal statutes and regulations, including the Anti-Kickback statute. Compliance regularly expressed reservations regarding Biogen's physician consultant meeting programs.  For example, in response to the proposal to host 24 General Community Neurologist Consultant Meetings, Compliance warned that Marketing "should consider if 24 meetings are required to meet needs."  It also realized that it "(a)ppears that intent is to invite all community neurologists, in area. . . ."  When Regional Marketing sought approval to retain 280 consultants in connection with its proposal to hold 28 Risk Benefit Decisions consultant meetings, Compliance warned:

> Request is for a <u>very high</u> # of HCP consultants (up to 280) + meetings (28). Policy states that only the minimum # of consultants necessary shall be employed.  Strongly recommend that approver consider whether this need can be met w/ fewer consultants + mtgs. (emphasis in original).

75.     As the note above indicates, although Compliance could make recommendations and notify management of the consequences of paying kickbacks, Compliance did not ultimately decide whether the programs would go through.  The person who told Bawduniak to set up the programs, Tony Kingsley, was the "approver," who decided whether the consultant meetings would be held.  And Kingsley, time and again, approved the proposed programs regardless of Compliance's express reservations.

76.     Thus, in March 2010 and May 2010, respectively, Kingsley approved the General Community Neurologist consultant meetings and the Risk Benefit Decisions Consultant Meetings.  In July 2010, when Regional Marketing sought to expand the Risk Benefit Decisions series to 31 meetings using as many as 310 consultants, Kingsley approved the payments again, despite Compliance's comment that "Request is for a very high # of HCP [Health Care Provider] consultants overall."  For several other programs Compliance strongly recommended that the "approver" and the "submitter" reconsider whether the need could be met with fewer consultants.  But such reconsiderations never occurred and the programs were routinely approved, usually by Kingsley.

77.     In addition to the high number of consultants and meetings, Compliance frequently raised other concerns.  For example, Compliance questioned whether it was possible to hold a "New Therapy Entrant Strategy" consultants meeting with 25 consultants in late July 2010 and have "enough time to apply the feedback obtained at

this meeting to slide decks to be used at upcoming speaker training mtgs in August."
Kingsley ignored this concern and approved the meeting.

78.    In 2011, Compliance's Amy Zahler also raised concerns that many of the
consultants for the Global Thought Leader Consultant Meeting "are frequently utilized
by various depts… [and] may have provided recent feedback on similar topics." The
concern was that Biogen was "soliciting duplicate feedback at this meeting." But Zahler
took no action to determine whether such duplication took place, leaving it instead to
Marketing to worry about such details. Marketing, of course, was not troubled by this,
since the goal of increasing consultant meetings required that consultants get paid to go
to more than one meeting per year. Francisco Granata, Biogen's Executive Vice
President of Global Commercial Operations, approved the meeting.

79.    A final example is the duplicative and balkanized speaker training.
Rather than simply training speakers in one fell swoop, Biogen found ways to make
speaker training a full time activity. There were national speaker training meetings and
regional speaker training meetings, and Avonex speaker training meetings and Tysabri
speaker training meetings. In July 2011, Amy Zahler was asked to review a regional
Avonex speaker training meeting with 75 consultants. She worried about the "public
perception" of the excessive and fragmented speaker training, having just reviewed a
proposal to train 75 consultants to speak on Tysabri, as well as a proposal to train an
equivalent number of national speakers for both drugs. Zahler expressed concern that
there was "potential duplication of content at this meeting" and asked "whether [it is]
necessary for HCPs who are speakers for both Avonex and Tysabri to attend both

meetings." Marketing VP Andi Bruell ignored these concerns and approved the consulting event.

80.     Pursuant to its kickback strategy, Biogen held close to 100 consultant meetings each year—so many that the selected neurologists frequently consulted more than once, usually on nearly identical topics. To combat Gilenya's market entry in 2010, Relator Bawduniak increased the number of consultant meetings over those held the prior year by 280%. In those meetings, Biogen paid 864 physicians to "consult," paying a total of $4.7 million in consulting fees, in 1,625 separate payments. The average single consulting fee was $2,900 and the average doctor attended nearly 2 meetings.

81.     Biogen used consultant meetings as part of its blunting tactics to combat the launch of Gilenya. In 2010, Biogen identified prescribers of their drugs who it believed were at the highest risk of placing patients on Gilenya (which Biogen frequently abbreviated as FTY) within a year. On August 19, 2010, Biogen's Business Intelligence Department circulated a "Top 50 At Risk MDs" spreadsheet, which contained a list of 50 high volume prescribers that the company believed were most likely to adopt Gilenya. Marketing began to focus attention on how to maintain these critical accounts as Biogen prescribers.

82.     On September 2, 2010, the Director of Avonex Marketing, Lisa Hickey, sent Bawduniak and other senior marketing officials an email referencing the Top 50 At Risk MDs spreadsheet and informing the recipients that "TK (Tony Kingsley) has asked us to pull together a holistic view of our engagement with this group." She asked the marketing officials to determine how many of the listed high prescribers "have

participated in our consultant/steering committee meetings," and wanted to know from Bawduniak what types of programs the targeted doctors had attended.

83.     Ten days later, Hickey sent Bawduniak a second email containing a new spreadsheet setting forth the Top 50 At Risk MDs.  Hickey wanted Bawduniak to provide "all the activity we have against these HCPs [health care providers]," letting her know which doctors had attended local consultant meetings, and which doctors were slated to receive speaker training in the next 60 days.  She also wanted to know what activities the Bawduniak's staff was planning for each doctor on the list.  Shortly thereafter the Bawduniak received an email from his own boss, Bill Ames, asking him to also identify which doctors on the Top 50 at Risk list had attended a consultant meeting.

84.     On September 15, 2010, Bawduniak met with Bill Ames to discuss the requests he had received from Ames and Hickey.  In the meeting Ames admitted that the "holistic approach" senior management was considering was to target important prescribers whose business Biogen did not want to lose and to pay them to attend meetings with the hope that such treatment would influence them to keep prescribing Avonex and Tysabri.  Ames confirmed that the spreadsheets Hickey sought from the Relator were to be used to track the payment opportunities being offered to the Top 50 At Risk MDs and to ensure they were receiving opportunities to receive payments from Biogen.

85.     Bawduniak knew that providing a list of completed and anticipated payments to major prescribers who the company had identified as priority accounts would constitute evidence of unlawful payments for the purpose of obtaining

prescriptions.  He warned Ames that the existence of such lists would raise serious compliance problems.  Bawduniak also contacted the Compliance Department and asked "hypothetically" if such information was requested from a senior executive would it be proper to provide it.  He was informed that the "hypothetical" requests violated two of Biogen's compliance policies: one which prohibited any "agreement with an individual with the intent of, directly or indirectly, implicitly or explicitly, influencing or encouraging the recipient to purchase, prescribe,  (or) sell . . . any Biogen Idec product or to reward any past such behavior"; and a second that "strictly prohibited" Biogen employees "from completing return on investment analyses or from other tracking of business in connection with a Consultant Meeting."

86.     Bawduniak informed Hickey and Ames that providing the requested information would make it clear that Biogen was making payments for prescriptions.  Hickey, in particular, still pressed for the requested information and found it from sources other than Bawduniak.

87.     In February 2011, Bawduniak was removed from his position as Director of Regional Marketing and given his current position as a Thought Leader Liaison.  The new position was a distinct demotion, and Bawduniak no longer had any direct reports or line responsibilities.  Bawduniak had received excellent reviews as the Director of Regional Marketing.  Biogen demoted him because it no longer viewed him as a team player and viewed him as being more concerned with compliance than generating profits for Biogen.

88.     When it came time for Biogen to promote its own oral treatment for MS, Tecfidera, it continued to use sham consulting meetings to pay doctors for brand loyalty.  In 2011, more than a year before Tecfidera was approved for use by the FDA, Biogen knew that two sets of clinical trials involving the drug, DEFINE and CONFIRM, were yielding better than expected results.  Biogen wanted to publicize those results and prime the market for immediate adoption once the drug was approved.  However, Biogen could not promote Tecfidera before it was approved as such conduct blatantly violates the Food Drug & Cosmetic Act.  Biogen had to find a method of publicizing results without appearing to engage in promotion.

89.     Art Enk, the Senior Director of Tecfidera Marketing, and Deb Glasser, the Associate Director of Tecfidera Marketing, were dedicated to making Tecfidera as successful a launch as possible, regardless of the cost.  Both believed that the long term success of the Tecfidera brand depended on prescribers immediately adopting Tecfidera as the MS drug of choice once FDA approval had been granted.  Biogen's upper management, including Tony Kingsley, shared Enk and Glasser's belief there would be absolutely no recovery from a slow start for Tecfidera.  Biogen was determined to do everything possible to guarantee the drug's success, including engaging in the illegal payment of kickbacks to prescribers to drive up Tecfidera prescriptions.

90.     Biogen developed the "HCP [health care provider] Engagement Program" as its primary weapon to ensure Tecfidera's success.  Masquerading as a program to gather feedback on the Tecfidera trials from neurologists around the country, the HCP

Engagement Program was in reality a vehicle through which Biogen funneled payments

to physicians.  In fact, Biogen internally used the term "engage" synonymously with

"pay" when referring to "physician engagement."

91.     Biogen hired Relator Fernando Villegas in November, 2011 as the Senior

Product Manager for the Tecfidera marketing brand.  In that position, Villegas' primary

responsibility was to run the HCP Engagement Program.  As part of this program,

Villegas was directed by Enk and Glasser to create a series of consultant meetings to

present the Tecfidera data to physicians who would serve and be paid as "consultants."

The true purpose of the consultant meetings and physician payments, however, was to

predispose each physician to place as many patients on Tecfidera as possible when the

drug was ultimately approved by the FDA.

92.     There was a process to holding a consultant meeting.  Villegas would first

work with the his marketing team and create a Needs Assessment Form that would be

submitted to Biogen's Compliance Department for approval.  A Needs Assessment

Form is an internal Biogen document that is supposed to provide written explanation of

the Legitimate Business Need for consulting meeting and provide additional

information including consultant selection criteria, meeting location and number of

attendees.

93.  Biogen's Tecfidera marketing team was very careful when communicating with

the Compliance Department.  Concerned about creating a paper trail that could alert

government inspectors to the true nature and purpose of the consultant meetings,

Villegas' superiors, Art Enk and Deb Glasser, explicitly instructed Villegas and his

marketing team to use extreme caution in communicating with Compliance regarding the consultant meetings.  Nearly all communication between the Tecfidera marketing team and the Compliance Department regarding the Needs Assessment Forms and consultant meetings were done over the phone.

94.     Nereyda Garica, Biogen's head of compliance, also directed her Compliance co-workers to exercise caution about communicating in writing regarding the consultant meetings and Needs Assessment Forms.  Expressing concern over the sheer number of consultant meetings the Tecfidera marketing team sought approval for, Garcia told Villegas that it was "necessary to keep a clean paper trail when discussing physician engagement relative to consultant meetings."  Garcia informed Villegas that never before had Biogen sought approval for so many consultant meetings for one drug.

95.     During the telephone conversations with Compliance, a compliance manager would instruct Villegas or another member of the Tecfidera marketing team on the particular terminology that should be included in the Needs Assessment Form to withstand scrutiny from government inspectors.

96.     Despite concerns over the number of consultant meetings, the Compliance Department did not exert much influence over whether or not a consultant meeting would take place.  Compliance routinely rubber stamped Needs Assessment Forms for consultant meetings and, in the rare event that Compliance did raise an issue with a purported need for a consultant meeting, Enk, Glasser, and the Tecfidera marketing team simply went above the Compliance Department and were granted approval by a

more senior commercial executive.  Following compliance's approval of a Needs

Assessment Form, Villegas would deliver the form to Kingsley or Joe Ciaffoni for final

approval.  Neither Kingsley nor Ciaffoni ever raised any questions about the requests

made in the form; it was rubber stamped and was always approved quickly.

97.     The Tecfidera marketing team began planning the consultant meetings in

November 2011, and submitted the required Needs Assessment Forms to Compliance

for approval.  On November 4, 2011, Douglas Gill, a Thought Leader Liaison for

Biogen's US Marketing Department, submitted a Needs Assessment Form to Biogen's

Compliance Department seeking authorization to pay 96 high prescribing physicians to

attend six regional consultant meetings.  The Needs Assessment asserted that Biogen

needed to obtain the consultants' perspective regarding the DEFINE clinical data, what

a Tecfidera Treatment Algorithm would look like, feedback on Biogen's theory of the

mechanism of action of Tecfidera, what commercial activities would assist a successful

launch, and to determine whether there was any regional differentiation in response to

Biogen's data.

98.     All of these grounds were pretextual.  With regard to the first three

reasons, none of the "consultants" had any experience with the unapproved drug, and

the only information they had received had come from Biogen—any "consultation"

they would provide would solely be a regurgitation of marketing materials they had

received from Biogen.  As to whether the "consultants" could identify commercial

activities that could assist a successful launch of Tecfidera, Biogen had an entire

marketing department with special (and extensive) expertise in the successful launch of

MS medications—Biogen did not need to retain dozens of physicians with absolutely no marketing qualifications to learn about commercial launch applications.  Similarly, due to its extensive experience in the field, Biogen already was well versed in any differences between marketing to community based practitioners and those centered in teaching hospitals, or any regional distinctions.  Indeed, the Needs Assessment Form sheepishly acknowledged that there may be no regional distinctions—a fact already well known to the professional marketers at Biogen.

99.     Notwithstanding the lack of any objective need to pay some of its most important customers to hear about a new product that could not legally be promoted, Biogen's Compliance Department approved the request to retain 96 consultants.  On November 14, 2011, Amy Zahler approved the request to retain consultants.  She acknowledged that the "(t)otal number of consultants is significant at 96 HCPs," and urged the Tecfidera marketing team to "(c)onsider whether need can be met w/fewer." The concerns were never addressed and approval was granted.  Biogen held six regional consultant meetings relating to the DEFINE clinical studies in Atlanta, Chicago Dallas, Detroit, New York and San Francisco between February and March 2012.

100.    Throughout the first quarter of 2012, Art Enk, and Deb Glasser, constantly pushed Villegas to "increase the number of HCPs at the consultant meetings."  When Villegas expressed concern with increasing the number of "consultants" to an unmanageable number at the meetings, Enk and Glasser explained that it was Villegas' job to make sure that HCPs were comfortable enough with the trial data so that they would quickly prescribe Tecfidera once the drug had been approved.

101.    In May and June 2012, Villegas and the Tecfidera marketing team conducted a similar set of regional consultant meetings in connection with its efforts to publicize the positive results of the CONFIRM clinical studies.  Although the results of CONFIRM were comparable to the DEFINE results, Biogen claimed that it required the insight of another 96 "consultants" on the same issues that were the focus of the DEFINE consultant meetings.  As with the DEFINE Regional Consultants Meeting, Biogen once again sought input from physicians about how they would utilize a drug with which they had no experience and about which they were wholly dependent on information provided by Biogen.

102.    Instead of making use of experienced "consultants" whose opinions Biogen coveted four months earlier, Biogen deliberately selected a new set of "consultants" for the CONFIRM meetings.  Thus, an additional 96 practitioners across the country were flown to luxury destinations across the country and paid thousands of dollars to hear Biogen speakers publicize a drug they could not legally promote.  The CONFIRM regional consulting meetings were held in Charlotte, Chicago, Dallas, New York City, Orlando and San Francisco.  And, as with the DEFINE meetings, the information the consultants provided did not effect, and could not effect, the marketing programs Biogen has already designed for the anticipated launch of Tecfidera. Throughout the first half of 2012, Villegas and his team built consultant meetings around presenting the DEFINE and CONFIRM data to as many neurologists as possible.  The Tecfidera team carefully selected the individuals who would be invited to the consultant meetings.  The doctors invited to the DEFINE and CONFIRM consultant

meetings had no special expertise in marketing or the technical topics that were allegedly the subject of the meetings.  Instead, the selected physicians were identified by the TLL team based upon their ability to prescribe large quantities of Tecfidera. Non-Biogen loyalists that the TLL team deemed as "targets of influence" were also selected to attend the consultant meetings, particularly high prescribers of Biogen competitor Copaxone.  Biogen paid these prescribers to attend and presented data illustrating the superiority of Tecfidera to Copaxone.  Through cash payments, Biogen hoped to convert Copaxone loyalists to Tecfidera loyalists, once the drug was approved.

103.    The doctors invited to the DEFINE and CONFIRM regional consultants meetings had no special expertise in marketing or the technical topics that were allegedly the subject of the consulting meetings.  Instead, the selected physicians were identified by regional sales personnel based upon their ability to either prescribe large quantities of Tecfidera or to influence their colleagues and other physicians to prescribe Tecfidera.

104.    In addition to paying for all travel expenses, each "consultant" was paid a substantial stipend to attend the meetings.  Not all of the consultants were paid the same amount.  Biogen classified physicians based upon criteria that measured their ability to influence the prescription of MS treatments.  Doctors who were thought to have the greatest ability to influence MS prescribing were paid the most, with lesser amounts paid to physicians who were deemed to have a lesser capability to drive prescriptions.  For example, Dr. Jeffrey Dunn was paid a "Consult Fee" of $5,720.00 for attending a Tecfidera consultant meeting held in San Francisco, CA on February 4, 2012.

Dr. Daniel Bandari was paid a "Consult Fee" of $6,600.00 for attending the same meeting, Dr. Charles Smith was paid $5,400.00 to attend and Dr. Harmeet Sachdev received $2,500.00 to attend the San Francisco consultant meeting.

105.    Similarly, Dr. Douglas Jeffrey was paid a Consult Fee of $6,600.00 to attend a Tecfidera consultant meeting in Atlanta, GA on the same date, February 4, 2012.  Areen Said was paid a Consult Fee of $3,750.00 to attend, and Mark Skeen received a Consult Fee of $7,920.00 for attending the same meeting.  Dozens of other prescribers were paid comparable fees to attend Tecfidera consultant meetings throughout the first half of 2012.  *See Exhibit 6.*

106.    The number of consultant meetings and the large amount Biogen paid its consultants to attend the meetings are further called into question in light of the "consulting product" Biogen was supposedly paying for.  At the conclusion of each Tecfidera consultant meeting, Consultant Evaluations were disseminated and filled out by each physician who attended the meeting.  The Consultant Evaluation, supposedly the consulting product Biogen had paid each "consultant" thousands of dollars for, was entirely worthless.  Consultant Evaluations asked physicians to rate Biogen's presenters, the hotel, and the food and beverage that Biogen provided.  Physicians' comments on the evaluations, when they were provided at all, were equally useless.  For example, the Consultant Evaluations from the Tecfidera CONFIRM consultant meeting that was held in Chicago, IL on June 29, 2012, included consultant comments such as "very nice meeting, great day!" and "A Very Good Meeting to Attend!".  The majority of the Consultant Evaluation forms from the Chicago consultant meeting were

left blank.  The nature of the comments provided in the Consultant Evaluation forms from the June 29, 2012 consultant meeting are representative of the type of feedback "consultants" provided to Biogen at all of the Tecfidera consultant meetings.  Biogen never had any intent to use the "consulting" it received from consultant meetings in developing its Tecfidera marketing program and never, in fact, used it for that purpose.

107.    Biogen hired the medical communication agencies to condense the Consultant Evaluations into Executive Summaries from each consultant meeting.  Although the Executive Summaries were supposed to be used by Biogen for internal marketing purposes they never were.  First, as discussed above, the Consultant Evaluations on which the Executive Summaries were based contained no useful information at all.  Second, regional marketing plans did not exist at Biogen, and national marketing plans had already been developed months in advance - the consultant meetings and Executive Summaries were far too late to alter them.

108.    Nevertheless, Biogen continued with the practice of generating useless Executive Summaries.  Biogen exercised caution in how the Executive Summaries were generated and what information was included in them.  Villegas would meet with the medical agency firm to go over the Consultant Evaluations before the company emailed him a draft of the Executive Summary over Biogen's network.  Villegas was directed to dictate verbatim what needed to be in the Executive Summaries before a draft was produced to justify the program.

109.    Villegas eventually complained to his superiors that there were virtually no differences in physician feedback from one meeting to the next to justify continued

utility of the programs, and questioned how helpful the physician feedback really was to Biogen. Enk and Glasser responded by telling Villegas - "this is our time to detail these physicians on the product [Tecfidera], it is a captive audience that we are paying to sit and listen to us." The Consultant Evaluations and Executive Summaries were merely "compliance theatre," and no one at Biogen ever looked at either document for marketing purposes.

110.    In the second half of 2012, Biogen continued holding sham Tecfidera consultant meetings. For example, on October 4th and 5th, 2012, Biogen held a Tecfidera consultant meeting in San Francisco, paying twenty physicians as consultants. The Needs Assessment Form, submitted to Compliance on July 17, 2012, notes that the purpose of the consultant meeting "is to obtain feedback from KOL consultants on some of the proposed marketing messages…to be used to market" Tecfidera. The reviewing compliance manager was Amy Zahler. Her note states that "feedback must be documented & utilization of information must be shown/demonstrated." The only documentation generated from the consultant meeting were the Consultant Evaluations and Executive Summary – which were useless to Biogen other than giving the appearance that the consultant meetings had a legitimate purpose. Biogen held a similar consultant meeting in Atlanta, GA on October 18-19, 2012, during which thirty-six consultants were paid to consult on proposed marketing messages. The large Consult Fees attending prescribers were paid to attend these meetings can be seen in the spreadsheet, attached as *Exhibit 6*.

111.     At the end of 2012, as the FDA approval date for Tecfidera drew near,

Villegas was asked to create consulting meeting plan for 2013.  Villegas met with Enk

and Glasser and proposed a total of five Tecfidera consultant meetings.  Enk and

Glasser rejected Villegas' plan, blatantly telling him that five consultant meetings were

not nearly enough.  When Villegas questioned why more consultant meetings were

needed and pointedly asked whether Biogen ever planned on using any of the

"feedback" it received from its paid consultants, Enk and Glasser informed Villegas that

he was to increase the number of consultant meetings to "shore up support and build

demand for the HCP community to ensure a successful launch for the [Tecfidera]

brand."  Enk and Glasser told Villegas that a larger number of consultant meetings were

necessary to "create surround sound" to "keep the noise going so as to engage as many

doctors as possible."  The subtext to Enk and Glasser's comments was clear: hold as

many consultant meetings and pay as many physicians as possible to increase the

number of Tecfidera prescriptions.

112.     Enk and Glasser directed Villegas to increase the total number of

consultant meetings from 5 to 22.  Tecfidera consultant meetings continued right up

until the drug's approval date.  For example, on December 10, 2012, Villegas presented

a Needs Assessment Form to Compliance for a consultant meeting that was to be held

in Atlanta, GA on February 1, 2013.  The consultant meeting was approved and fifteen

physicians were paid as consultants to attend.  Joel Greenberg was paid a Consult Fee

of $3,750.00 to attend the Tecfidera consultant meeting in Atlanta, and William Stuart

received a Consult Fee of $4,400.00 to attend the same consultant meeting.  In addition

to cash payments, Biogen provided all of the physicians with meals and covered the cost of hotels and travel expenses. On February 8, 2013, the same consultant meeting was presented to another set of fifteen physicians at a west coast location. From 2011 through 2013, Biogen held 46 Tecfidera consultant meetings and speaker program/training events – making over 1,000 individual payments to HCPs for attending the events.

113.    Executing the consultant meetings became increasingly difficult for Villegas as the number of meetings increased. The Consulting Evaluations repeatedly failed to produce any useful or insightful information and Villegas struggled to create Executive Summaries that looked at all different from one consultant meeting to the next. Villegas approached management and expressed his concern that the information in the Executive Summaries was duplicative and not useful to Biogen. Villegas was told by Enk that it was okay if the end of meeting documents contained "information that we already know," – which was a direct contradiction of the purported purpose of the meetings. Glasser and Enk reiterated to Villegas the importance of ensuring that prescribers were "keeping patients in the warehouse" in anticipation of Tecfidera approval. Biogen's Tecfidera team frequently used the term "warehouse" to refer to patients that were waiting for Tecfidera to be approved before either starting an MS treatment or switching medications. Biogen sales reps would routinely ask prescribers the number of patients the prescriber had in his warehouse. The physicians who had the most patients in their warehouse were given preferential treatment – which included receiving larger cash payments.

114.     Tecfidera launched on March 27, 2013, and the uptake was very fast. Physicians were prescribing Tecfidera at such a fast rate that Biogen had trouble keeping up with the demand for the drug.  Shortly after launch, however, Biogen began receiving negative feedback associated with the drug's side effects – particularly gastro-intestinal ("GI") issues a number of patients were experiencing.  Biogen worried that the incidence of side effects could have a negative impact on the number of prescriptions written.  Biogen again relied on consultant meetings to induce physicians to write Tecfidera prescriptions.  Villegas was directed to plan consultant meetings to reassure prescribers.

115.     Biogen continued to run sham consultant meetings throughout the summer of 2013.  In August, 2013, Villegas met with Glasser to discuss the consulting meeting plan for the second half of the year.  During the meeting, Villegas objected to the number of consultant meetings that were being held, particularly since it was post launch and Biogen could not possibly be incorporating new feedback it had learned from the meetings, since the prescribers were just now getting commercial experience with the product.  Villegas told Glasser that he was uncomfortable with being asked to continue to use consultant meetings as a way to push Tecfidera to potential prescribers. Glasser told Villegas that "this is what it is like when you are on a launch brand" and "we question your commitment when you say things like this."  Villegas felt threatened by Glasser's comments and continued to follow his supervisor's instructions even though he questioned the legality of the consultant meetings.

116.    In September 2013, marketing was re-organized and Villegas was abruptly and without warning placed on another brand, Plegridy, a drug that was destined to struggle for commercial relevance.  He was told that he was being transferred to Plegridy because of his launch expertise.  It was clear to Villegas that he was removed from his position in retaliation for his continued questions and complaints about improper marketing tactics being used by Biogen.

117.    The purpose of the consultant meetings and the reason so much was spent on each consultant was to predispose each consultant to place as many patients on Tecfidera as possible when the drug was ultimately approved by the FDA.  In other words, the payments were kickbacks designed to influence each of the consultants to prescribe Tecfidera as soon as it was available.  Each of the health care providers participated in the Medicare program, and on information and belief, each of the health care providers prescribed Tecfidera to at least one Medicare patient within the first three months of Tecfidera being approved for use in the United States.

**2.**    Biogen's Use of Sham Speaking Payments

118.    The second mechanism Biogen employed to get payments to important prescribers was to pay physicians for speaking on behalf of the company and for receiving training to become a speaker.  Recognizing the value of peer-to-peer selling, drug companies have traditionally employed physicians to give presentations regarding their products at dinner meetings and other gatherings.  The physician attendees receive a good meal at a high end restaurant and the speaker receives payment for his time.  In order to qualify to speak at such engagements, the physician

must receive speaker training from the company.  The speaker attends a weekend presentation at a major metropolitan center and is provided with first class meals and accommodations.  The speaker is also paid for attending the training class.

119.   Like consulting payments, speaking payments are permitted only if they are reasonable and do not further a kickback motive.  But Biogen knew that even if the FDA or other authorities detected an increase in the number of Biogen's speakers, the regulators would be unable to discern whether the number was unreasonable.  Training speakers and sponsoring promotional speaking events were routine activities for pharmaceutical companies and hardly subject to any oversight.

120.   By 2008, however, Avonex had been on the market for twelve years and all MS practitioners were well acquainted with it.  Although Tysabri was newer, it too was a mature drug that had been on the market for several years and was well known to the industry.  To the extent neurologists still had an interest in learning about the uses and administration of either drug, Biogen had trained hundreds of speakers and could easily handle the demand for any events with their available resources.

121.   Yet despite the fact that there was little demand among neurologists for more promotional meetings and that Biogen already had more trained speakers than it could possibly employ, Biogen trained hundreds of new speakers on Avonex and Tysabri in 2009 and 2010.  This initiative was consistent with Biogen's goal of increasing consulting opportunities for physicians in order to blunt the market entry of Gilenya.

122.   Biogen could not just pay the physicians thousands of dollars to attend an all-expenses-paid weekend at a first class hotel in a major metropolitan area for nothing;

but it did the next best thing.  Notwithstanding that the cost to train each speaker was several thousand dollars, it only required speakers to appear twice on Biogen's behalf. And many speakers only had to speak once if the local sales force was unable to arrange a second engagement.  (Speakers were also paid in full if no one attended their event or if the engagement was cancelled within three days of the scheduled date, as was often the case).  Examples of such minimally utilized speakers include David Ewing (two talks in 2009), Richard LaFrance (one talk in 2009, one in 2010),  Tommasina Papa-Rugino (one talk in 2009), Kathryn Chenault (one talk in 2009, two in 2010), and Kenneth Pugar (two talks in 2010).

123.    Nor did Biogen get much impact for the one or two events at which the speaker actually presented.  Given the large number of speakers who had to present at least once, and the small demand for the promotional programs, most speakers spoke to miniscule audiences: frequently just one other physician.  And often times, this audience member was someone the speaker knew quite well, such as a junior colleague from his or her own office. Biogen would pay several thousand dollars to wine and dine two doctors and to have one doctor conduct a chat that could have just as easily been held in the physicians' lunchroom.  The value of such expenditures, however, was not from the information communicated to the audience member; it was the brand loyalty the speaker would exhibit after being paid to deliver Biogen's promotional message.

124.    Biogen also held an excessive number of dinner meetings.  In 2010, Biogen paid for 832 dinner meetings.  It paid 367 doctors to attend, meaning that the average doctor was treated to between two and three dinners in 2010.  Not counting the cost of

the meal, which was always at an upscale restaurant, the average fee to "speak" at one of these dinners was $2,500.  Biogen paid out $2.3 million in such speaker fees in 914 separate payments.

125.    A different gambit eliminated the physician attendee altogether.  Biogen also sponsored Patient Education Programs (PEP), where it paid doctors to speak to a room full of MS patients at a local hotel or community center. Biogen placed physicians into the PEP program who it believed did not have sufficient experience or expertise to educate fellow physicians.  Conducting a short program before patients was much less rigorous than speaking before peers.  In many ways, these PEP sessions were marketing programs for the inexperienced physicians, giving them a higher profile in the community and possibly attracting new patients.

126.    The PEP meetings served no purpose for Biogen that was legitimate.  If Biogen had wanted to fund patient outreach or education, it could have done so through any number of public and private organizations devoted to the cause. Biogen, however, knew that by assisting inexperienced physicians with marketing within their own communities, the neurologists would reward Biogen by prescribing its medications.

127.    Biogen hosted 557 PEPs in 2010.  It paid 456 physicians to speak at these events, paying $1.3 million in 748 separate payments.  On average, PEP speakers presented at one or two PEP programs a year.

128.    Biogen had separate training programs for Tysabri and Avonex, although most of the training overlapped.  Thus, if a physician wanted to talk about both drugs

in a presentation, he would receive two all-expenses-paid weekends and double the

training fee.  Biogen's Compliance Department noted the duplication of content in the

two training programs and questioned whether it was necessary for physicians who

were speakers for both products to attend both trainings.  But like most warnings from

Compliance, this caveat was ignored.

129.    After receiving Speaker Training, a physician was considered qualified to

speak for a year.  If the physician wished to continue to speak for Biogen, he either had

to attend another all-expenses-paid conference at a first class hotel in a major

metropolitan area or watch a 15 minute video that provided an annual update and

reminded the physician of FDA regulations regarding speaking engagements.  Speakers

were paid several thousand dollars to repeat the Speaker Training program (which did

not vary much from year to year).  They were not paid to watch the video.  Most

physicians who signed up for additional terms elected to be paid to take the training.

Had Biogen wanted trained speakers, instead of wanting to pay physicians for future

prescriptions, it would have required returning physicians to watch the video on their

own time.  The fact that Biogen happily paid numerous physicians thousands of dollars

to attend a program they had already experienced is further evidence that the purpose

of the program was to disguise kicking cash back to doctors.

130.    A particularly lucrative speaking opportunity usually reserved for the

highest volume prescribers was presenting at a consultants meeting or speaker training.

Practicing physicians familiar with Avonex and Tysabri were the lecturers who

instructed at these programs.  These doctors also received all-expenses-paid weekends

and substantial honoraria, but they only had to appear for their portion of the training. Making a presentation at these meetings was highly coveted.  In theory, it was in Biogen's interest to have new speakers or consultants trained by the best qualified physicians, but this opportunity was used by sales and marketing executives to extend kickbacks to unqualified physicians who agreed to prescribe Biogen's products.

131.    In connection with a consultant program held in 2010, Bill Ames and Mike Jones, who was the National Sales Director for the western half of the United Sates, required Jeff Ferrari to use an unqualified doctor as a key presenter.  Jeff Ferrari was an RSMM whose territory included Los Angeles.  The doctor was Darin Okuda, a Los Angeles doctor who prescribed Biogen products infrequently.  Because of Okuda's unfamiliarity with Biogen's products, Jeff Ferrari was concerned that he would give a poor lecture.  However, Ames and Jones considered Okuda to be a priority given that even his small rate of Avonex prescriptions was deemed to be "at risk" given the impending launch of Gilenya.  Ames and Jones believed they could preserve and even increase the quantity of Okuda's prescriptions if they provided him with lucrative speaking opportunities.  Moreover, the sales force knew that Okuda was shopping for a Ferrari sports car (most new models start at $200,000) and would appreciate the opportunity to receive income that would help him purchase it.

132.    Over Jeff Ferrari's strong objections, Biogen gave Dr. Okuda the engagement and paid a substantial honorarium.  The results worked out as Biogen predicted.  After the speaking engagement, Okuda placed a greater percentage of his patients on Biogen's products.  And not surprisingly, Biogen kept the lucrative

payments coming.  In fact, in just the first three months of 2012, Dr. Okuda has already earned $34,000.  Thanks to the increased generosity of Biogen, he was able to purchase his new Ferrari.

133.     Biogen's Tecfidera HCP Engagement Program also utilized excessive speaking engagements and speaker trainings as a way to funnel payments to physicians.  Biogen paid physicians significant cash kickbacks to speak at Tecfidera promotional events and to attend speaker trainings.  While running Biogen's HCP Engagement Program, Relator Villegas was in charge of planning and executing the Tecfidera speaker engagements.  Villegas and the Tecfidera marketing team submitted Needs Assessment Forms to Compliance for speaker programs and speaker trainings, following the same protocol they used for the consulting meetings.  The speaker program and speaker training Needs Assessment Forms greatly exaggerated the number of speakers the company needed for various Tecfidera events.  For example, on August 22, 2012, Villegas submitted a Needs Assessment Form to Compliance, which stated that Biogen "will need a cadre of speakers to conduct promotional programming across the US."  The purpose of the meeting was "to train HCPs who will act as faculty at two live national speaker training meetings."  The Needs Assessment stated that "2-6 [HCPs] will be used as faculty," yet the request was made for 24 HCPs to attend the training.  Compliance approved the request for 24 health care providers to attend the training, which took place in January 2013, with no questions asked.  Biogen covered all of the travel expenses for the health care providers who attended the meeting and paid them substantial cash payments – in the thousands of dollars - for attending.

134.    In 2013, the Tecfidera marketing team held two large Tecfidera speaker training meetings – one on the east coast and one on the west coast.  The goal of the meetings was to "engage" as many physicians as possible to generate more Tecfidera prescriptions.  The Neurology 2013 Ft. Lauderdale, FL Tecfidera Speaker Training East meeting was held on April 12, 2013 and attended by 144 health care providers.  The Neurology 2013 Scottsdale, AZ Tecfidera Speaker Training West meeting was held on April 19, 2013 and attended by 128 health care providers.  All of the health care providers were paid substantial fees for simply attending the meeting.  For example, Dr. Lily Jung Henson received $6,600.00 for attending the Neurology 2013 Scottsdale speaker training meeting and Dr. Todd Janus received $7,920.00 for attending the same meeting.  These examples are representative of the payment amounts Biogen made to physicians attending the speaker training programs.  Had Biogen really cared about gaining valuable feedback on Tecfidera, it would only have sought advice from the top physicians at the top teaching hospitals.  Instead, Biogen paid hundreds of physicians substantial amounts of money for the sole reason of purchasing loyalty to the Tecfidera brand.

135.    Biogen's Tecfidera marketing team devised different types of speaker programs to maximize the number of physicians it could pay in hopes of increasing the number of Tecfidera prescriptions.  As it had done with Avonex and Tysabri, Biogen paid physicians and other prescribers to attend local peer-to-peer promotional events.  The Tecfidera Launch Meeting Facilitator Guide, an internal marketing document created by the Tecfidera marketing team, called for at least 4 of these "offsite" peer-to-

peer speaker programs per territory in 2013.  "Offsite" speaker programs indicated that the program would be held over an expensive breakfast, lunch, or dinner and the speakers were paid thousands of dollars for their time.  The programs consisted of a 45-60 minute presentation by a paid physician-speaker at a restaurant.  10-15 other HCPs received free meals for attending the program. The Tecfidera marketing team instructed each ABM that every territory should invite approximately 41 unique health care providers in 2013.  Biogen defined unique health care providers as those who had not attended an offsite speaker event within the calendar year, and instructed its ABMs to limit repeat attendees at the speaker programs.  The reason for this was to pay as many prescribers as possible to maximize the number of Tecfidera prescriptions that were written.

136.    In late May 2013, Biogen implemented the Expert on Demand speaker program.  The Expert on Demand program was a high impact speaker program that enabled ABMs to offer their key customers a one-one-one meeting with a national or regional KOL.  The Expert on Demand speaker program targeted health care providers that were high prescribers of non-Biogen products.  Biogen paid the KOL significant amounts to meet with these prescribers and "educate" them on Tecfidera.  Purportedly an educational program, the true goal of the Expert on Demand speaker program was to drive HCP recruitment.  The Tecfidera Launch Meeting Facilitator Guide noted that "[p]rogramming should be accomplished ASAP in order to facilitate early adoption among HCPs."  Each region was allocated three Expert on Demand programs, but marketing noted that "[a]dditional programs may be 'flexed' to meet business needs."

It was telling that all of these speaker programs were coordinated and funded by Biogen's marketing department not the medical research department.  The recruitment of the KOL experts was done by the sales force.

137.    Villegas expressed concern about the legality of Biogen's Tecfidera speaker meetings to Curt Hoffman, an Associate Director of the Tecfidera Marketing team, as well as Art Enk.  Enk told Villegas "If there is a barrier, we'll help you tear it down."  Both Hoffman and Enk told Villegas to push forward with the speaker meetings as planned despite his legitimate concerns.  With the help of Enk, Glasser, and Hoffman, Villegas and his team pushed the speaker meetings through Compliance and were able to get them approved despite the unnecessarily large number of events and invitees.

### F.    Analysis of Biogen's Kickbacks

138.    The amount of money Biogen paid directly to doctors in 2009 exceeded $8 million.  That year it paid 820 physicians a total of $8.8 million in consulting and speaking fees.  The mean payout was $10,600 per physician, and the median payout was $3,300 per physician.

139.    In 2010, it expanded the breadth of its program, reaching even more physicians.  Biogen paid 1,200 physicians:  20% of the potential market for its product, and 40% of the group that controlled 60% of the market share.  It spent a total of $9.1 million in consulting and speaking fees.  The following chart shows the breakdown between consulting payments and speaker payments in 2010:



Average Percentage of Each Category



140.     In 2010, the mean payout was $7,500 per physician, and the median

payout was $2,800 per physician.  Average payouts to physicians, however, do not truly

represent what Biogen intended.  As noted above, Biogen stratified neurologists into

four groups based on their prescription volume:  key accounts, high prescribers,

medium prescribers and low prescribers.  It also categorized the 6,000 physicians into

four loyalty groups. Those already loyal to Biogen were "Avonex advocates," while

those trending towards Biogen were "Avonex opportunity." Those loyal to a competitor

were labeled "competitor advocates," and those trending away from Biogen were

labeled "Avonex risk."

141.     Thus, each prescriber within the top 6,000 was classified in accordance

with their prescription volume and their loyalty to Biogen.  Examining how Biogen paid

neurologists in the different categories is enlightening.

**Value to Biogen**

High ← Low

|  | **Avonex advocate** | **Avonex Risk** | **Avonex Opportunity** | **Competitor advocate** |
|---|---|---|---|---|
| **Key account** | $96,363<br>n=36 p=28<br>(78%)<br>$2.68 m | $42,329<br>n=111 p=79<br>(71%)<br>$3.34 m | $28,745<br>n=84 p=56<br>(67%)<br>$1.61 m | $22,706<br>n=32 p=21<br>(66%)<br>$0.48 m |
| **High volume** | $21,536<br>n=74 p=30<br>(41%)<br>$0.65 m | $14,503<br>n=427 p=157<br>(37%)<br>$2.28 m | $9,540<br>n=345 p=125<br>(36%)<br>$0.53 m | $9,686<br>n=88 p=27<br>(31%)<br>$0.26 m |
| **Medium volume** | $10,504<br>n=224 p=22<br>(10%)<br>$0.23 m | $8,631<br>n=948 p=110<br>(11%)<br>$0.95 m | $5,966<br>n=944 p=89<br>(9%)<br>$0.53 m | $6,014<br>n=295 p=31<br>(11%)<br>$0.19 m |
| **Low Volume** | $3,848<br>n=250 p=14<br>(6%)<br>$0.05 m | $5,729<br>n=551 p=27<br>(5%)<br>$0.15 m | $4,204<br>n=737 p=24<br>(3%)<br>$0.10 m | $5,575<br>n=370 p=8<br>(2%)<br>$0.04 m |
| **All Others** | $10,392<br>n=16,580 p=44<br>(0%)<br>$0.46 m | | | |

High ↑ Low

In addition to depicting the average amount Biogen paid the sixteen categories of neurologists, the chart provides the total number of neurologists in each category, the percentage of neurologists within each category who received payment from Biogen and gross amount paid within the category.  (In the chart "n" is the total number of

neurologists in the category and "p" is the number of neurologists in the category that Biogen paid).

142.   The chart demonstrates that instead of seeking the most qualified consultants or speakers, Biogen deliberately paid the highest prescribers in proportion to their value to the company.  For example, roughly 70% of all "key accounts" received consulting or speaker payments, regardless of qualification, professional affiliation, speaking ability, or academic pedigree.  In contrast, only about 40% of the "high volume" prescriber received money.

143.   Although not as important as ability to deliver a high number of prescriptions, brand loyalty was also important to Biogen's payment programs as well. Biogen was most likely to either reward established customers (and thus ensure they would continue to favor Biogen with their prescribing) or to pay those neurologists who the company believed were likely to reduce their current level of prescribing.  Both types of payments were made to maintain Biogen's dominant market share.   Biogen's payment distribution is further evidence that the purpose of the payments was to induce prescriptions, not obtain services from the payees.

144.   In 2010, in connection with Gilenya's market entry, Biogen created yet another segmentation of physicians, based on certain attributes that were correlated to the likelihood the physician would adopt Gilenya. Biogen assigned all 16,000 prescribers of MS drugs in its database into one of four "risk" groups based on the likelihood of adoption of Gilenya.  Physicians most likely to adopt Gilenya were deemed "high risk," and those least likely to adopt it considered "low risk":

| Segment No. | Segment Name | Risk Level | No. of Physicians | No. in "Top 6,000" |
|---|---|---|---|---|
| 1 | Progressive Drivers | High | 1,026 | 985 |
| 2 | Independence Guardians | High | 3,889 | 1,323 |
| 3 | Non-committal Doers | Medium | 2,102 | 784 |
| 4 | Cautious Minimalists | Low | 8,977 | 2,247 |

145.    Nearly 1,000 of the top 6,000 neurologists were at high risk of switching to Gilenya because they were "progressive drivers," i.e. early adopters who would be likely to embrace Gilenya rapidly.  Another 1,300 physicians were also high risk because they were "independence guardians" who focused on patient convenience. These physicians were thought to be at high risk of switching because an oral medication is more convenient than injections or infusion.  The remaining 3,000 physicians were deemed a much lower risk for switching.

146.    Once again, analysis of the payments to the neurologists within each classification shows that Biogen directed its payments in the manner most likely to preserve its market share.  Biogen's average payments to each "progressive driver" was $11,000 in 2009 and 2010. By comparison, Biogen's average payments to physicians in the bottom two risk categories, the "non-committal doers" and the "cautious minimalists," were $562 and $92, respectively. Biogen specifically targeted payments to physicians it deemed likely to use a competitor's product, and spread its money in a manner likely to keep those physicians prescribing Biogen's products.

### 1.    Biogen Violates its Own Rules to Pay Large Kickbacks to High Volume Prescribers

147.    Given the value of high prescribers, Biogen made sure they were lavishly rewarded.  The following table shows the highest paid doctors in 2008 and 2009:

| Physician | 2008 | 2009 | Total |
|---|---|---|---|
| Munschauer, Rick | $267,219.00 | $295,303.00 | $562,522.00 |
| Tornatore, Carlo | $320,411.00 | $196,790.00 | $517,201.00 |
| Brandes, David | $220,180.00 | $257,615.00 | $477,795.00 |
| Frohman, Elliot | $235,447.00 | $229,457.00 | $464,904.00 |
| Vartanian, Tim | $272,200.00 | $148,929.00 | $421,129.00 |
| Zivadinov, Robert | $169,000.00 | $194,760.00 | $363,487.00 |
| Crayton, Heidi | $169,568.00 | $123,553.00 | $293,121.00 |
| Khatri, Bhupendra | $142,244.00 | $124,438.00 | $266,682.00 |
| Phillips, J. Ted | $ 56,998.00 | $203,949.00 | $260,947.00 |
| Scott, Thomas | $ 88,839.00 | $171,022.00 | $259,861.00 |
| Weinstock-Guttman, B. | $174,447.00 | $ 82,900.64 | $257,347.64 |
| Jeffery, Douglas | $ 90,862.00 | $142,500.00 | $233,362.00 |
| Fox, Edward | $ 79,230.00 | $148,602.00 | $227,832.00 |

148.    Three of the physicians listed above (Drs. Munschauer, Zivadinov, and
Weinstock-Guttman) were affiliated with the Jacobs Neurological Institute in Buffalo,
NY, one of the largest MS treatment centers in the country.  The Jacobs Institute
generated an enormous number of prescriptions for Avonex and Tysabri—the most in
the Upstate NY region—and Biogen paid the physicians affiliated with the Institute in
order to reward its personnel for the prescription volume and to maintain their
beneficial relationship. Thus, it did not matter that Dr. Zivadinov was a radiologist
affiliated with the Jacobs Neurological Institute and did not prescribe drugs himself,
because the payments to him and the other members of the Institute's MS practice area
guaranteed favorable placement of Biogen's products.

149.    Not surprisingly, each of the physicians on the highest paid list (with the
exception of Dr. Zivadinov), was a "key account" or a "high" volume prescriber. Most
of these doctors were also considered at high risk for adopting Gilenya.  Thus,
payments were necessary to protect Biogen's market share with these critical

prescribers. Biogen had an internal rule that capped the amount that it paid to doctors at $150,000 per year.  This rule was supposed to prevent Biogen from making unjustifiable payments to doctors that would be immediately flagged as kickbacks.  But Biogen allowed itself to selectively designate "exceptions" to the cap. In 2008, there were eight physicians who exceeded the cap. In 2009, however, Biogen doubled the number of exempted physicians, requesting exceptions for the following physicians:

> David Brandes
> Robert Zivadinov
> Elliot Frohman
> Ted Phillips
> Doug Jeffery
> Rick Munschauer
> Tim Vartanian
> Dave Hojnacki
> Vincent Macaluso
> Stan Cohan
> Heidi Crayton
> Carlo Tornatore
> Dusan Stefoski
> Tom Scott
> Bhupendra Khatri
> Pat Coyle
> John Foley

150.    In 2010, Biogen once again increased the list of exempted physicians, adding four additional names:

> Andrew Pachner
> Chris LaGanke
> Peter Wade
> Ed Fox

151.    The amounts that Biogen paid between 2008 and 2010 were staggering.

Five prescribers received more than half a million dollars each. Many others received

more than a quarter of a million dollars each:

| Physician | 2008 | 2009 | 2010 | Total |
|---|---|---|---|---|
| Tornatore, Carlo | $320,411.00 | $196,790.50 | $102,550.00 | $619,751.50 |
| Brandes, David | $220,180.00 | $257,615.43 | $141,750.00 | $619,545.43 |
| Frohman, Elliot | $235,447.00 | $229,457.44 | $115,250.00 | $580,154.44 |
| Munschauer, Rick | $267,219.00 | $295,303.60 | -- | $562,522.60 |
| Vartanian, Tim | $272,200.00 | $148,929.51 | $101,675.00 | $522,804.51 |
| Phillips, J. Ted | $56,998.00 | $203,949.71 | $122,500.00 | $383,447.71 |
| Khatri, Bhupendra | $142,244.00 | $124,438.60 | $111,275.00 | $377,957.60 |
| Scott, Thomas | $88,839.00 | $171,022.70 | $108,375.00 | $368,236.70 |
| Fox, Edward | $79,230.00 | $148,602.23 | $103,850.00 | $331,682.23 |
| Foley, John | $80,610.00 | $119,448.07 | $113,400.00 | $313,458.07 |

**2.      Biogen Violates Its Own Rules Limiting the Fair Market Value of Individual Payments to Physicians**

152.    Biogen also violated its own rules in terms of the fair market value limits it

placed on physician payments.  For promotional speaking events, Biogen had a tier

system, which limited payments a physician could earn according to the tier that the

payment was deemed to fall within:

| 2009 FAIR MARKET VALUE RATES | | | |
|---|---|---|---|
| **Neurology Promotional Rates - MDs** | **Fees Include Travel** | | |
| Tier 1 | $2100 - $5600 | | |
| Tier 2 | $1800 - $4800 | | |
| Tier 3 | $1500 - $4000 | | |
| Tier 4 | $1200 - $3200 | | |
| | | | |
| **Neurology Promotional Rates - AHPs** | **Fees Include Travel** | | |
| Tier 1 | $900 - $2400 | | |
| Tier 2 | $720 - $1920 | | |
| Tier 3 | $600 - $1600 | | |
| Tier 4 | $540 - $1260 | | |
| | | | |
| **Key Points:** | | | |
| ** Consult with your RMP or an SBA (for Neuron speakers) **prior to quoting any program rates** | | | |
| ** There will be an annual speaking cap in place for promotional events, please contact your RSMM or the SBA team if you have questions | | | |

Biogen routinely disregarded this tier system, and paid physicians according to the highest possible tier, even if the payment exceeded the tier that was truly appropriate.

153.    Worse, Biogen also blatantly disregarded the upper limit for fair market value. The absolute maximum fee that Biogen could pay for promotion was $5,600 per event. However, the following is a list of more than 100 payments—totaling nearly $1 million—that exceeded Biogen's maximum allowable payment:

| **Last Name** | **Amount** | **Event Date** | **Reason For Request** |
|---|---|---|---|
| Munschauer | $8,820.00 | 1/21/2009 | HCP Speaker Fee- International |
| Tornatore | $5,950.00 | 2/4/2009 | HCP Speaker Fee |
| Herndon | $5,950.00 | 2/10/2009 | HCP Speaker Fee |
| Cohan | $7,350.00 | 2/25/2009 | HCP Speaker Fee |
| Bakshi | $7,350.00 | 2/26/2009 | HCP Speaker Fee |
| Brandes | $5,950.00 | 3/10/2009 | HCP Speaker Fee |
| Coyle | $5,950.00 | 3/11/2009 | HCP Speaker Fee |
| Brandes | $5,950.00 | 3/24/2009 | HCP Speaker Fee |
| Kinkel | $5,950.00 | 3/25/2009 | HCP Speaker Fee |
| Lathi | $6,300.00 | 3/25/2009 | HCP Speaker Fee |

| Last Name | Amount | Event Date | Reason For Request |
|-----------|--------|------------|--------------------|
| Levin | $5,950.00 | 3/25/2009 | HCP Speaker Fee |
| Skeen | $7,350.00 | 3/26/2009 | HCP Speaker Fee |
| Tornatore | $7,350.00 | 4/1/2009 | HCP Speaker Fee |
| Vartanian | $7,350.00 | 4/8/2009 | HCP Speaker Fee |
| Brandes | $5,950.00 | 4/14/2009 | HCP Speaker Fee |
| Munschauer | $7,350.00 | 4/14/2009 | HCP Speaker Fee |
| Lathi | $11,100.00 | 4/15/2009 | HCP Speaker Fee |
| Frohman | $7,350.00 | 4/16/2009 | HCP Speaker Fee |
| Phillips | $7,350.00 | 4/16/2009 | HCP Speaker Fee |
| Munschauer | $5,950.00 | 4/18/2009 | HCP Speaker Fee |
| Levin | $5,950.00 | 4/21/2009 | HCP Speaker Fee |
| Tornatore | $7,350.00 | 4/29/2009 | HCP Speaker Fee |
| Vartanian | $7,350.00 | 5/5/2009 | HCP Speaker Fee |
| Frohman | $5,950.00 | 5/7/2009 | HCP Speaker Fee |
| Jeffery | $5,750.00 | 5/9/2009 | HCP Speaker Fee |
| Brandes | $7,350.00 | 5/11/2009 | HCP Speaker Fee |
| Moses | $6,300.00 | 5/11/2009 | HCP Speaker Fee |
| Phillips | $5,950.00 | 5/13/2009 | HCP Speaker Fee |
| Coyle | $5,950.00 | 5/14/2009 | HCP Speaker Fee |
| Cree | $5,950.00 | 5/21/2009 | HCP Speaker Fee |
| Fox | $6,300.00 | 5/22/2009 | HCP Speaker Fee |
| Levin | $7,350.00 | 5/27/2009 | HCP Speaker Fee |
| Cree | $5,950.00 | 6/4/2009 | HCP Speaker Fee |
| Brandes | $5,950.00 | 6/8/2009 | HCP Speaker Fee |
| Zivadinov | $5,950.00 | 6/9/2009 | HCP Speaker Fee |
| Coyle | $5,950.00 | 6/11/2009 | HCP Speaker Fee |
| Crayton | $6,300.00 | 6/11/2009 | HCP Speaker Fee |
| Jeffery | $5,950.00 | 6/11/2009 | HCP Speaker Fee |
| Kerr | $7,350.00 | 6/19/2009 | HCP Speaker Fee |
| Crayton | $6,300.00 | 6/23/2009 | HCP Speaker Fee |
| Fox | $7,350.00 | 6/25/2009 | HCP Speaker Fee |
| Munschauer | $5,950.00 | 6/25/2009 | HCP Speaker Fee |
| Brandes | $7,350.00 | 6/30/2009 | HCP Speaker Fee |
| Benedict | $7,350.00 | 7/2/2009 | HCP Speaker Fee-International |
| Phillips | $5,950.00 | 7/9/2009 | HCP Speaker Fee |
| Skeen | $7,350.00 | 7/15/2009 | HCP Speaker Fee |
| Fox | $6,300.00 | 7/23/2009 | HCP Speaker Fee |
| Cohan | $5,950.00 | 7/29/2009 | HCP Speaker Fee |
| Zivadinov | $7,350.00 | 8/4/2009 | HCP Speaker Fee |
| Zivadinov | $7,350.00 | 8/10/2009 | HCP Speaker Fee |
| Lucas | $7,350.00 | 8/18/2009 | HCP Speaker Fee |

| Last Name | Amount | Event Date | Reason For Request |
|---|---|---|---|
| Phillips | $7,350.00 | 8/27/2009 | HCP Speaker Fee |
| Tornatore | $7,350.00 | 8/27/2009 | HCP Speaker Fee |
| Weinstock-Guttman | $5,950.00 | 8/27/2009 | HCP Speaker Fee |
| Cohan | $7,350.00 | 8/28/2009 | HCP Speaker Fee |
| Coyle | $5,950.00 | 9/3/2009 | HCP Speaker Fee |
| Tornatore | $5,950.00 | 9/17/2009 | HCP Speaker Fee |
| Munschauer | $5,950.00 | 9/23/2009 | HCP Speaker Fee |
| Phillips | $5,950.00 | 9/24/2009 | HCP Speaker Fee |
| Coyle | $5,950.00 | 9/30/2009 | HCP Speaker Fee |
| Khatri | $5,950.00 | 10/1/2009 | HCP Speaker Fee |
| Vartanian | $7,350.00 | 10/1/2009 | HCP Speaker Fee |
| Munschauer | $7,350.00 | 10/7/2009 | HCP Speaker Fee |
| Fox | $6,300.00 | 10/8/2009 | HCP Speaker Fee |
| Zamvil | $5,950.00 | 10/8/2009 | HCP Speaker Fee |
| Stefoski | $5,950.00 | 10/9/2009 | HCP Speaker Fee |
| Jeffery | $7,350.00 | 10/15/2009 | HCP Speaker Fee |
| Coyle | $5,950.00 | 10/16/2009 | HCP Speaker Fee |
| Katsamakis | $5,950.00 | 10/24/2009 | HCP Speaker Fee |
| Coyle | $5,950.00 | 10/29/2009 | HCP Speaker Fee |
| Jeffery | $7,350.00 | 11/5/2009 | HCP Speaker Fee |
| Brandes | $5,950.00 | 11/9/2009 | HCP Speaker Fee |
| Foley | $6,300.00 | 11/12/2009 | HCP Speaker Fee |
| Fox | $5,950.00 | 11/12/2009 | HCP Speaker Fee |
| Jeffery | $7,350.00 | 11/12/2009 | HCP Speaker Fee |
| Scott | $5,950.00 | 11/20/2009 | HCP Speaker Fee |
| Brandes | $7,350.00 | 11/23/2009 | HCP Speaker Fee |
| Frohman | $7,350.00 | 12/9/2009 | HCP Speaker Fee |
| Munschauer | $5,950.00 | 12/11/2009 | HCP Speaker Fee |
| Cohan | $5,950.00 | 1/21/2010 | HCP Speaker Fee |
| Pelletier | $5,950.00 | 2/3/2010 | HCP Speaker Fee |
| Lucas | $5,950.00 | 2/5/2010 | HCP Speaker Fee |
| Hojnacki | $6,300.00 | 2/15/2010 | HCP Speaker Fee |
| Brandes | $5,950.00 | 2/16/2010 | HCP Speaker Fee |
| Foley | $6,300.00 | 2/18/2010 | HCP Speaker Fee |
| Brandes | $5,950.00 | 2/23/2010 | HCP Speaker Fee |
| Pachner | $5,950.00 | 3/10/2010 | HCP Speaker Fee |
| Lucas | $5,950.00 | 3/10/2010 | HCP Speaker Fee |
| Brandes | $5,950.00 | 3/11/2010 | HCP Speaker Fee |
| Frohman | $7,350.00 | 3/11/2010 | HCP Speaker Fee |
| Fox | $7,350.00 | 3/16/2010 | HCP Speaker Fee |
| Stefoski | $8,820.00 | 3/22/2010 | HCP Speaker Fee-International |

| Last Name | Amount | Event Date | Reason For Request |
|---|---|---|---|
| Phillips | $5,950.00 | 3/30/2010 | HCP Speaker Fee |
| Fox | $5,950.00 | 3/30/2010 | HCP Speaker Fee |
| Frohman | $7,350.00 | 4/1/2010 | HCP Speaker Fee |
| Vartanian | $5,950.00 | 4/5/2010 | HCP Speaker Fee |
| Coyle | $5,950.00 | 4/7/2010 | HCP Speaker Fee |
| Brandes | $7,350.00 | 4/19/2010 | HCP Speaker Fee |
| Pachner | $7,350.00 | 4/20/2010 | HCP Speaker Fee |
| Hojnacki | $6,300.00 | 4/21/2010 | HCP Speaker Fee |
| Foley | $6,300.00 | 4/22/2010 | HCP Speaker Fee |
| Brandes | $7,350.00 | 4/27/2010 | HCP Speaker Fee |
| Hendin | $6,300.00 | 4/28/2010 | HCP Speaker Fee |
| Brandes | $7,350.00 | 5/3/2010 | HCP Speaker Fee |
| Coyle | $7,350.00 | 5/5/2010 | HCP Speaker Fee |
| Frohman | $7,350.00 | 5/6/2010 | HCP Speaker Fee |
| Galetta | $5,950.00 | 5/11/2010 | HCP Speaker Fee |
| Cohan | $7,350.00 | 5/18/2010 | HCP Speaker Fee |
| Hojnacki | $6,300.00 | 5/20/2010 | HCP Speaker Fee |
| Frishberg | $5,950.00 | 5/25/2010 | HCP Speaker Fee |
| Foley | $6,300.00 | 6/3/2010 | HCP Speaker Fee |
| Laganke | $6,300.00 | 6/10/2010 | HCP Speaker Fee |
| Vartanian | $5,950.00 | 6/14/2010 | HCP Speaker Fee |
| Frohman | $7,350.00 | 7/15/2010 | HCP Speaker Fee |
| Hendin | $6,300.00 | 7/21/2010 | HCP Speaker Fee |
| Levin | $5,950.00 | 7/28/2010 | HCP Speaker Fee |
| Selhorst | $5,950.00 | 8/20/2010 | HCP Speaker Fee |
| Laganke | $6,300.00 | 8/24/2010 | HCP Speaker Fee |
| Herndon | $5,950.00 | 8/26/2010 | HCP Speaker Fee |
| Zamvil | $5,950.00 | 8/31/2010 | HCP Speaker Fee |
| Lucas | $5,950.00 | 9/8/2010 | HCP Speaker Fee |
| Jeffery | $7,350.00 | 9/9/2010 | HCP Speaker Fee |
| Fox | $7,350.00 | 9/14/2010 | HCP Speaker Fee |
| Cohan | $5,950.00 | 9/14/2010 | HCP Speaker Fee |
| Zamvil | $7,350.00 | 9/15/2010 | HCP Speaker Fee |
| Vartanian | $5,950.00 | 9/20/2010 | HCP Speaker Fee |
| Fox | $7,350.00 | 9/21/2010 | HCP Speaker Fee |
| Khatri | $5,950.00 | 9/22/2010 | HCP Speaker Fee |
| Kita | $7,350.00 | 9/29/2010 | HCP Speaker Fee |
| Foley | $6,300.00 | 9/30/2010 | HCP Speaker Fee |
| Hojnacki | $6,300.00 | 9/30/2010 | HCP Speaker Fee |
| Hojnacki | $6,300.00 | 10/13/2010 | HCP Speaker Fee |
| Okuda | $7,350.00 | 10/21/2010 | HCP Speaker Fee |
| Frohman | $5,950.00 | 10/21/2010 | HCP Speaker Fee |

| Last Name | Amount | Event Date | Reason For Request |
|---|---|---|---|
| Bandari | $5,950.00 | 10/26/2010 | HCP Speaker Fee |
| Boster | $5,950.00 | 10/29/2010 | HCP Speaker Fee |
| Foley | $6,300.00 | 11/11/2010 | HCP Speaker Fee |
| Jeffery | $7,350.00 | 11/18/2010 | HCP Speaker Fee |
| Zamvil | $5,950.00 | 11/18/2010 | HCP Speaker Fee |
| Brandes | $7,350.00 | 12/6/2010 | HCP Speaker Fee |
| Pelletier | $7,350.00 | 12/7/2010 | HCP Speaker Fee |
| Lucas | $5,950.00 | 12/8/2010 | HCP Speaker Fee |

### 3.   Biogen Rewards One of Its Highest Prescribers with the Ultimate Kickback, a Lucrative Job

154.   In 2008 and 2009, no physician received more money from Biogen than Dr.

Frederick Munschauer. He received $562,522 in payments during those years, or about

$770 per day. A close look at his 2009 payments shows how this was achieved:

| Date | Payment | Reason |
|---|---|---|
| 1/6/2009 | $2,800.00 | HCP Speaker Fee |
| 1/21/2009 | $8,820.00 | HCP Speaker Fee-International |
| 1/26/2009 | $7,350.00 | Consult Fee |
| 2/6/2009 | $8,050.00 | Consult Fee |
| 2/6/2009 | $4,550.00 | Consult Fee |
| 2/20/2009 | $9,100.00 | Consult Fee |
| 2/25/2009 | $3,675.00 | HCP Speaker Fee |
| 2/26/2009 | $3,675.00 | HCP Speaker Fee |
| 3/4/2009 | $3,675.00 | HCP Speaker Fee |
| 3/5/2009 | $3,675.00 | HCP Speaker Fee |
| 3/13/2009 | $1,250.00 | HCP Speaker Fee |
| 3/20/2009 | $9,100.00 | Consult Fee |
| 3/25/2009 | $1,250.00 | HCP Speaker Fee |
| 3/26/2009 | $1,000.00 | HCP Speaker Fee |
| 3/30/2009 | $1,250.00 | HCP Speaker Fee |
| 4/3/2009 | $8,150.00 | Consult Fee |
| 4/14/2009 | $7,350.00 | HCP Speaker Fee |
| 4/18/2009 | $5,950.00 | HCP Speaker Fee |
| 4/28/2009 | $2,800.00 | HCP Speaker Fee |
| 5/2/2009 | $4,550.00 | Consult Fee |

| Date | Payment | Reason |
|---|---|---|
| 5/5/2009 | $4,550.00 | HCP Speaker Fee |
| 5/7/2009 | $2,800.00 | HCP Speaker Fee |
| 5/30/2009 | $7,350.00 | Consult Fee |
| 6/3/2009 | $4,375.00 | HCP Speaker Fee |
| 6/4/2009 | $4,375.00 | HCP Speaker Fee |
| 6/11/2009 | $1,400.00 | HCP Speaker Fee |
| 6/15/2009 | $7,350.00 | Consult Fee |
| 6/25/2009 | $5,950.00 | HCP Speaker Fee |
| 7/7/2009 | $4,050.00 | Consult Fee |
| 7/9/2009 | $1,250.00 | HCP Speaker Fee |
| 7/10/2009 | $6,300.00 | Consult Fee |
| 7/14/2009 | $1,400.00 | HCP Speaker Fee |
| 7/22/2009 | $4,550.00 | HCP Speaker Fee |
| 8/5/2009 | $1,400.00 | HCP Speaker Fee |
| 8/13/2009 | $4,550.00 | HCP Speaker Fee |
| 8/19/2009 | $6,860.00 | HCP Speaker Fee |
| 9/10/2009 | $8,330.00 | HCP Speaker Fee |
| 9/12/2009 | $6,300.00 | Consult Fee |
| 9/23/2009 | $5,950.00 | HCP Speaker Fee |
| 10/2/2009 | $9,100.00 | Consult Fee |
| 10/7/2009 | $7,350.00 | HCP Speaker Fee |
| 10/16/2009 | $6,300.00 | Consult Fee |
| 10/28/2009 | $2,100.00 | Consult Fee |
| 11/2/2009 | $1,250.00 | HCP Speaker Fee |
| 11/6/2009 | $5,600.00 | HCP Speaker Fee |
| 11/11/2009 | $2,275.00 | HCP Speaker Fee |
| 11/13/2009 | $7,350.00 | Consult Fee |
| 11/18/2009 | $4,550.00 | HCP Speaker Fee |
| 12/8/2009 | $1,250.00 | HCP Speaker Fee |
| 12/9/2009 | $4,550.00 | HCP Speaker Fee |
| 12/11/2009 | $5,950.00 | HCP Speaker Fee |

Biogen paid Dr. Munschauer about once a week, sometimes more than once on the same day. He consulted 16 separate times, sometimes on the same day or just a few days apart. He earned $7,000 for an average consulting event. He spoke 35 separate times in 2009, earning on average $4,000 per speaking event. In 2009 alone, Biogen paid

Dr. Munschauer seven payments that were above fair market value.  And in each year, Biogen had to exempt Dr. Munschauer from the annual payment cap.

155.    Like many physicians, Dr. Munschauer had figured out that he could ingratiate himself to a drug company like Biogen through prescriptions. Dr. Munschauer was interviewed for a Consortium of Multiple Sclerosis (CMSC) podcast titled "How to Manage an MS Center and Make it Work." In that interview, Dr. Munschauer candidly admitted that "it is possible to have an MS center and not go broke…You have to be a little creative, but it is." What Dr. Munschauer was referring to was the lucrative kickback relationship that he and Biogen had "creatively" forged.  In that same interview, Dr. Munschauer also admitted that he used a large amount of Tysabri in his practice, which was also "a revenue generating process for us."

156.    Dr. Munschauer has also instructed neurologists visiting the CMSC website that kickbacks are there for the taking. Dr. Munschauer has specifically urged prescribers to "solicit industry support," and to "form strategic alliances" that allow them to "barter for support":



157.  Munschauer was speaking from experience.  As Chief of the Jacobs Neurological Institute, he had formed precisely the form of "strategic alliance" and "bartering" that he advocated.  In exchange for writing the most prescriptions in the Upstate New York region, doctors affiliated with the Jacobs Neurological Institute received the most money—well over a $1 million combined for Munschauer and the Institute's doctors and prescribing nurses from 2008 through 2010.  Mindful of the revenue that the Institute created, Biogen targeted each person capable of influencing prescriptions with lavish payments. Biogen used "strategic P2P's [peer-to-peer] and PEP's," as well as lunches and dinners, to push for an even higher market share from the Institute.

157.    For example, in late 2009, Biogen provided Munschauer with back-to-back payments for a PEP program and a P2P program, with the goal of increasing his market

share from 73% to 75%. *See Exhibit 5*. Biogen provided his colleague Weinstock-Guttman with a P2P speaking fee to speak to four of the Institute's other prescribers (Hojnacki, Umhauer, Miller, and Ramanathan) with the goal of increasing her market share from 61% to 63%. *Id.* Biogen then targeted Hojnacki with a dinner, with the goal of increasing his market share from 45% to 50%. Biogen took nurses Miller and Umhauer to lunch, and took Miller to a dinner a few weeks later, with the goal of increasing their market shares by two percentage points (to 63% for Miller and 67% for Umhauer). Biogen gave additional payments to these doctors and nurses in form of additional PEP and P2P speaking fees with the goal of having 10 new patients put on Tysabri in the 4th quarter of 2009. *Id.*

158.    Sometime in either 2008 or 2009, Biogen discussed rewarding Dr. Munschauer with the ultimate prize, a cushy job as VP of Medical Affairs.  Biogen was not concerned that it would lose Dr. Munschauer's prescriptions.  Dr. Weinstock-Guttman was still Director of the MS practice at the Institute, and Biogen was paying her and her colleagues, most notably Dr. Hojnacki, hundreds of thousands of dollars to maintain Biogen's overall share of the Institute's prescriptions. Biogen continues to give money directly to the Jacobs Institute through educational and research grants.

159.    Biogen hired Dr. Munschauer, and he began working as a Biogen employee in January 2010. This position is far less demanding than a medical practice, and commands a higher salary, estimated to be $300,000 or more.  Dr. Munschauer also has received stock options and other emoluments and benefits that make this position valuable.

160.    Not only are all of Dr. Munschauer's Avonex and Tysabri prescriptions tainted by the kickbacks he received, but every prescription he wrote after he knew that he was being considered for employment at Biogen and before his first day of work there was done with a clear conflict of interest.  Accordingly, these prescriptions also violated his agreement to participate in federal programs and were thus ineligible for reimbursement.

### 4.    Biogen Broadly Distributes Its Kickbacks

161.    In addition to the massive sums directed to the highest prescribers, Biogen proportionally delivered sizeable yet smaller sums of cash to physicians who wrote sizeable yet smaller quantities of prescriptions.  The following two doctors illustrate this practice.

162.    Dr. Donald Negroski is a neurologist in Florida. He typically wrote about 360 prescriptions for Avonex per year, earning Biogen roughly $1 million. Biogen considered him a "Key Account," and because his market share was trending towards Biogen, he was labeled an "Avonex Opportunity."  He was also considered high risk for "oral uptake."

163.    To ensure that Dr. Negroski maintained his patients on Biogen's MS products, Biogen paid him almost exactly $30,000 per year, a tiny fraction of the revenue he generated for the company.  In 2009, Biogen paid him $30,500; in 2010, it paid him $30,550.  As his 2010 payments reveal, this was done with a mix of consultant meetings, speaking dinners, and a PEP program:

| Date | Amount | Type | Program |
|------|--------|------|---------|
| 1/29/2010 | $5,000.00 | Consult Fee | Consultant Meeting |
| 2/18/2010 | $2,000.00 | Speaker Fee | Promo Physician Dinner |
| 3/2/2010 | $2,000.00 | Speaker Fee | PEP Program |
| 4/21/2010 | $2,000.00 | Speaker Fee | Promo Physician Dinner |
| 5/20/2010 | $5,250.00 | Speaker Fee | Promo Physician Dinner |
| 8/6/2010 | $5,400.00 | Consult Fee | Speaker Training |
| 9/2/2010 | $2,000.00 | Speaker Fee | Promo Physician Dinner |
| 10/23/2010 | $4,500.00 | Consult Fee | Consultant Meeting |
| 11/3/2010 | $2,400.00 | Speaker Fee | Promo Physician Dinner |

164.    No valuable feedback was ever obtained from Dr. Negroski, nor was it necessary for him to consult on so many occasions in such a short period of time. Moreover, his regular use as a speaker was not a reflection of his speaking abilities; it was to provide him with a regular source of payments.  In fact, Dr. Negroski attended speaker training in August 2010, despite the fact that Biogen had already used him as a speaker four times that year alone.

165.    A similar example is Dr. Lilyana Amezcua, a neurologist in Los Angeles. She typically wrote about 120 prescriptions for Avonex per year, earning Biogen roughly $300,000. Biogen considered her to be a "Medium" volume prescriber, and because her market share was trending away from Biogen, she was labeled an "Avonex Risk."  She was also considered high risk for "oral uptake."

166.    To increase Dr. Amezcua's prescribing of Biogen's biologicals, and to prevent her from diverting prescriptions to Novartis's new oral tablet, Biogen paid her roughly $20,000 per year, a tiny fraction of the revenue she generated for the company. In 2009, Biogen paid her $15,100; in 2010, as the launch of Gilenya neared, it paid her $24,500.  Her 2010 payments reveal the same pattern of payments as Dr. Negroski:

| Date | Amount | Type | Program |
|---|---|---|---|
| 1/29/2010 | $5,750.00 | Consult Fee | Consultant Meeting |
| 2/24/2010 | $2,000.00 | Speaker Fee | Promo Physician Dinner |
| 5/14/2010 | $4,500.00 | Consult Fee | Consultant Meeting |
| 7/28/2010 | $2,000.00 | Speaker Fee | PEP Program |
| 8/10/2010 | $3,750.00 | Consult Fee | Speaker Training |
| 10/21/2010 | $2,000.00 | Speaker Fee | Promo Physician Dinner |
| 12/8/2010 | $4,500.00 | Consult Fee | Consultant Meeting |

167.     As with Dr. Negroski, Biogen did not obtain any feedback of value from Dr. Amezcua, nor was it necessary for her to consult every quarter.  Biogen regularly paid her to speak at events to provide her with payments, not to further its business objectives.  And like Dr. Negroski, paying Dr. Amezcua to attend speaker training was superfluous because Biogen had already paid her to speak on two occasions earlier in the year.

### G.     Biogen Caused the Presentation of False Claims to the United States

#### 1.     Federal Reimbursement for Avonex, Tysabri, and Tecfidera

168.     Through Medicare and Medicaid, the United States Government and the individual states reimburse a large percentage of all Avonex, Tysabri, and Tecfidera prescriptions.  Medicare not only covers individuals over age 65, but it also provides medical coverage for many individuals who are permanently disabled under the Social Security Act, as is the case for many MS patients.  When medically necessary, Tysabri infusions are covered under Medicare Part B and are paid for by the federal government.  Avonex injections may be covered under Medicare Part B or Medicare Part D, depending on the patient's circumstances.  Tecfidera is reimbursed under Medicare Part D.  It is estimated that at least 30% of all MS patients in the United States

are covered by Medicare.  Multiple sclerosis therapies are Medicare's second largest drug expenditure, second only to cancer treatment.

169.    Medicaid, a joint program between the states and the federal government, also routinely pays for Avonex, Tysabri, and Tecfidera prescriptions.  Medicaid provides health coverage to millions of non-elderly low-income non-disabled adults, particularly those with families. Medicaid also provides coverage to several million low-income seniors and non-elderly people with disabilities.  Given the substantial annual cost of IMA therapy, many uninsured MS sufferers turn to Medicaid to pay for their treatments.  A 2007 study found that 10.5% of all MS suffers were covered for MS therapy through Medicaid.  The federal government pays more than half of the funding for the Medicaid program.

170.    The United States also pays for Avonex, Tysabri, and Tecfidera through the Veteran's Administration, through the Federal Employees Health Benefits (FEHB) Program, and through TRICARE, its insurance program for Department of Defense personnel and their families.

171.    The amount that the federal government and the states have spent on Avonex, Tysabri, and Tecfidera is substantial. The Relators estimate that from 2006-2012, these government entities have spent roughly $900 million on Avonex and roughly $200 million on Tysabri.  In 2014 alone, Relators estimate that government health care programs spent roughly $220 million on Tecfidera.

172.    Every time a neurologist seeks reimbursement from Medicare, Medicaid or some other federal health care program for the administration of Tysabri or Avonex,

a claim is presented for payment for the purposes of the False Claims Act.  Similarly, every time a Medicare or Medicaid patient obtains Avonex or Tecfidera from a pharmacy, the pharmacy presents a claim for payment.  As noted above, all of these claims are conditioned upon compliance with the Anti-Kickback Statute.  Were the applicable federal program aware that the presented claim had been induced by a kickback, it would not be permitted to pay it.

> **2.    Biogen's Kickbacks Induced Medicare, Medicaid and the Federal Programs to Pay For Thousands of Prescriptions**

173.    Attached are spreadsheets that list payments known to the Relators that Biogen made to physicians pursuant to the sham consulting and sham speaking programs described above.  *See Exhibits 1-6.*  Although the lists are extensive, they are not exhaustive; other payments have been made for which the Relators do not presently have documentation.  These programs were initiated before Relators joined Biogen, and there were numerous payments made in 2007 and 2008 which are not listed.  There are also numerous payments from 2011-2016 that Relators are aware of that are not listed.  Payments are still being made pursuant to these abusive programs at this time.

174.    For the reasons set forth above, none of these payments were made to obtain the services which were purportedly provided in exchange for Biogen's remuneration.  In reality, each and every one of these payments was to induce the recipient to write prescriptions for Avonex, Tysabri, or Tecfidera in the future.  The payments were made to either gain prescriptions from the neurologists or to maintain the prescriber's current level of support.  Any payment listed in the Exhibits (and any

payment made pursuant to the consulting and speaking programs that are not listed in the Exhibits) constitutes an illegal kickback.

175.    Exhibits 1–4 list 6,682 kickbacks paid to 1,492 physicians in 2009 and 2010, totaling $19,920,970.  Every physician listed on Exhibits 1–4 who had more than two patients on Avonex or Tysabri likely submitted, or caused to be submitted, a federal claim for reimbursement because more than 40.5% of all MS patients have their MS medications paid for by Medicare, Medicaid or another federal health care program. The average annual cost of Avonex treatment is $62,934.00, and the average annual cost of Tysabri treatment is $64,233.00.  Medicare and Medicaid pay more than $40,000 a year for each MS patient who is prescribed Avonex or Tysabri for the patient's condition.  The physicians listed in these Exhibits who received kickbacks maintained between 31,000 to 47,000 patients on Avonex or Tysabri during the time they received kickbacks.  If only 40% of these patients were covered by federal health care programs, then the United States spent between $270,000,000 and $435,000,000 annually on claims that were induced by kickbacks.  For the years 2009 through 2011, this amount exceeds $815 million and may be as high as $1.3 billion.

176.    Exhibit 6 lists 1,064 kickbacks totaling over $3 million paid to health care providers from 2011-2013 for attending sham Tecfidera consulting or speaking events. The current wholesale acquisition cost for annual treatment of Tecfidera is $63,315 and Medicare and Medicaid pay more than $45,000 a year, or approximately 71%, for each MS patient who is prescribed Tecfidera.  In 2014, Tecfidera generated $2.9 billion in revenue for Biogen.  Assuming that only 40% of Tecfidera patients were covered by

government health care programs, then the United States spent approximately $835 million on Tecfidera in 2014 alone.  A significant percentage of the amount the United States spent on Tecfidera was tainted by illegal kickbacks.

177.    Relators have obtained Medicare Part B Claims Summaries for 2012, which summarizes claims data by physician, drug (Avonex, Tysabri, or Tecfidera), and year.  Relator also has obtained Medicare Part D claims summaries for the year 2013. The Medicare Part D summary includes the total number of claims submitted in 2013 by a physician for a particular drug (Avonex, Tysabri, or Tecfidera), and the total amount Medicare paid for the claims.  When comparing the Medicare Claims summaries to Exhibits 1-6, it is evident that the vast majority of physicians identified in the Medicare Claims Summaries spreadsheet who submitted Medicare claims for Avonex, Tysabri, and/or Tecfidera, have received kickback payments from Biogen for attending a consultant meeting or speaker event for one of the three Biogen drugs.  Representative examples are detailed below:

178.    Brian Apatoff's practice is located at 401 East 55th Street at 1st Avenue, the Plaza 400 Building Ground Floor Professional Suite New York, NY 10022.  From 2009-2010, Biogen paid Brian Apatoff $47,600.00 for attending 13 different speaker and consultant events for Avonex.  Medicare claims data for the years 2009 through 2012 has not been made publicly available and Relators do not have access to it.  In 2013, Apatoff, however, submitted 269 claims for payment to Medicare for Avonex and Medicare Part D paid $1,385,712.86 for these Avonex prescriptions.  Given the large percentage of MS prescriptions paid for by Medicare; the fact that Apatoff accepted Medicare patients in

the years 2009 -2012, and the numerous claims for Avonex that Apatoff submitted to Medicare in 2013 when such data is publicly available, there is no reason to believe Apatoff did not present Avonex claims for payment to Medicare during the years 2009-2012. All such claims, as well as the claims Apatoff submitted in 2013, were tainted by the kickbacks Biogen paid Apatoff.

179.   On February 1, 2013, Apatoff was paid $6,600.00 to attend a Tecfidera consultant meeting. Biogen covered all of Apatoff's expenses for attending the meetings. In 2013, Apatoff submitted 36 claims for payment to Medicare for Tecfidera. Medicare Part D paid $238,202.56 for these Tecfidera prescriptions. All of these claims were tainted by the kickback Biogen paid to Apatoff.

180.   David Brandes's office is located at Hope Neurology 10810 Parkside Dr., Knoxville, TN 37934. From January 16, 2009, through December 6, 2010, Biogen paid David Brandes $350,450.00 to attend over 70 speaker and consultant events relating to Avonex and Tysabri. Medicare claims data for the years 2009 through 2012 has not been made publicly available and Relators do not have access to it. In 2013, Brandes, however, submitted 11 claims for payment to Medicare Part D for Avonex prescriptions, for which Medicare paid $44,366.62. The same year, Brandes presented Medicare Part D with 22 claims for payment for Tysabri, costing the program $98,178.04. Given the large percentage of MS prescriptions paid for by Medicare; the fact that Brandes accepted Medicare patients in the years 2009 -2012, and the numerous claims for Avonex and Tysabari that Barnes submitted to Medicare in 2013 when such data is publicly available, there is no reason to believe Barnes did not present Avonex

and Tysabari claims for payment to Medicare during the years 2009-2012. All such claims, as well as the claims Barnes submitted in 2013 were tainted by the kickbacks Biogen paid Barnes.

181.    Biogen paid Brandes $6,600.00 to attend a Tecfidera consultant meeting on April 12, 2013, and another $6,600.00 to attend a Tecfidera consultant meeting on December 12, 2013. In 2013, Brandes submitted 40 claims for payment to Medicare Part D for Tecfidera prescriptions. Medicare's cost for these prescriptions was $220,471.32. All of these claims were tainted by the kickbacks Biogen paid to Brandes.

182.    Patricia Coyle's address is located at 179 N Belle Mead Rd., East Setauket, NY 11733. From 2009-2010, Biogen has paid Patricia Coyle $204,108 for attending 48 Avonex and Tysabri consultant and speaker events. Medicare claims data for the years 2009 through 2012 has not been made publicly available and Relators do not have access to it. In 2013, however, Coyle submitted 21 claims for payment for Avonex prescriptions to Medicare. Medicare Part D paid $144,799.24 for these claims. Given the large percentage of MS prescriptions paid for by Medicare; the fact that Coyle accepted Medicare patients in the years 2009 -2012, and the numerous claims for Avonex that Coyle submitted to Medicare in 2013 when such data is publicly available, there is no reason to believe Coyle did not present Avonex claims for payment to Medicare during the years 2009-2012. All such claims, as well as the claims Coyle submitted in 2013 were tainted by the kickbacks Biogen paid Coyle.

183.    John Foley's office is located at 370 E 9th Ave, Suite 106 Salt Lake City, UT 84103. Foley received $200,350.00, spread over 54 different kickback payments for

serving as a consultant and speaker for Avonex and Tysabri events between January 15,

2009, and December 20, 2010.  Medicare claims data for the years 2009 through 2012 has

not been made publicly available and Relators do not have access to it.  Given the large

percentage of MS prescriptions paid for by Medicare; the fact that Foley accepted

Medicare patients in 2009-2012, and the numerous claims for Tecfidera Foley submitted

to Medicare in 2013 when such data is publicly available, there is no reason to believe

Foley did not present Avonex and Tysabri claims for payment to Medicare during the

years 2009-2012.  All such claims were tainted by the kickbacks Biogen paid Foley.

184.    On January 14, 2012, Foley attended a Tecfidera consultant meeting, for

which he was paid $6,480.00.  On October 4, 2012, Foley received $5,400.00 for attending

a Tecfidera consultant meeting.  He received $5,400.00 for another Tecfidera consultant

meeting on April 12, 2013, and was paid $6,480.00 for attending a Tecfidera consultant

meeting on October 10, 2013.  In 2013, Foley submitted 109 claims for payment to

Medicare for Tecfidera.  Medicare Part D paid $515,776.92 for these claims.  All such

claims were tainted by the kickbacks Biogen paid Foley.

185.    Edward Fox's office is located at 16040 Park Valley Drive Bld B Suite 100

Round Rock, TX 78681.  Between January 16, 2009 and December 7, 2010, Biogen paid

Fox $227,500.00 to attend 47 speaker and consulting events relating to Avonex and

Tysabri.  Medicare claims data for the years 2009 through 2012 has not been made

publicly available and Relators do not have access to it.  In 2013, however, Fox

submitted 80 claims for payment to Medicare Part D for Avonex, costing the program

$380,107.32.  Given the large percentage of MS prescriptions paid for by Medicare; the

fact that Fox accepted Medicare patients in 2009-2012, and the numerous claims for Avonex Fox submitted to Medicare in 2013 when such data is publicly available, there is no reason to believe Fox did not present Avonex claims for payment to Medicare during the years 2009-2012.  All such claims were tainted by the kickbacks Biogen paid to Fox.

186.    On March 7, 2013, Fox received $16,280.00 for attending a Tecfidera consultant meeting.  In 2013, Fox submitted 15 claims for payment to Medicare for Tecfidera.  Medicare Part D paid $68,680 for these claims.  All such claims Fox submitted in 2013 were tainted by the kickbacks Biogen paid Fox.

187.    Joseph Guarnaccia's medical practice is located at 130 Division St FL 1 MS Treatment Ctr Griffin Hospital Derby, CT 06418.  From March 31, 2009, through December 21, 2010, Guarnaccia was paid $61,740.00 for attending 22 consulting meetings involving Avonex.  Medicare claims data for the years 2009 through 2012 has not been made publicly available and Relators do not have access to it.  In 2013, however, Guarnaccia presented Medicare Part D with 225 claims for payment for Avonex, costing the program $989,811.27.  Given the large percentage of MS prescriptions paid for by Medicare; the fact that Guarnaccia accepted Medicare patients in 2009-2012, and the numerous claims for Avonex that Guarnaccia submitted to Medicare in 2013 when such data is publicly available, there is no reason to believe Guarnaccia did not present Avonex claims for payment to Medicare during the years 2009-2012.  All such claims, as well as the claims Guarnaccia submitted in 2013 were tainted by the kickbacks Biogen paid Guarnaccia.

188.    On April 19, 2013, Guarnaccia was paid $7,920.00 to attend a Tecfidera

consultant meeting.  His expenses for attending the meeting were also covered.  In 2013,

Guarnaccia submitted 67 claims for payment to Medicare for Tecfidera.  Medicare Part

D paid $320,314.20 for these claims.  All of these claims were tainted by the kickbacks

Biogen paid Guarnaccia.

189.    Barry Hendin's office is located at 5090 N 40th St #250 Phoenix, AZ 85018.

Hendin was paid $158,050.00 to attend 41 speaker and consultant meetings involving

Avonex and Tysabri from February 6, 2009, through November 23, 2010.  Medicare

claims data for the years 2009 through 2012 has not been made publicly available and

Relators do not have access to it.  In 2013, however, Hendin submitted 52 claims for

payment for Avonex, for which Medicare paid $270,797.49.  Given the large percentage

of MS prescriptions paid for by Medicare; the fact that Hendin accepted Medicare

patients in the years 2009-2012, and the numerous claims for Avonex that Hendin

submitted to Medicare in 2013 when such data is publicly available, there is no reason

to believe Hendin did not present Avonex claims for payment to Medicare during the

years 2009-2012.  All such claims, as well as the claims Hendin submitted in 2013, were

tainted by the kickbacks Biogen paid Hendin.

190.    On September 30, 2011, Hendin was paid $5,400.00 to attend a Tecfidera

Consultant meeting.  He was paid $7,920.00 to attend a similar consultant meeting on

January 14, 2012, and paid $6,600 to attend a Tecfidera consultant meeting on October 4,

2012.  Then, on March 7, 2013, Hendin attended a Tecfidera consultant meeting for

which he received $14,080.00.  On July 24, 2013, he was paid a fee of $3,080.00 for a

teleconference consult.  Hendin received two separate payments for attending an August 13, 2013 Tecfidera consultant meeting – one for $5,280.00, and another for $11,880.00.  In 2013 alone, Hendin submitted 32 claims for payment to Medicare for Tecfidera, costing the program $189,903.58.  All such claims Hendin submitted were tainted by the kickbacks Biogen paid Hendin.

191.    David Hojnacki's office is located at the Jacobs Neurological Ins. 100 High Street Buffalo, NY 14203.  Hojnacki was paid $211,900.00 for attending 53 speaker events or consultant meetings between January 2, 2009, and December 16, 2010.  Medicare claims data for the years 2009 through 2012 has not been made publicly available and Relators do not have access to it.  In 2013, however, Hojancki submitted 191 claims for payment to Medicare for Avonex, for which Medicare paid $911,894.66.  Given the large percentage of MS prescriptions paid for by Medicare; the fact that Hojnacki accepted Medicare patients in the years 2009-2012, and the numerous claims for Avonex that Hojnacki submitted to Medicare in 2013 when such data is publicly available, there is no reason to believe Hojnacki did not present Avonex claims for payment to Medicare during the years 2009-2012.  All such claims were tainted by the kickbacks Biogen paid to Hojnacki.

192.    Biogen paid Hojnacki $6,480.00 to attend a Tecfidera consultant meeting on April 12, 2013.  He was also paid $5,400.00 to attend a Tecfidera consultant meeting on December 12, 2013.  In 2013, Hojnacki submitted 89 claims for payment to Medicare for Tecfidera, costing the program $470,553.62.  All of these claims were tainted by the kickbacks Biogen paid to Hojnacki.

193.    Douglas Jeffrey is a physician at the Department of Neurology-Wake Forest Med School Clinical Science Building – 4th Floor Med Cty Blvd. Stitch Bldg. S. Winston Salem, NC 27157.  Jeffrey was paid $188,150 to attend 36 speaker and consultant events for Avonex and Tysabri between January 16, 2009 and November 18, 2010.  Medicare claims data for the years 2009 through 2012 has not been made publicly available and Relators do not have access to it.  In 2013, however, Jeffrey submitted 25 claims for payment to Medicare for Avonex, for which the program paid $119,195.74. The same year, Jeffrey presented Medicare Part D with 17 claims for payment for Tysabri costing the program $76,504.17.  Given the large percentage of MS prescriptions paid for by Medicare; the fact that Jeffrey accepted Medicare patients in the years 2009-2012, and the numerous claims for Avonex and Tysabri that Jeffrey submitted to Medicare in 2013 when such data is publicly available, there is no reason to believe Jeffrey did not present Avonex and Tysabri claims for payment to Medicare during the years 2009-2012.  All such claims, as well as the claims Jeffrey submitted in 2013, were tainted by the kickbacks Biogen paid Jeffrey.

194.    On February 4, 2012 Jeffrey was paid $6,600.00 to attend a Tecfidera consultant meeting.  Jeffrey was paid $6,600.00 to attend a Tecfidera consultant meeting on April 12, 2013.  Biogen covered hundreds of dollars in expenses for both meetings. In 2013, Jeffrey submitted 23 claims for payment to Medicare for Tecfidera.  Medicare paid $142,034.42 for the claims.  All of these claims were tainted by the kickbacks Biogen paid Jeffrey.

195.     George Katsamakis's office is located at 22285 Pepper Rd #401 Barrington, IL 60010.  From January 26, 2009 through December 4, 2010, Biogen paid Katsamakis $151,040.00 to attend 46 speaker or consultant events involving Avonex and Tysabri. Medicare claims data for the years 2009 through 2012 has not been made publicly available and Relators do not have access to it.  In 2013, however, Katsamakis submitted 42 claims for payment for Avonex for which Medicare paid $189,043.39.  That same year, he presented Medicare Part D with 11 claims for payment for Tysabri, costing the program $46,364.04.  Given the large percentage of MS prescriptions paid for by Medicare; the fact that Katsamakis accepted Medicare patients in the years 2009-2012, and the numerous claims for Avonex and Tysabri that Katsamakis submitted to Medicare in 2013 when such data is publicly available, there is no reason to believe Katsamakis did not present Avonex and Tysabri claims for payment to Medicare during the years 2009-2012.  All such claims, as well as the claims Katsamakis submitted in 2013, were tainted by the kickbacks Biogen paid Katsamakis.

196.     On September 30, 2011, Katsamakis attended a Tecfidera consultant meeting, receiving $3,500.00.  On January 14, 2012, he was paid $7,920.00 for attending a Tecfidera consultant meeting, and was paid $17,600.00 for attending a Tecfidera consultant meeting on March 7, 2013.  In 2013, Katsamakis submitted 68 claims for payment to Medicare for Tecfidera, costing the program $364,135.72.  All of these claims were tainted by the kickbacks Biogen paid Katsamakis.

197.     Bhupendra Khatri's office is located at 2801 W Kinnickinnic River Pkway, Ste 630 St. Luke's Medical Center, Milwaukee, WI.  From February 6, 2009 through

December 4, 2010, Bhupendra Khatri was paid $212,975.00 for attending 50 consultant and speaker events for Avonex and Tysabri.  Medicare claims data for the years 2009 through 2012 has not been made publicly available and Relators do not have access to it. In 2013, however, Khatri submitted 70 claims for payment for Avonex to Medicare Part D, for which the program paid $309,946.69.  Given the large percentage of MS prescriptions paid for by Medicare; the fact that Khatri accepted Medicare patients in the years 2009-2012, and the numerous claims for Avonex that Khatri submitted to Medicare in 2013 when such data is publicly available, there is no reason to believe Khatri did not present Avonex claims for payment to Medicare during the years 2009-2012.  All such claims, as well as the claims Khatri submitted in 2013, were tainted by the kickbacks Biogen paid Khatri.

198.    On September 30, 2011, Khatri received $3,500 for attending a Tecfidera consultant meeting.  On February 8, 2013, Khatri received $7,920 for attending Tecfidera consultant meeting.  Khatri was paid $17,600 for attending a March 7, 2013, consultant meeting.  In 2013, Khatri made 73 claims for payment to Medicare for Tecfidera, costing the program $453,543.75.  All of these claims were tainted by the kickbacks Biogen paid Khatri.

199.    Andrew Pachner's office is located at 90 Bergen St #4100 Newark, NJ 07103.  Between February 6, 2009, and December 15, 2010, Andrew Pachner was paid $175,175.00 for 41 different consultant or speaker events involving Avonex or Tysabri. Medicare claims data for the years 2009-2012 has not been made publicly available and Relators do not have access to it.  In 2013, Pachner submitted 22 claims for payment to

Medicare Part D for Avonex, for which Medicare paid $90,563.94.  Given the large percentage of MS prescriptions paid for by Medicare; the fact that Pachner accepted Medicare patients in the years 2009-2012, and the numerous claims for Avonex that Pachner submitted to Medicare in 2013 when such data is publicly available, there is no reason to believe Pachner did not present Avonex claims for payment to Medicare during the years 2009-2012.  All such claims, as well as the claims Pachner submitted in 2013, were tainted by the kickbacks Biogen paid Pachner.

200.    Relators have also obtained Medicaid claims data for California, Georgia, Massachusetts, North Carolina, and Texas.  As set forth below, the data for California, Georgia, and Massachusetts details individual claims for payment for the Biogen products at issue, made to the state Medicaid program by physicians who received kickbacks from Biogen.  The data for North Carolina and Texas is in summary form – identifying periods of time during which physicians submitted claims for payment for Avonex, Tysabri, and/or Tecfidera.  All of the prescribers identified also received at least one substantial cash payment from Biogen - purportedly as a consulting/speaker fee - before submitting a Medicaid claim for payment for one of the three Biogen MS drugs at issue.  *See Exhibits 1-4, 6.*

**California Medi-Cal:**

201.    Mark Aguis's office is located at 4860 Y St., Suite 3700, Sacramento, CA 95817.  On February 6, 2009, Biogen paid Mark Aguis $7,000.00 to attend a consultant meeting.  Later that year, on November 13, 2009, Biogen paid Aguis another $5,250.00 to attend a consultant meeting.  On January 29, 2010, Aguis was paid $8,500.00 to attend

an Avonex consultant meeting.  He received a payment of $3,500.00 to attend a Tysabri

consultant meeting on November 6, 2010.  Mark Aguis was paid $7,920.00 to attend a

Tecfidera consultant meeting on January 14, 2012.  Biogen paid Aguis another $6,600.00

to attend a Tecfidera consultant meeting on April 19, 2013.  All of Aguis's expenses for

both meetings were covered by Biogen.  Below is a representative chart of individual

claims for payment Mark Aguis submitted to Medi-Cal (California's Medicaid Program)

after receiving the kickback payment from Biogen.  The chart below depicts specific

claims for payment submitted by Aguis for Biogen's drugs to Medi-Cal after receiving

substantial kickback fees from Biogen.  The "Dispensed Date" refers to the date the

drug was dispensed; CCN # is a number that uniquely identifies a particular payment

of a claim; RX # identifies the prescription number.  The final two columns are the date

Medi-Cal made payment and the amount it paid.

| Dispensed Date | CCN # | Drug Name | RX # | Payment date | Medi-Cal Paid |
|---|---|---|---|---|---|
| 05/17/2010 | 137950265000 | Avonex | 0874276 | 06/01/2010 | $2,653.97 |
| 06/08/2010 | 159950246200 | Avonex | 0874276 | 06/28/2010 | $2,613.25 |
| 07/09/2010 | 190950256700 | Avonex | 0874276 | 07/19/2010 | $2,613.25 |
| 11/04/2010 | 308950272800 | Avonex | 0932554 | 11/15/2010 | $2,731.25 |
| 12/07/2010 | 341950290700 | Avonex | 0932554 | 12/20/2010 | $2,697.20 |
| 05/17/2013 | 3137955092200 | Tecfidera | 000000089849 | 05/28/2013 | $4,489.25 |
| 06/27/2013 | 3178955173300 | Tecfidera | 000000089850 | 07/08/2013 | $4,489.25 |
| 07/24/2013 | 3206955038900 | Tecfidera | 000000089850 | 08/05/2013 | $4,489.25 |

| 11/12/2010 | 1007251203900 | Tysabri | N/A | 02/07/2011 | $458.37 |
|---|---|---|---|---|---|

202.     Daniel Bandari's office is located at 3900 W. Coast Hwy Ste 330, Newport

Beach, CA 92663.  From January 21, 2009 through December 7, 2010, Biogen made 47

separate payments to Bandari for participating in Avonex and Tysabri speaker events

and consultant meetings.  These payments totaled $161,550.00.  Biogen paid Bandari to

attend two Tecfidera consultant meetings in 2012 – one held on February 4, the other

held on June 21.  Bandari received $6,600.00 to attend each of these meetings.  In 2013,

Biogen paid Bandari $6,600.00 to attend a Tecfidera consultant meeting on April 19, and

paid him another $4,400.00 to attend a similar Tecfidera meeting on December 5, 2013.

Below is a representative chart of individual claims for payment Bandari submitted to

Medi-Cal (California's Medicaid Program) after receiving kickback payments from

Biogen.  The chart below depicts specific claims for payment submitted by Bandari for

Biogen's drugs to Medi-Cal after receiving substantial kickback fees from Biogen.

| Dispensed Date | CCN # | Drug Name | RX # | Payment date | Medi-Cal Paid |
|---|---|---|---|---|---|
| 10/21/2010 | 294962958700 | Avonex | 0123039 | 11/01/2010 | $2,632.10 |
| 12/08/2010 | 342964122900 | Avonex | 0123039 | 12/20/2010 | $2,632.10 |
| 11/15/2013 | 137235793921 | Tecfidera | 000001329802 | 11/21/2013 | $1,073.00 |
| 11/27/2013 | 137312570061 | Tecfidera | 000001329803 | 11/28/2013 | $4,592.00 |
| 12/23/2013 | 137574288361 | Tecfidera | 000001329804 | 12/26/2013 | $4,592.00 |

{00033378}

203.    Regina Berkovich's office is located at 5755 Corteen Place, Valley Village, CA 91607.  From February 19, 2009 through November 6, 2010, Biogen paid Berkovich $69,150.00, for attending 21 speaker events and consultant meetings for Avonex and Tysabri.  On November 30, 2011, Biogen paid Berkovich $5,400.00 to attend a Tecfidera consultant meeting.  She was paid another $4,350.00 to attend a second Tecfidera consultant meeting on December 2, 2011.  On January 14, 2012, Berkovich received $6,480.00 as a consult fee for attending a Tecfidera meeting.  Then, on March 7, 2013, she received $16,280.00 for attending a Tecfidera consultant meeting.  Below is a representative chart of individual claims for payment Berkovich submitted to Medi-Cal after receiving the kickbacks described above from Biogen.  The chart below depicts specific claims for payment submitted by Berkovich for Biogen's drugs to Medi-Cal after receiving substantial kickback fees from Biogen.

| Dispensed Date | CCN # | Drug Name | RX # | Payment date | Medi-Cal Paid |
|---|---|---|---|---|---|
| 10/14/2009 | 9287963475700 | Avonex | 0113519 | 10/26/2009 | $2,762.40 |
| 02/07/2011 | 1026963948500 | Avonex | 0125408 | 1/26/2011 | $2,790.13 |
| 11/11/2009 | 9315961746700 | Avonex | 0113519 | 11/23/2009 | $2,300.04 |
| 07/15/2014 | 4216394219397 | Tecfidera | N/A | 08/31/2014 | $4,969.42 |
| 08/07/2014 | 3040000845233 | Tecfidera | 1344082 | 04/21/2015 | $4,967.42 |

204.    Jeffrey Dunn's office is located at 1616 Petal Way, San Jose, CA 95129. From January 26, 2009 through December 8, 2010, Jeffrey Dunn received $70,200.00 in consult fees and speaker fees for Biogen events relating to Avonex and Tysabri.  From

September 30, 2011 through May 9, 2013, Dunn attended 9 Tecfidera consultant

meetings. Biogen paid him $62,086.32 for his "consultation" at these meetings.  Below

are representative examples of claims for payment Dunn submitted for Biogen's

Avonex, Tysabri, and Tecfidera products.

| Dispensed Date | CCN # | Drug Name | RX # | Payment date | Medi-Cal Paid |
|---|---|---|---|---|---|
| 06/07/2010 | 288991903700 | Tysabri | N/A | 11/22/2010 | $864.36 |
| 04/05/2012 | 1211004056377 | Tysabri | N/A | 05/09/2012 | $4,642.46 |
| 06/10/2013 | 3996674313 | Tecfidera | 000000551378 | 06/20/2013 | $4,591.48 |
| 09/06/2013 | 4070278153 | Tecfidera | 000000557746 | 09/12/2013 | $4,591.48 |
| 10/01/2013 | 4091526897 | Tecfidera | 000000557747 | 10/10/2013 | $4,591.48 |

205.    Scott Zamvil's practice is located at 3851 Nathan Way, Palo Alto, CA

94303. From January 13, 2009 through December 15, 2010, Zamvil was paid $157,350.00,

to attend 35 speaker and consultant events involving Avonex and Tysabri.  In addition,

on September 30, 2011, Scott Zamvil was paid $6,300.00 to attend a Tecfidera consultant

meeting.  Zamvil was paid $8,360.00 as a consult fee for attending a Tecfidera

consultant meeting which was held on January 12, 2012.  He received $7,920.00 to

attend a Tecfidera consultant meeting on January 14, 2012, $6,160.00 to attend a

Tecfidera consultant meeting on May, 9, 2013, and another $7,920.00 to attend a

Tecfidera consultant meeting on October 10, 2013. Below is a representative chart of

individual claims for payment Zamvil submitted to Medi-Cal while receiving kickbacks

from Biogen. The chart below depicts specific claims for payment submitted by Zamvil for Biogen's drugs to Medi-Cal after receiving substantial kickback fees from Biogen.

| Dispensed Date | CCN # | Drug Name | RX # | Payment date | Medi-Cal Paid |
|---|---|---|---|---|---|
| 05/28/2009 | 9148954498800 | Avonex | 1501027 | 06/08/2009 | $2,395.58 |
| 07/01/2009 | 9182957039900 | Avonex | 1501027 | 07/13/2009 | $2,395.58 |
| 09/03/2013 | 3298007144454 | Tecfidera | N/A | 11/30/2013 | $4,558.60 |
| 10/02/2013 | 3298007174029 | Tecfidera | N/A | 11/30/2013 | $4,558.60 |
| 11/23/2013 | 3345007244010 | Tecfidera | N/A | 12/31/2013 | $4,558.60 |

**Georgia Medicaid:**

206.    Biogen paid Jeffrey English $5,400 to attend a Tecfidera consultant meeting on January 13, 2012. He was paid $13,320 to attend a Tecfidera consultant meeting on March 7, 2013 and paid another $3,600.00 to attend a Tecfidera consultant meeting on June 13, 2013. Relators do not have data relating payments Biogen made to consultants and speakers after 2013.  There is no reason to believe Biogen's payments to English did not continue into 2014 and beyond.  Relators also do not have claims data before 2013. Given the large percentage of MS prescriptions paid for by Medicare and Medicaid, there is no reason to believe English did not submit claims for payment for the Biogen drugs at issue before 2013.

207.    Below is a representative chart of individual claims for payment English submitted to Georgia Medicaid after receiving the kickback payment from Biogen. The "Dispensed Date" refers to the date the drug was dispensed; ICN # is a 15-digit number

that uniquely identifies a particular payment of a claim; "NDC Desc." is the description

of the drug, RX # identifies the prescription number.  The final two columns are the

date Medicaid made payment and the amount it paid.

| Dispensed Date | ICN # | NDC Desc. | RX # | Payment date | Paid Amount |
|---|---|---|---|---|---|
| 11/15/2013 | 2513355114097 | Tecfidera | 349295 | 12/24/2013 | $4,544.25 |
| 12/16/2013 | 2515283091134 | Tecfidera | 4369 | 10/13/2015 | $5,905.00 |
| 07/21/2014 | 2514207080671 | Tecfidera | 7011767 | 07/28/2014 | $5,023.80 |
| 08/13/2014 | 2514228198364 | Tecfidera | 7011767 | 08/18/2014 | $5,023.80 |

208.    Biogen paid Joel Greenberg $3,750.00 to attend a Tecfidera consultant

meeting on February 1, 2013.  The following is a representative chart of individual

claims for payment Greenberg submitted to Georgia Medicaid after receiving the

kickback payment from Biogen. Relators do not have data relating payments Biogen

made to consultants and speakers after 2013.  There is no reason to believe Biogen's

payments to Greenberg did not continue into 2014 and beyond.  Relators also do not

have claims data before 2013. Given the large percentage of MS prescriptions paid for

by Medicare and Medicaid, there is no reason to believe Greenberg did not submit

claims for payment for the Biogen drugs at issue before 2013.

| Dispensed Date | ICN # | NDC Desc. | RX # | Payment date | Paid Amount |
|---|---|---|---|---|---|
| 07/19/2013 | 2513208010180 | Tecfidera | 345654 | 07/30/2013 | $4,544.25 |
| 12/13/2013 | 2513355015877 | Tecfidera | 345734 | 09/30/2014 | $4,544.25 |

| 04/08/2014 | 2514116079214 | Tecfidera | 30060280 | 04/30/2014 | $5,025.80 |
| 12/15/2014 | 2514354097290 | Tecfidera | 30060874 | 12/23/2014 | $5,277.80 |
| 07/13/2015 | 2515199078581 | Tecfidera | 366993 | 07/21/2015 | $5,454.04 |

209.    Douglas Stuart was paid $3,750.00 to attend a Tecfidera consultant meeting on April 12, 2013.  He was paid another $3,750.00 to attend a Tecfidera consultant meeting on June 20, 2013.  The following is a representative chart of individual claims for payment Stuart submitted to Georgia Medicaid after receiving consulting fees from Biogen. Relators do not have data relating payments Biogen made to consultants and speakers after 2013.  There is no reason to believe Biogen's payments to Stuart did not continue into 2014 and beyond.  Relators also do not have claims data before 2013. Given the large percentage of MS prescriptions paid for by Medicare and Medicaid, there is no reason to believe Stuart did not submit claims for payment for the Biogen drugs at issue before 2013.

| Dispensed Date | ICN # | NDC Desc. | RX # | Payment date | Paid Amount |
|---|---|---|---|---|---|
| 08/25/2014 | 2514242106972 | Tecfidera | 30060517 | 09/03/2014 | $5,025.80 |
| 09/19/2014 | 2514270018958 | Tecfidera | 30060517 | 09/30/2014 | $5,025.80 |
| 10/16/2014 | 2514291231721 | Tecfidera | 30060517 | 10/21/2014 | $5,025.80 |
| 11/19/2014 | 2514326213302 | Tecfidera | 30060517 | 11/25/2014 | $5,277.80 |
| 12/12/2014 | 2514354028461 | Tecfidera | 1324 | 12/22/2014 | $5,277.80 |

210.    Ben Thrower was paid $4,500.00 for attending a Tecfidera consultant

meeting on September 20, 2011.  He was paid $6,480.00 for attending another Tecfidera

consultant meeting on June 28, 2012.  The following is a representative chart of

individual claims for payment Thrower submitted to Georgia Medicaid, after having

received consult fees from Biogen. Relators do not have data relating payments Biogen

made to consultants and speakers after 2013.  There is no reason to believe Biogen's

payments to Thrower did not continue into 2014 and beyond.  Relators also do not have

claims data before 2013. Given the large percentage of MS prescriptions paid for by

Medicare and Medicaid, there is no reason to believe Thrower did not submit claims for

payment for the Biogen drugs at issue before 2013. The chart below depicts specific

claims for payment Ben Thrower submitted for Tecfidera scripts he wrote, to Georgia

Medicaid after receiving substantial kickback fees from Biogen.

| Dispensed Date | ICN # | NDC Desc. | RX # | Payment date | Paid Amount |
|---|---|---|---|---|---|
| 11/26/2013 | 251334162814 | Tecfidera | 349782 | 12/03/2013 | $4,544.25 |
| 12/20/2013 | 2513362086556 | Tecfidera | 350536 | 12/31/2013 | $4,544.25 |
| 01/17/2014 | 2514025002452 | Tecfidera | 349293 | 01/28/2014 | $4,587.45 |
| 04/25/2014 | 2514123028975 | Tecfidera | 349293 | 05/06/2014 | $4,976.70 |
| 07/15/2014 | 2514200163846 | Tecfidera | 356673 | 07/22/2014 | $4,923.03 |

211.    Mitzi Williams was paid $3,600.00 for attending a Tecfidera consultant

meeting on February 4, 2012, and paid $5,400.00 to attend a Tecfidera consultant

meeting on June 7, 2012.  She was paid another $5,400.00 to attend a Tecfidera

consultant meeting on April 12, 2013.  The following is a representative chart of

individual claims for payment Williams submitted to Georgia Medicaid after receiving

consulting fees from Biogen.  Relators do not have data relating payments Biogen made

to consultants and speakers after 2013.  There is no reason to believe Biogen's payments

to Williams did not continue into 2014 and beyond.  Relators also do not have claims

data before 2013.  Given the large percentage of MS prescriptions paid for by Medicare

and Medicaid, there is no reason to believe Williams did not submit claims for payment

for the Biogen drugs at issue before 2013.

| Dispensed Date | ICN # | NDC Desc. | RX # | Payment date | Paid Amount |
|---|---|---|---|---|---|
| 02/21/2014 | 2514060027305 | Tecfidera | 7008122 | 03/03/2014 | $5,023.80 |
| 03/26/2014 | 2514088183519 | Tecfidera | 7008123 | 03/31/2014 | $5,023.80 |
| 04/25/2014 | 2514123010895 | Tecfidera | 7008123 | 05/05/2014 | $5,023.80 |
| 05/28/2014 | 2514151143188 | Tecfidera | 7008123 | 06/02/2014 | $5,023.80 |
| 10/08/2014 | 2514284180718 | Tecfidera | 821 | 10/14/2014 | $5,025.80 |

**Massachusetts Medicaid:**

212.    Ranbir Dhillon's office is located at Partners MS Center, 1 Brookline Pl Ste

225, Brookline, MA 0245.  Dhillon was paid $3,000 to attend a Tecfidera consultant

meeting on March 9, 2012, and paid another $3,000 to attend a Tecfidera consultant

meeting on June 14, 2012.  On November 14, 2013, Dhillon received an additional $3,000

to attend a Tecfidera consultant meeting.  Below are representative examples of claims

for payment Dhillon submitted to Massachusetts' Medicaid program for Tecfidera

prescriptions after receiving cash kickbacks from Biogen.  The "claim submitted"

column identifies the date the claim for payment was presented to Medicaid.  The "Paid

Amount" column is the amount paid by Medicaid.

| Claim Submitted | Drug Name | Paid Amount |
|---|---|---|
| 09/09/2014 | Tecfidera | $5,027.41 |
| 10/06/2014 | Tecfidera | $4,937.21 |
| 10/31/2014 | Tecfidera | $5,060.50 |
| 12/01/2014 | Tecfidera | $5,436.75 |
| 12/04/2014 | Tecfidera | $5,060.50 |

213.    Eric Klawitier's office is located at 88 Beale St. #1 Brookline, MA 02466.

Biogen paid Klawitier $6,600 to attend a Tecfidera consultant meeting on December 12,

2012. Below are representative examples of claims for payment Klawitier submitted to

Massachusetts' Medicaid program for Tecfidera prescriptions after receiving cash

kickbacks from Biogen.

| Dispensed Date | Drug Name | Paid Amount |
|---|---|---|
| 01/07/2014 | Tecfidera | $4,724.35 |
| 02/04/2014 | Tecfidera | $5,032.53 |
| 02/07/2014 | Tecfidera | $4951.99 |
| 03/05/2014 | Tecfidera | $4,937.21 |

| 03/17/2014 | Tecfidera | $5,032.53 |
|---|---|---|

214.     Revere Kinkel's office is located at 15 Mount Vernon Street, Cambridge, MA 02140.  From February 4, 2009 through December 7, 2010, Kinkel received $61,740 for attending 16 speaker or consulting events for Avonex and Tysabri.  On September 30, 2011, Kinkel attended a Tecfidera consultant meeting.  He was paid $5,400 to attend.  Kinkel was paid $4,050 to attend a Tecfidera consultant meeting on December 2, 2011, and paid $7,920 to attend a consultant meeting on January 14, 2012.  On March 16, 2012, Kinkel attended another Tecfidera consultant meeting for which he was paid $7,920.  On June 14, 2012, Kinkel attended a Tecfidera consultant meeting for which he received $5,400.  He received another $7,920 for attending a Tecfidera consultant meeting on October 4, 2012.  Below are representative examples of claims for payment Kinkel submitted to Massachusetts' Medicaid program for Avonex and Tecfidera prescriptions after receiving cash kickbacks from Biogen.

| Dispensed Date | Drug Name | Paid Amount |
|---|---|---|
| 03/03/2009 | Avonex | $2,207.10 |
| 11/16/2010 | Avonex | $2,777.48 |
| 09/30/2013 | Tecfidera | $4,535.35 |
| 11/11/2013 | Tecfidera | $4,574.17 |
| 12/18/2013 | Tecfidera | $4,710.73 |

215.    Ellen Lathi's office is located at St. Elizabeth's Medical ACenter, 736
Cambridge Street, Brighton, MA 02135.  From February 6, 2009 through December 8,
2010, Lathi was paid $98,400 to attend 30 Biogen speaker or consultant events involving
Avonex and Tysabri.  On April 12, 2013, Lathi attended a Tecfidera consultant meeting
for which she was paid $6,480.00.  Below are representative examples of claims for
payment Lathi submitted to Massachusetts' Medicaid program for Tecfidera and
Avonex prescriptions after receiving cash kickbacks from Biogen.

| Dispensed Date | Drug Name | Paid Amount |
|---|---|---|
| 02/17/2009 | Avonex | $2,207.10 |
| 02/23/2009 | Avonex | $2,207.10 |
| 07/08/2010 | Avonex | $2,736.30 |
| 01/14/2011 | Avonex | $2,944.76 |
| 07/15/2013 | Tecfidera | $4,606.15 |

216.    Salvatore Napoli's office is located at 15 Payson Rd., Caritas Norwood,
Foxboro, MA 02035.  From June 10, 2009 through September 29, 2010, Salvatore Napoli
received $13,500 in speaking and consulting fees for attending six Avonex or Tysabri
events.  Napoli attended a Tecfidera consultant meeting on March 9, 2012.  Biogen paid
him $3,750 for attending.  On June 14, 2012, Napoli attended another Tecfidera
consultant meeting, for which he was paid another $3,750.  On April 12, 2013, Napoli
attended a Tecfidera consultant meeting and was paid $6,480 to attend.  Below are
representative examples of claims for payment Napoli submitted to Massachusetts'

Medicaid program for Avonex and Tecfidera prescriptions after receiving cash kickbacks from Biogen.

| Dispensed Date | Drug Name | Paid Amount |
|---|---|---|
| 06/16/2009 | Avonex | $2,417.10 |
| 08/11/2009 | Avonex | $2,777.48 |
| 10/06/2010 | Avonex | $2,777.48 |
| 06/24/2014 | Tecfidera | $5,173.75 |
| 07/25/2014 | Tecfidera | $5,173.75 |

**North Carolina Medicaid:**

217.    Jill Conway's office is located at 7425 Harrisonwoods Place in Charlotte, NC 20270.  Jill Conway received a payment of $6,600.00 for attending a Tecfidera consultant meeting on February 4, 2012.  She was reimbursed $273.00 in expenses for attending the consultant meeting.  On June 7, 2012, Conway received another $6,600.00 for attending a Tecfidera consultant meeting and was reimbursed $80.00 in expenses. On March 7, 2013, Conway attended a Tecfidera consultant meeting for which she was paid $16,280.00.  From the date Conway received the first kickback payment through March 11, 2015, she has submitted 70 claims for payment for Tecfidera to North Carolina's Medicaid program totaling $110,726.00.

218.    Steven Freedman's office is located at Raleigh Neurology Associates, 1540 Sunday Drive Raleigh, NC 27607.  Biogen paid Steven Freedman $105,750.00 in consultant fees and speaker fees from March 18, 2009 through December 9, 2010, for

Avonex and Tysabri events.  From February 4, 2012, through March 7, 2013, Steven Freedman attended four Tecfidera consultant meetings.  Biogen paid Freedman over $24,650 for attending the Tecfidera consultant meetings.  From February 6, 2012 through November 3, 2015, Freedman submitted 196 claims for payment to North Carolina's Medicaid program for the three Biogen products at issue.  Freedman submitted 53 claims for Avonex between February 6, 2012, and May 8, 2014, which cost North Carolina Medicaid $91,574.00.  From July 23, 2013 through November 3, 2015, Freedman submitted 75 claims for Tecfidera, totaling $216,721.00.  From March 20, 2012 through September 15, 2015, Freedman submitted 68 claims for Tysabri totaling $260,896.00.

219.    Robert Frere's office is located at 1809 Bloomsbury Rd., Greenville, NC 27858.  Biogen paid Robert Frere a $3,750.00 consult fee for attending a Tecfidera consultant meeting on February 4, 2012.  On June 7, 2012, Frere was again paid $3,750.00 for attending a Tecfidera consulting meeting.  On April 12, 2013, Biogen paid Frere another $3,750.00 for attending a Tecfidera consulting meeting.  Frere was also reimbursed all of his expenses for attending these three meetings.  From the time Frere attended the February 4, 2012 consultant meeting, through November 6, 2015, he submitted 194 claims to North Carolina's Medicaid for Avonex and Tecfidera, costing the program $641,459.00.  From February 9, 2012 through November 2, 2015, Frere submitted 89 claims for Avonex totaling $341,878.00.  From April 11, 2013, through November 6, 2015, Frere submitted 105 claims to Medicaid for Tecfidera, totaling $299,581.00.

220.     Areen Said's address is located at 436 Windchime Drive Wilmington, NC 28412.  In 2009, Areen Said was paid $9,050.00 to speak or consult for Biogen at Avonex events.  On February 4, 2012, and June 7, 2012, Said attended Tecfidera consultant meetings, for which he was paid $3,750.00 per appearance.  From February 9, 2012, through October 12, 2015, Said submitted 166 claims to the North Carolina Medicaid program for Biogen's drugs, costing the program $469,846.00.  From February 6, 2012 through June 24, 2014, Said submitted 74 claims for Avonex totaling $246,616.00.  From June 12, 2013 through October 12, 2015, Said submitted 92 claims for Tecfidera totaling $223,230.00.

221.     Richard Sater's office is located at 1814 Westchester Drive, Suite 401 High Point, NC 27262.  From February 6, 2009 through September 17, 2010, Biogen paid Richard Sater $27,000.00 in speaker fees and consult fees for seven different Avonex and Tysabri events.  On April 12, 2013, Sater was paid $6,600.00 to attend a Tecfidera consulting meeting.  From April 12, 2013, through November 3, 2015, Richard Sater submitted 136 claims for payment to North Carolina's Medicaid program for Biogen products.  Medicaid paid $429,972.00 for these claims.  Sater submitted 61 claims for Tecfidera totaling $180,730.00 from September 5, 2013 and October 22, 2015.  From April 15, 2013 through November 3, 2015, Sater submitted 48 claims for Tysabri totaling $178,436.00, and from April 25, 2013 through February 12, 2015, Sater submitted 27 claims for Avonex, costing North Carolina's Medicaid Program $70,806.00.

222.     Mark Skeen's office is located at 4828 Eno Woods Trail Durham, NC 27712.  Biogen paid Skeen $70,000.00, spread out over 14 Avonex or Tysabri speaker

and consulting events, from March 26, 2009 through November 13, 2010.  Biogen also paid Skeen $7,920.00 to attend a Tecfidera consulting meeting on February 4, 2012, and another $7,920.00 to attend a Tecfidera consultant meeting on October 4, 2012.  On December 12, 2013, Biogen paid Skeen $6,600.00 to attend a consultant meeting and covered his expenses.  From February 12, 2012, through October 13, 2015, Mark Skeen submitted 78 claims for payment to North Carolina's Medicaid program for Biogen's three MS products.  Medicaid paid $133,377.00 for the 78 claims.  From February 14, 2012 through March 26, 2014, Skeen submitted 24 claims for Avonex, costing North Carolina's Medicaid Program $56,550.00.  From June 12, 2013 through October 13, 2015, Skeen submitted 49 claims for Tecfidera, costing North Carolina Medicaid $69,486.00.  From March 8, 2012 through April 17, 2012 Skeen submitted 5 claims for Tysabri, totaling $7,341.00.

**Texas Medicaid:**

223.    George Hutton's office is located at 3727 Tartan Ln., Houston, TX 77025. Between February 6, 2009 and November 11, 2010, Biogen paid George Hutton $36,750.00 in speaker fees and consulting fees for attending 9 events relating to its Avonex and Tysabri products.  Biogen paid Hutton to attend two Tecfidera consulting meetings – one held on January 14, 2012, and the other on April 12, 2013. For attending these two meetings Hutton was paid $7,920.00 and $6,600.00 respectively. Biogen also covered his expenses for attending the meetings.  Hutton submitted 42 claims for payment, for Avonex and Tecfidera, to Texas's Medicaid program between July 13, 2012 and June 25, 2015 costing Texas' Medicaid program $214,607.  From July 13, 2012 to

January 9, 2014, Hutton submitted 13 claims to Texas's Medicaid program for Avonex, costing the program $57,093.00. From September 23, 2013 through June 25, 2015, Hutton submitted 29 claims for Tecfidera, costing Medicaid $157,514.00.

224.    Flavia Nelson's office is located at 6431 Fannin St., Suite 7 Houston, TX 77030.  On May 23, 2012 Biogen paid Flavia Nelson to attend a Tecfidera consultant meeting for which she was paid $5,280.00.  On April 19, 2013, Nelson was paid $6,600.00 to attend a Tecfidera consultant meeting.  On August 11, 2015, Nelson submitted one claim for payment for Tecfidera to the Texas Medicaid program, which paid $5,912.

225.    Annette Okai's office is located at 3600 Gaston Ave., Ste 1155 Dallas, TX 75246.  Biogen paid Annette Okai $2,000.00 to attend a Tecfidera consultant meeting on February 25, 2012.  It paid her another $3,750.00 to attend a Tecfidera consultant meeting on April 19, 2013.  Annette Okai submitted 27 claims for payment for Tecfidera between July 3, 2013, and May 18, 2015, costing Texas's Medicaid program $137,831.00.

226.    Darin Okuda's office is located at 530 Rockingham Dr. Irving, TX 75063. In 2010, Biogen paid Darin Okuda $49,350.00 to attend 11 speaker or consulting events relating to Avonex and Tysabri.  In 2012, Biogen paid Okuda $21,231.95 in consulting fees to attend Tecfidera events.  In 2013, Biogen paid Okuda $14,484.28 to attend a single Tecfidera consultant meeting which was held on March 7, 2013.  On September 5, 2014, Darin Okuda submitted 5 claims for payment for Avonex to Texas's Medicaid program, costing the program $15,308.

227.    Each and every one of these claims would not have been paid had the United States known that the physician who submitted the claim (or who wrote the

prescription that was the basis of the claim) had received a kickback from Biogen. As the person who knowingly paid the kickback to each and every one of the physicians, Biogen has caused the false claims which were submitted by the physicians and the pharmacies. Pursuant to the False Claims Act, Biogen is liable for the amount the United States paid on account of the false claims and a monetary penalty for each false claim submitted. Relators do not have complete data sets with regard to either the kickback payments Biogen made to physicians for attending speaker and consultant events, or claims data. Relator's data does contain hundreds of claims for payment submitted to government health care programs by physicians who received kickback payments from Biogen. Exhibits 1-6 document the kickbacks paid to these physicians.

### FIRST CAUSE OF ACTION:  UNITED STATES FALSE CLAIMS ACT
31 U.S.C. §3729(a)(1)(A)

228.    The Relators repeat and reallege the allegations set forth in Paragraph 1 through 227 as if fully set forth herein.

229.    As described in detail above, Biogen has caused the presentation of numerous false claims to the United States through the Medicare and Medicaid programs and other federal health insurance programs for medically unnecessary, excessive, abusive, and tainted claims for Avonex, Tysabri and Tecfidera. Biogen improperly paid kickbacks to induce health care providers to prescribe a Biogen product over a more appropriate competitor product. Indeed, Biogen encourages such prescribing by rewarding doctors and prescribing nurses with more and more payments based on their prescription levels. At all times, Biogen knew its kickback

scheme would cause Medicare and Medicaid to pay for unnecessary, excessive, abusive, and tainted claims for Avonex, Tysabri and Tecfidera; that was the entire purpose of the scheme.

230.    The kickbacks described above resulted in the presentation of claims to the Medicare and Medicaid programs and other programs paid for by the United States. These claims were false claims because the United States and/or Medicaid officials are prohibited from paying any claims that were induced through the payment of a kickback.  Had the program administrators known that the claims for Avonex, Tysabri, and Tecfidera were the product of the payment of kickbacks the claims would have been denied.

231.    By paying kickbacks, Biogen also knowingly caused its customers, the physicians and prescribing nurses that wrote the Avonex, Tysabri and Tecfidera prescriptions, to violate their participation agreements with Medicare, Medicaid and other federal payment programs.  These prescribers all certified that they were in compliance with the Anti-Kickback Statute, and compliance was a precondition for payment. Biogen knew that its conduct caused prescribers to violate their provider agreements, and to invalidate the precondition for payment. These false certifications and lack of compliance caused by the kickbacks were material to false or fraudulent claims being paid.  Had Biogen or the physicians informed Medicare, Medicaid and the federal insurance programs about the kickback relationships, these physicians would have been excluded from further participation in the federal programs, and their claims would have been ineligible for reimbursement.

232.    As a result of the kickbacks, millions of dollars were spent by Medicare, Medicaid, and the other federal programs for medically unnecessary, excessive, abusive, and tainted claims for Avonex, Tysabri and Tecfidera that should never have been reimbursed.  Additionally, if a provider receives kickbacks, all of his or her claims, whether for Biogen products or other goods and services, are ineligible for reimbursement.  Accordingly, Biogen is liable for all claims submitted by or as result of a physician that would have been ineligible because of its kickbacks.

WHEREFORE, Relator, on behalf of the United States of America, requests that this Court:

> (a)  Enter judgment holding Biogen liable for a civil penalty of $11,000 for each violation of the False Claims Act committed by it;
>
> (b)  Enter a judgment against Biogen for three times the amount of damages sustained by the United States because of the false claims;
>
> (c)  Award the Relator a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730;
>
> (d)  Award the Relator his costs and reasonable attorneys' fees for prosecuting this action; and
>
> (e)  Enter such other relief which the Court finds just and equitable.

## SECOND CAUSE OF ACTION:  DISTRICT OF COLUMBIA FALSE CLAIMS ACT
### D.C. Code §§ 2-308.03 *et seq*.

233.    The Relators repeat and reallege all of the allegations set forth in paragraphs 1 through 232 as if fully set forth herein.

234.    By virtue of the acts described above, Biogen knowingly presented, or caused to be presented, to an officer or employee of the District of Columbia a false claim for payment or approval, in violation of D.C. Code § 2-308.14(a)(1).

235.    By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used, a false record or statement to get a false claim paid or approved by the District of Columbia, in violation of D.C. Code § 2-308.14(a)(2).

236.    The District of Columbia, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

237.    By reason of Biogen's acts, the District of Columbia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

238.    Pursuant to D.C. Code § 2-308.14(a), the District of Columbia is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

### THIRD CAUSE OF ACTION: CALIFORNIA FALSE CLAIMS ACT
Cal. Gov't. Code §§ 12650 *et seq.*

239.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 238238 as if fully set forth herein.

240.    By virtue of the acts described above, Biogen knowingly presented or caused to be presented to an officer or employee of the State of California or of any

political subdivision thereof, a false claim for payment or approval, in violation of Cal. Gov't Code § 12651(a)(1).

241.    By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used a false record or statement to get a false claim paid or approved by the State of California or by any political subdivision, in violation of Cal. Gov't Code § 12651 (a)(2).

242.    California, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

243.    By reason of Biogen's acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

244.    Pursuant to Cal. Gov't Code § 12651(a), the State of California is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

## FOURTH CAUSE OF ACTION:  COLORADO MEDICAID FALSE CLAIMS ACT
### CRS §§ 25.5-4-304 *et seq.*

245.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 244 as if fully set forth herein.

246.    By virtue of the acts described above, Biogen knowingly presented or caused to be presented to an officer or employee of a Colorado agency a false claim for payment or approval, in violation of CRS §25.5-4-305(a).

247.    By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a Colorado agency, in violation of CRS §25.5-4-305(b).

248.    Colorado, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

249.    By reason of Biogen's acts, the State of Colorado has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

250.    Pursuant to CRS §25.5-4-305(a), the State of Colorado is entitled to three times actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

### FIFTH CAUSE OF ACTION:  CONNECTICUT FALSE CLAIMS ACT
#### Connecticut General Statutes, §17b-301a *et seq.*

251.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 250 as if fully set forth herein.

252.     By virtue of the acts described above, Biogen knowingly presented or caused to be presented to an officer or employee of a Connecticut agency a false claim for payment or approval, in violation of Conn. Gen. Stat. § 17b-301b(a)(1).

253.     By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a Connecticut agency, in violation of Conn. Gen. Stat. § 17b-301b(a)(2).

254.     Connecticut, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

255.     By reason of Biogen's acts, the State of Connecticut has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

256.     Pursuant to Conn. Gen. Stat. § 17b-301b(a), the State of Connecticut is entitled to three times actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

## SIXTH CAUSE OF ACTION: DELAWARE FALSE CLAIMS AND REPORTING ACT
6 Del C. §§ 1201 *et seq.*

257.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 256 as if fully set forth herein.

258.     By virtue of the acts described above, Biogen knowingly presented, or caused to be presented, directly or indirectly, to an officer or employee of Delaware a false or fraudulent claim for payment or approval, in violation of 6 Del. C. § 1201(a)(1).

259.     By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved by Delaware in violation of 6 Del. C. § 1201(a)(2).

260.     Delaware, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not have been paid but for the acts and/or conduct of Biogen as alleged herein.

261.     By reason of Biogen's acts, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

262.     Pursuant to 6 Del. C. § 1201(a), the State of Delaware is entitled to three times the amount of actual damages plus the maximum penalty of $11 ,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

## SEVENTH CAUSE OF ACTION: FLORIDA FALSE CLAIMS ACT
### Fla. Stat. §§ 68.081 *et seq.*

263.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 262 as if fully set forth herein.

264.    By virtue of the acts described above, Biogen knowingly presented or caused to be presented to an officer or employee of a Florida agency a false claim for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

265.    By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a Florida agency, in violation of Fla. Stat. § 68.082(2)(b).

266.    Florida, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

267.    By reason of Biogen's acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

268.    Pursuant to Fla. Stat. § 68.082(2)(g), the State of Florida is entitled to three times actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

## EIGHTH CAUSE OF ACTION: GEORGIA STATE FALSE MEDICAID CLAIMS ACT
### O.C.G.A. § 49-4-168

269.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 268 as if fully set forth herein.

270.    By virtue of the acts described above, Biogen knowingly presented or caused to be presented to an officer, employee, fiscal intermediary grantee or contractor of the Georgia Medicaid Program a false claim for payment or approval, in violation of O.G.C.A. § 49-4-168.1(a)(1).

271.    By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program, in violation of O.G.C.A. § 49-4-168.1(2)(b).

272.    The Georgia Medicaid program, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

273.    By reason of Biogen's acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

274.    Pursuant to O.G.C.A. § 49-4-168.1(a), the State of Georgia is entitled to three times actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used or caused to be made or used by Biogen.

## NINTH CAUSE OF ACTION: HAWAII FALSE CLAIMS ACT
### Haw. Rev. Stat. §§ 661-21 *et seq.*

275.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 274 as if fully set forth herein.

276.     By virtue of the acts described above, Biogen knowingly presented, or caused to be presented, to an officer or employee of the State of Hawaii a false or fraudulent claim for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(1).

277.     By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Hawaii, in violation of Haw. Rev. Stat. § 661-21(a)(2).

278.     The State of Hawaii, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

279.     By reason of Biogen's acts, the State of Hawaii has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

280.     Pursuant to Haw. Rev. Stat. § 66l-21(a)(8) the State of Hawaii is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

### TENTH CAUSE OF ACTION:  ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT
### 740 Ill. Comp. Stat. §§ 175/1 *et seq.*

281.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 280 as if fully set forth herein.

282.    By virtue of the acts described above, Biogen knowingly presented, or caused to be presented, to an officer or employee of the State of Illinois a false or fraudulent claim for payment or approval in violation of 740 Ill. Comp. Stat. § 175/3(a)(1).

283.    By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Illinois, in violation of 740 Ill. Comp. Stat. § 175/3(a)(2).

284.    Illinois, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

285.    By reason of Biogen's acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

286.    Pursuant to 740 Ill. Comp. Stat. § 175/3(a)(7), the State of Illinois is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

## ELEVENTH CAUSE OF ACTION:  INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT
### Ind. Code. §§ 5-11-5.5 *et seq.*

287.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 286 as if fully set forth herein.

288.    By virtue of the acts described above, Biogen knowingly presented, or caused to be presented, to an officer or employee of the State of Indiana a false or fraudulent claim for payment or approval in violation of Ind. Code §§ 5-11-5.5-2(b)(1) and (8).

289.    By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Indiana, in violation of §§ 5-11-5.5-2(b)(2) and (8).

290.    Indiana, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

291.    By reason of Biogen's acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

292.    Pursuant to § 5-11-5.5-2(b), the State of Indiana is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

## TWELFTH CAUSE OF ACTION: IOWA MEDICAID FALSE CLAIMS ACT
### Iowa Code §685 *et seq.*

293. Relators repeat and reallege the allegations set forth in paragraphs 1 through 292 as if fully set forth herein.

294. By virtue of the acts described above, Biogen knowingly presented or caused to be presented to an officer or employee of a Iowa agency a false claim for payment or approval, in violation of Iowa Code §685.2.1.a.

295. By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a Iowa agency, in violation of Iowa Code §685.2.1.b.

296. Iowa, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

297. By reason of Biogen's acts, the State of Iowa has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

298. Pursuant to Iowa Code 685.2.1, the State of Iowa is entitled to three times actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

## THIRTEENTH CAUSE OF ACTION: LOUISIANA FALSE CLAIMS ACT/MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW
### 46 La. Rev. Stat. Ch. 3 §§ 437.1 *et seq.*

299.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 298 as if fully set forth herein.

300.    By virtue of the acts described above, Biogen knowingly presented or caused to be presented to Louisiana false or fraudulent claims, in violation of 46 La. Rev. Stat. Ch. 3 §438.3(A).

301.    By virtue of the acts described above, Biogen knowingly engaged in misrepresentation to obtain, or attempt to obtain, payment from Louisiana medical assistance programs funds, in violation of 46 La. Rev. Stat. Ch. 3 § 438.3(B).

302.    Louisiana, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen alleged herein.

303.    By reason of Biogen's acts, the State of Louisiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

304.    Pursuant to 46 La. Rev. Stat. Ch. 3 § 438.5 and § 438.6, the State of Louisiana is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

## <u>FOURTEENTH CAUSE OF ACTION:  MARYLAND FALSE HEALTH CLAIMS ACT</u>
### Md. Code Ann., Health-Gen §2-601 *et seq.*

305.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 304 as if fully set forth herein.

306.    By virtue of the acts described above, Biogen knowingly presented or caused to be presented to an officer or employee of a Maryland agency a false claim for payment or approval, in violation of Md. Code Ann., Health-Gen §2-602(a)(1).

307.    By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a Maryland agency, in violation of Md. Code Ann., Health-Gen §2-602(a)(2).

308.    Maryland, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

309.    By reason of Biogen's acts, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

310.    Pursuant to Md. Code Ann., Health-Gen §2-602(b), the State of Maryland is entitled to three times actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

## FIFTEENTH CAUSE OF ACTION:  MASSACHUSETTS FALSE CLAIMS LAW
M.G.L. c. 12 §§ 5A *et seq.*

311.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 310 as if fully set forth herein.

312.    By virtue of the acts described above, Biogen knowingly presented, or caused to be presented to the Commonwealth of Massachusetts, a false or fraudulent claim for payment or approval, in violation of M.G.L. c. 12 § 5B(l).

313.    By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used, a false record or statement to obtain payment or approval of a claim by the Commonwealth of Massachusetts or any political subdivision thereof, in violation of M.G.L. c. 12 § 5B(2).

314.    Massachusetts, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

315.    By reason of Biogen's acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

316.    Pursuant to M.G.L. c. 12 § 5B(9), the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

### SIXTEENTH CAUSE OF ACTION:  MICHIGAN MEDICAID FALSE CLAIM ACT
M.C.L. §§ 400.601 *et seq.*

317.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 316 as if fully set forth herein.

318.    By virtue of the acts described above, Biogen knowingly caused to be presented to Michigan, a false statement or false representation of a material fact in an application for Medicaid benefits, in violation of M.C.L. § 400.603(l).

319.    By virtue of the acts described above, Biogen knowingly caused to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit under the Michigan Medicaid program, in violation of M.C.L. 400.603(2).

320.    Michigan, unaware of the falsity of the statements and claims caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

321.    By reason of Biogen's acts, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

322.    Pursuant to M.C.L. § 400.612, the State of Michigan is entitled to three times the amount of actual damages, forfeiture of all amounts received by Biogen and the maximum penalty of $10,000 for each and every false or fraudulent claim made, used, presented or caused to be made, used or presented by Biogen.

## SEVENTEENTH CAUSE OF ACTION:  MINNESOTA FALSE CLAIMS ACT
### M.S.A. §15C.01 *et seq.*

323.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 322 as if fully set forth herein.

324.    By virtue of the acts described above, Biogen knowingly presented or caused to be presented to an officer or employee of a Minnesota agency a false claim for payment or approval, in violation of M.S.A. §15C.02(a)(1).

325.    By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a Minnesota agency, in violation of M.S.A. §15C.02(a)(2).

326.    Minnesota, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

327.    By reason of Biogen's acts, the State of Minnesota has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

328.    Pursuant to M.S.A. §15C.02(a), the State of Minnesota is entitled to three times actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

## EIGHTEENTH CAUSE OF ACTION:  MONTANA FALSE CLAIMS ACT
### Mont. Code Ann. §§17-8-401 *et. seq.*

329.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 328 as if fully set forth herein.

330.    By virtue of the acts described above, Biogen knowingly presented, or caused to be presented to an officer or employee of a Montana governmental entity, a false or fraudulent claim for payment or approval, in violation of Mont. Code Ann. § 17-8-403(l)(a).

331.    By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used, a false record or statement to obtain payment or approval of a claim by governmental entities of Montana, in violation of Mont. Code Ann. § 17-8-403(l) (b).

332.    Montana, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

333.    By reason of Biogen's acts, the State of Montana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

334.    Pursuant to Mont. Code Ann. § 17-8-403(2), the State of Montana is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

## NINETEENTH CAUSE OF ACTION:  NEVADA FALSE CLAIMS ACT
### Nev. Rev. Stat. §§ 357.010 *et seq.*

335.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 354 as if fully set forth herein.

336.     By virtue of the acts described above, Biogen knowingly presented or caused to be presented to Nevada a false claim for payment or approval, in violation of Nev. Rev. Stat. §357.040(1)(a).

337.    By virtue of the acts described above, Biogen knowingly made or used, or caused to be made or used, a false record or statement to obtain payment or approval by Nevada of a false claim, in violation of Nev. Rev. Stat. § 357.040(1)(b).

338.    Nevada, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

339.    By reason of Biogen's acts, the State of Nevada has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

340.    Pursuant to Nev. Rev. Stat. § 357.040(1), the State of Nevada is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.


## TWENTIETH CAUSE OF ACTION: NEW JERSEY FALSE CLAIMS ACT
### N.J. Stat. Ann. §§2A:32C-1 *et seq.*

341.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 340 as if fully set forth herein.

342.     By virtue of the acts described above, Biogen knowingly presented, or caused to be presented to an employee, officer or agent of New Jersey or any contractor, grantee or recipient of New Jersey state funds, a false or fraudulent claim for payment or approval, in violation of N.J. Stat. Ann. 2A:32-C3a.

343.     By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid by New Jersey, in violation of N.J. Stat. Ann. 2A:32-C3b.

344.     New Jersey, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

345.     By reason of Biogen's acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

346.     Pursuant to N.J. Stat. Ann. 2A:32-C3, the State of New Jersey is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

## TWENTY-FIRST CAUSE OF ACTION:  NEW MEXICO FALSE CLAIMS ACT
### N.M.S.A §§ 27-14-1 *et seq.*

347.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 346 as if fully set forth herein.

348.    By virtue of the acts described above, Biogen presented, or caused to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent, in violation of N.M.S.A. § 27-14-4(A).

349.    By virtue of the acts described above, Biogen made, used or caused to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false, in violation of N.M.S.A. § 27-14-4(C).

350.    New Mexico, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

351.    By reason of Biogen's acts, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

352.    Pursuant to N.M.S.A. § 27-14-4, the State of New Mexico is entitled to three times the amount of actual damages plus the maximum penalty which may be applicable for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

## TWENTY-SECOND CAUSE OF ACTION: NEW YORK FALSE CLAIMS ACT
### N.Y. Fin. Law §§ 187 *et seq.*

353. Relators repeat and reallege the allegations set forth in paragraphs 1 through 352 as if fully set forth herein.

354. By virtue of the acts described above, Biogen knowingly presented, or caused to be presented, to employees, officers or agents of New York or New York local governments, false or fraudulent claims for payment or approval, in violation of N.Y. Fin. Law § 189.1(a).

355. By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by New York or a New York local government, in violation of N.Y. Fin. Law § 189.1 (b).

356. New York, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

357. By reason of Biogen's acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

358. Pursuant to N.Y. Fin. Law § 189.1(g), the State of New York is entitled to three times the amount of actual damages plus the maximum penalty of $12,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

## TWENTY-THIRD CAUSE OF ACTION:  NORTH CAROLINA FALSE CLAIMS ACT
### N.C.G.S. §1-605 *et seq.*

359.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 358 as if fully set forth herein.

360.    By virtue of the acts described above, Biogen knowingly presented or caused to be presented to an officer or employee of a North Carolina agency a false claim for payment or approval, in violation of N.C.G.S. § 1-607(a)(1).

361.    By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a North Carolina agency, in violation of N.C.G.S. § 1-607(a) (2).

362.    North Carolina, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

363.    By reason of Biogen's acts, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

364.    Pursuant to N.C.G.S. § 1-607(a), the State of North Carolina is entitled to three times actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

## TWENTY-FOURTH CAUSE OF ACTION: OKLAHOMA MEDICAID FALSE CLAIMS ACT
Okla. Stat. §63-5053 *et seq.*

365. Relators repeat and reallege the allegations set forth in paragraphs 1 through 364 as if fully set forth herein.

366. By virtue of the acts described above, Biogen knowingly presented or caused to be presented to Officers or employees of the State of Oklahoma a false claim for payment or approval, in violation of Okla. Stat. §63-5053.1B1.

367. By virtue of the acts described above, Biogen knowingly made or used, or caused to be made or used, a false record or statement to obtain payment or approval by Oklahoma of a false claim, in violation of Okla. Stat. §63-5053.1B2.

368. Oklahoma, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

369. By reason of Biogen's acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

370. Pursuant to Okla. Stat. §63-5053.1B, the State of Oklahoma is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

## TWENTY-FIFTH CAUSE OF ACTION:  RHODE ISLAND FALSE CLAIMS ACT
R.I. Gen. Laws §§ 9-1.1 *et seq.*

371.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 370 as if fully set forth herein.

372.     By virtue of the acts described above, Biogen knowingly presented or caused to be presented to officers or employees of Rhode Island false claims for payment or approval, in violation of R.I. Gen. Laws §§ 9-1.1-3(a)(1).

373.    By virtue of the acts described above, Biogen knowingly made or used, or caused to be made or used, false records or statements to obtain payment or approval by Rhode Island of false claims, in violation of R.I. Gen. Laws §§ 9-1.1-3(a)(2).

374.    Rhode Island, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

375.    By reason of Biogen's acts, the State of Rhode Island has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

376.    Pursuant to R.I. Gen. Laws §§ 9-1.1-3(a), the State of Rhode Island is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

## TWENTY-SIXTH CAUSE OF ACTION:  TENNESSEE MEDICAID FALSE CLAIMS ACT
### Tenn. Code §§ 71-5-181 *et seq.*

377.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 376 as if fully set forth herein.

378.    By virtue of the acts described above, Biogen presented, or caused to be presented, to the state a claim for payment under the Medicaid program knowing such claim is false or fraudulent, in violation of Tenn. Code § 71-5-182(a)(l)(A).

379.    By virtue of the acts described above, Biogen made, used, or caused to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false, in violation of Tenn. Code § 71-5-182(a)(1)(B).

380.    Tennessee, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

381.    By reason of Biogen's acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

382.    Pursuant to Tenn. Code § 71-5-182(a)(1), the State of Tennessee is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

<u>**TWENTY-SEVENTH CAUSE OF ACTION: TEXAS MEDICAID FRAUD**</u>
<u>**PREVENTION LAW**</u>
Tex. Hum. Res. Code §§ 36.001 *et seq.*

383.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 382 as if fully set forth herein.

384.     By virtue of the acts described above, Biogen knowingly presented or caused to be presented false or fraudulent claims to the State of Texas for payment or approval, in violation of Tex. Hum. Res. Code § 36.002.

385.    By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce Texas to approve and pay such false and fraudulent claims, in violation of Tex. Hum. Res. Code § 36.002.

386.    Texas, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

387.    By reason of Biogen's acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

388.    Pursuant to, in violation of Tex. Hum. Res. Code § 36.052, the State of Texas is entitled to two times the amount of actual damages plus the maximum penalty of $15,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

## <u>TWENTY-EIGHTH CAUSE OF ACTION:  VIRGINIA FRAUD AGAINST TAXPAYERS ACT</u>
### Va. Code §§ 8.01-216.1 *et seq.*

389.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 388 as if fully set forth herein.

390.     By virtue of the acts described above, Biogen knowingly presented, or caused to be presented, to an officer or employee of the Commonwealth of Virginia a false or fraudulent claim for payment or approval," in violation of Va. Code § 8.01-216.3(A)(l).

391.    By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth of Virginia in violation of Va. Code § 8.01-216.3(A)(2).

392.    Virginia, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

393.    By reason of Biogen's acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

394.    Pursuant to Va. Code § 8.01-216.3(A), the Commonwealth of Virginia is entitled to three times the amount of actual damages plus the maximum penalty of

$10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

### TWENTY-NINTH CAUSE OF ACTION:  WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT
Revised Code of Washington §§ 74.66.005 *et seq.*

395.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 394 as if fully set forth herein.

396.      By virtue of the acts described above, Biogen knowingly presented, or caused to be presented, to an officer or employee or agent of Washington a false claim for medical assistance in violation of Wash. Rev. Code § 74.66.020(1)(a).

397.     By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used, a false record or statement to obtain approval or payment of a false claim for medical assistance by the State of Washington in violation of Wash. Rev. Code § 74.66.020(1)(b).

398.     Washington, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

399.     By reason of Biogen's acts, the State of Washington has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

400.      Pursuant to Wash. Rev. Code § 74.66.020(2), the State of Washington is entitled to three times the amount of actual damages plus the maximum penalty of

$11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

## THIRTIETH CAUSE OF ACTION:  WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE LAW
### Wis. Stat. §§ 20.931 *et seq.*

401.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 400 as if fully set forth herein.

402.    By virtue of the acts described above, Biogen knowingly presented, or caused to be presented, to an officer or employee or agent of Wisconsin a false claim for medical assistance in violation of Wis. Stat. § 20.931(2)(a).

403.    By virtue of the acts described above, Biogen knowingly made, used, or caused to be made or used, a false record or statement to obtain approval or payment of a false claim for medical assistance by the State of Wisconsin in violation of Wis. Stat. § 20.931(2)(b).

404.    Wisconsin, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Biogen, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Biogen as alleged herein.

405.    By reason of Biogen's acts, the State of Wisconsin has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

406.    Pursuant to Wis. Stat. § 20.931(2), the State of Wisconsin is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for

each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Biogen.

**THIRTY-FIRST CAUSE OF ACTION: RELATOR FERNANDO VILLEGAS AGAINST BIOGEN FOR RETALIATION IN VIOLATION OF 31 U.S.C. SECTION 3730(h)**

407.    Relator, Villegas, repeats and restates the allegations contained in paragraphs 1 through 406 and incorporates said allegations herein by reference.

408.    At all relevant times Villegas was engaged in protected activity for raising concerns about the marketing and sales tactics used by Biogen, which he believed to be illegal and improper.  In retaliation for his complaints, Biogen improperly terminated Villegas on January 14, 2014.

**CONCLUSION**

**WHEREFORE,** the Relator, on behalf of the United States and the States hereby prays that after a trial, this Court:

1.  Enter judgment holding Biogen liable for a civil penalty of $11,000 for each violation of the False Claims Act committed by Biogen;

2.  Enter a judgment against Biogen for three times the amount of damages sustained by the United States because of the acts of Biogen;

3.  Enter judgment holding Biogen liable for the maximum civil penalties permitted for each violation of the state false claims acts pled herein;

4.  Enter judgment against Biogen for the damages sustained by the States and the District because of the acts of Biogen described herein, multiplied, as permitted under the state statutes identified herein;

5. Award the Relators a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730;

6. Award the Relators a percentage of the proceeds of recoveries under the state statutes identified herein as permitted under each state's statute;

7. Award the Relators their costs and reasonable attorneys' fees for prosecuting this action; and

8. Enter judgment against Biogen and award Relator, Fernando Villegas, damages in an amount this Court shall deem just and proper, together with attorneys' fees, costs, interest and punitive damages for his §3730(h) retaliation claim.

9. Enter such other relief which the Court finds just and equitable.


**PLAINTIFFS/RELATORS DEMANDS A TRIAL BY JURY ON ALL COUNTS**


Respectfully submitted,

**Relator Michael Bawduniak, on behalf of the United States of America; State of California; State of Colorado; State of Connecticut; State of Delaware; District of Columbia; State of Florida; State of Georgia; State of Hawaii; State of Illinois; State of Indiana; State of Iowa; State of Louisiana; State of Maryland; State of Michigan; State of Minnesota; State of Montana; Commonwealth of Massachusetts; State of Nevada; State of New Jersey; State of New Mexico; State of New York; State of North Carolina; State of Oklahoma: State of Rhode Island; State of**

**Tennessee; State of Texas; Commonwealth of Virginia; State of Washington and State of Wisconsin**

By his attorneys,

Dated: June 15, 2016

   */s/ Thomas M. Greene*
Thomas M. Greene, Esq. BBO# 210020
tgreene@greenellp.com
Michael Tabb, Esq.  BBO# 491310
matabb@greenellp.com
**GREENE**LLP
One Liberty Square, Suite 1200
Boston, MA 02109
(617)  261-0040

David P. Angueira, BBO # 019610
Swartz & Swartz
10 Marshall Street
Boston, MA 02108
(617) 742-1900
(617) 367-7193

*-and-*

Harry C. Beach, Esq.  BBO# 547893
hbeach@harrybeach.com
Law Office of Harry C. Beach
30 Walpole Street
Norwood, MA  02062
(781) 255-5573

## CERTIFICATE OF SERVICE

    I hereby certify that, on June 15, 2016 this document (filed through the ECF system) was sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non- registered participants.

Dated:  June 15, 2016

         */s/ Thomas M. Greene*
          Thomas M. Greene

{00033378}

144