UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, *ex rel.* MICHAEL BAWDUNIAK, <br><br>                 Plaintiff-Relator, <br><br>          vs. <br><br> BIOGEN IDEC INC., <br><br>                Defendant. | Civil Action No. 12-10601-IT |

## TRIAL BRIEF OF DEFENDANT BIOGEN INC.

| | |
|---|---|
| ROPES & GRAY LLP | CRAVATH, SWAINE & MOORE LLP |
| Prudential Tower | Worldwide Plaza |
| 800 Boylston Street | 825 Eighth Avenue |
| Boston, MA 02199-3600 | New York, NY 10019 |
| (617) 951-7000 | (212) 474-1000 |

*Counsel for Defendant Biogen Inc.*

June 28, 2022

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARDS ........................................................................................................ 3

ARGUMENT ....................................................................................................................... 6

I.    The Evidence Will Show that Biogen Did Not Knowingly and Willfully Pay
      Kickbacks At Any of Its Programs. .......................................................................... 6

      A.    Speaker and Consultant Programs Were Necessary Because of the
            Complexities of Treating MS in a Rapidly Evolving Treatment Landscape
            During the Relevant Period. ............................................................................ 6

      B.    Biogen's Speaker Programs Were Legitimate Educational and
            Promotional Events. ........................................................................................ 8

      C.    Biogen's Consultant Meetings Served Legitimate Business Purposes and
            Helped Biogen Refine Its Research and Marketing Strategies. ....................... 10

      D.    Biogen Paid Fair Market Value for Speaking and Consulting Services. .......... 13

      E.    Payments and Meals "Marked" Under Relator's Theory of Liability Were
            Not Kickbacks. ............................................................................................... 14

II.   The Evidence Will Show That No Prescriptions or False Claims Resulted From
      the Meals or Fees Biogen Provided at Its Programs. ................................................ 15

III.  The Evidence Will Show that Biogen Did Not Proximately Cause False Claims
      To Be Submitted. ....................................................................................................... 17

IV.   Relator Cannot Prove that the Government Suffered Damages, and the Amount of
      Damages He Asserts Is Unsupported. ....................................................................... 18

V.    Outstanding Motions and Jury Instructions in Dispute ............................................ 19

CONCLUSION .................................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Com. Contractors, Inc. v. United States,
154 F.3d 1357 (Fed. Cir. 1998)...................................................................................4

Hanlester Network v. Shalala,
51 F.3d 1390 (9th Cir. 1995) ......................................................................................3

United States ex rel. Arnstein v. Teva Pharms. USA, Inc.,
No. 13 CIV. 3702 (CM), 2019 WL 1245656 (S.D.N.Y. Feb. 27, 2019)...........4, 16

United States ex rel. Concilio de Salud Integral de Loíza, Inc. v. J.C. Remodeling,
Inc.,
962 F.3d 34 (1st Cir. 2020)...................................................................................4, 17

United States ex rel. Schmidt v. Zimmer, Inc.,
386 F.3d 235 (3d Cir. 2004) ................................................................................4, 16

United States ex rel King v. Solvay Pharms., Inc.,
871 F.3d 318 (5th Cir. 2017) ......................................................................................4

United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.,
874 F.2d 20 (1st Cir. 1989)..........................................................................................3

United States v. McClatchey,
217 F.3d 823 (10th Cir. 2000) ....................................................................................3

United States v. Reichel,
No. 1:15-cr-10324 (D. Mass. June 17, 2016) .............................................................3

Universal Health Servs., Inc. v. United States ex rel. Escobar,
579 U.S. 176 (2016) .........................................................................................4, 16, 17

**Statutes & Rules**

31 U.S.C. § 3729(a)(1) .........................................................................................4, 17

31 U.S.C. § 3731(d) .............................................................................................4, 17

42 U.S.C § 1320a-7b...................................................................................................3

Local Rule 16.5(f)......................................................................................................18

**INTRODUCTION**

Biogen is a market leader in developing therapies to treat patients diagnosed with multiple sclerosis ("MS").  MS is a debilitating and complicated disease without any known cure.  It attacks a patient's central nervous system, and can cause patients over time to be unable to walk, use their arms or think clearly, and to lose their vision and experience tremendous pain. Medication is required to slow the progression of the disease.  Given the seriousness and complexity of MS and the number of different treatment options available, it is critical that both physicians and patients are knowledgeable about the different treatments, so they can choose the one that is best for each circumstance.

Biogen (like other pharmaceutical companies) held events called "speaker programs" for precisely for this reason:  to educate healthcare providers ("HCPs") and patients concerning its MS therapies.  Speaker programs are events at which an HCP trained and paid by Biogen for their time addresses other HCPs regarding Biogen's drugs.  The events typically occur at a dinner paid for by Biogen in order to make it convenient for the HCPs to attend programming after work hours.  Biogen also held programs called "consultant meetings," where Biogen paid HCPs to advise Biogen on how best to develop and market its therapies and on how they were being effectively used in clinical practice.  Both types of programs helped ensure that patients suffering from MS, and the doctors treating them, had the information necessary to make informed choices about Biogen's MS drugs.

Relator contends that the majority of Biogen's speaker and consultant programs held between 2009 and March 2014 (the "Relevant Period") were "shams."  He claims they were part of a multi-year, nationwide scheme to bribe thousands of HCPs using speaker and consultant fees and meals in order to induce them to prescribe Biogen's MS  drugs, resulting in the submission of false claims to the government for reimbursement of those prescriptions.

1

Contrary to Relator's unsubstantiated allegations, there is no credible evidence of a fraudulent scheme, let alone one of sweeping nationwide scope. Every single current and former Biogen employee apart from the Relator and a former Relator—both of whom stand to receive significant financial awards if they are successful in the lawsuit—will testify at trial that there was no bribery scheme and that the speaker and consultant programs they participated in were compliant with Biogen's policies and industry standards. Independent, third-party valuators will testify that they themselves determined the rates Biogen paid HCPs for all speaking and consulting services, and that those rates were fair market value and determined by standard methodology.

Because he lacks credible evidence of the scheme he has alleged, Relator will attempt to prove Biogen's intent through a set of so-called "markers" of fraud, and expert testimony based on those markers. This methodology is not a substitute for proof. Relator cannot prove fraud. He cannot show by a preponderance of the evidence that Biogen violated the Anti-Kickback Statute ("AKS") by intentionally paying thousands of kickbacks to thousands of doctors in exchange for prescriptions.

Relator's causation and damages theories similarly do not rely on evidence. Relator makes no effort to show that an HCP's prescribing was influenced by a payment or a meal they received. Instead, Relator relies on unrelated journal articles to generate arbitrary "taint periods"—time periods of six or twelve months during which an alleged kickback purportedly influenced every prescription written by an HCP for a particular Biogen drug—that are without legal or factual support. Relator cannot show by a preponderance of the evidence that these taint periods are proof of false prescriptions or proof that any claims were submitted to

the government in violation of the False Claims Act ("FCA").  Nor do they prove that the Government was damaged as a result.

## LEGAL STANDARDS

In every FCA case predicated upon alleged AKS violations, the jury must first determine whether Biogen violated the AKS.  See 42 U.S.C. § 1320a-7b(g).  In pertinent part, the AKS penalizes any person who "knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) . . . to any person to induce such person . . . to . . . recommend purchasing . . . [an] item for which payment may be made in whole or part under a Federal health care program."  42 U.S.C § 1320a-7b(b)(2).  Relator must prove that, with the specific intent to violate the law, the defendant paid remuneration to doctors in order to induce them to prescribe its drugs.  42 U.S.C. § 1320a-7b(h); Hanlester Network v. Shalala, 51 F.3d 1390, 1398 (9th Cir. 1995) (noting that "knowingly and willfully" requires appellants to "engage in prohibited conduct with the specific intent to disobey the law"); United States v. Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20, 33 (1st Cir. 1989) (upholding jury instruction that "[k]nowingly simply means to do something voluntarily, to do it deliberately, not to do something by mistake or by accident or even negligently.  Willfully means to do something purposely, with the intent to violate the law, to do something purposely that law forbids").

Scienter under the AKS is particularly demanding:  Relator must prove that Biogen paid remuneration with the intent to gain influence over the reason or judgment of the HCP to effect their decision to prescribe.  See Hanlester, 51 F.3d at 1398 (defining "induce" as "an intent to exercise influence over the reason or judgment of another in an effort to cause the referral of program-related business").  Further, a defendant cannot be liable where it merely hoped or expected that prescriptions ensue from remuneration that was designed wholly for other purposes.  See United States v. McClatchey, 217 F.3d 823, 834 (10th Cir. 2000) (affirming jury

3

instruction permitting a defendant to "hope for or expect" referrals from a doctor); <u>United States</u> <u>ex rel. Ruscher v. Omnicare, Inc.</u>, 663 F. App'x 368, 374 (5th Cir. 2016) ("There is no AKS violation, however, where the defendant merely hopes or expects referrals from benefits that were designed wholly for other purposes."); <u>see also</u> Substantive Jury Instructions at 5, <u>United</u> <u>States v. Reichel</u>, No. 1:15-cr-10324 (D. Mass. June 17, 2016) ("A defendant cannot be convicted of the Anti-Kickback statute merely because he sought to cultivate a business relationship or create a reservoir of goodwill that might ultimately affect one or more unspecified purchase or order decisions.").

The FCA imposes liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the Government. 31 U.S.C. § 3729(a)(1)(A).  To prove an FCA violation, Relator must show, at a minimum, falsity, scienter, causation and damages.  <u>See</u> <u>id.</u>

To prove that a claim is false, Relator must prove which claims, if any, resulted from the alleged kickbacks; thus, Relator's evidence of falsity would fail if the jury were to find that remuneration played no part in a doctor's decision to prescribe that particular drug.  <u>See</u> 42 U.S.C. § 1320a-7b(g); <u>United States ex rel King v. Solvay Pharms., Inc.</u>, 871 F.3d 318, 332 (5th Cir. 2017) (explaining that evidence of payments and subsequent prescriptions did not create a genuine issue of material fact that the compensation actually caused those physicians to prescribe that medication because "it would be speculation to infer that compensation for professional services legally rendered actually caused the physicians to prescribe Solvay's drugs to Medicaid patients."); <u>United States ex rel. Arnstein v. Teva Pharms. USA, Inc.</u>, No. 13 CIV. 3702 (CM), 2019 WL 1245656, at *27 (S.D.N.Y. Feb. 27, 2019) (finding that defendants could show at trial that "speaker payments played no part in [doctors'] decision to prescribe"

defendants' medications).  Scienter requires a showing that the defendant acted knowingly to cause a false claim to be presented to the government for payment.  See 31 U.S.C. § 3729(a)(1)(A).  With respect to causation, Relator must prove, at a minimum, that the unlawful behavior was a "'substantial factor in bringing about the filing'" of a false claim, and that the filing was "'a normal consequence of the situation created by [the defendant's] scheme.'"  Arnstein, 2019 WL 1245656, at *25 (quoting United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 244-45 (3d Cir. 2004)); see also Universal Health Servs., Inc. v. United States ex rel. Escobar, 579 U.S. 176, 187 n.2 (2016) (explaining that the FCA maintains "all . . . elements of common-law fraud" unless the statutory text provides otherwise).[1]

The FCA imposes damages in the amount that "the Government sustains because of the act of" the defendant, together with statutory trebling of damages and added penalties.  31 U.S.C. § 3729(a)(1).  Relator must prove the amount of damages which the Government sustains because of the act of the defendant, i.e., the "difference between the value that the government received and the amount that it paid."  United States ex rel. Concilio de Salud Integral de Loíza, Inc. v. J.C. Remodeling, Inc., 962 F.3d 34, 42 (1st Cir. 2020); 31 U.S.C. § 3731(d); Com. Contractors, Inc. v. United States, 154 F.3d 1357, 1371-72 (Fed. Cir. 1998) ("In order to recover FCA damages, the government must prove that it sustained an actual loss as a result of the contractor's false or fraudulent claim.").  This measure of damages is often described as a "benefit-of-the-bargain calculation."  Concilio de Salud, 962 F.3d at 42.

---

[1] Biogen has also argued that Relator must show that any false claims were material to the Government's payment decisions.  (See Opp'n to Relator's Mot. for Summ. J., Doc. No. 488 at 35-38.)

## ARGUMENT

I.   **The Evidence Will Show that Biogen Did Not Knowingly and Willfully Pay Kickbacks At Any of Its Programs.**

Relator alleges that between January 2009 and March 2014, Biogen violated the AKS and FCA by paying millions of dollars in kickbacks to thousands of HCPs throughout the United States in order to induce those HCPs to write prescriptions for three of Biogen's MS drugs: Avonex, Tysabri and Tecfidera. These purported kickbacks allegedly took the form of: (1) meals provided to HCP attendees at speaker and consultant programs; (2) payments to HCP speakers who presented at speaker programs and who attended speaker training events; and (3) consultant fees paid to HCP consultants at consultant meetings.

Speaker programs and consultant meetings are legal, and it is appropriate and customary for companies like Biogen to pay HCP speakers and consultants for their services and to provide meals to feed doctors at end-of-day programs to encourage doctors to attend. To establish that Biogen paid illegal kickbacks, Relator must show that Biogen paid and provided meals to HCPs not for their time or as incentives to attend, but as bribes to induce HCPs to prescribe Biogen's drugs over their reason or judgment. Relator cannot meet this burden at trial.

A.   **Speaker and Consultant Programs Were Necessary Because of the Complexities of Treating MS in a Rapidly Evolving Treatment Landscape During the Relevant Period.**

Biogen will introduce evidence to show that because MS is a complicated disease to treat, and because the information and treatment options available were regularly changing, HCPs needed to be educated about MS and MS drugs during the Relevant Period, and Biogen needed feedback from HCPs to, among other things, help develop its marketing and business strategies. This evidence includes the testimony of: (1) former Biogen senior marketing executives and brand team personnel, such as Tony Kingsley, the former SVP of U.S.

Commercial and EVP of Global Commercial; Curt Hoffman, a former Associate Director of the Tecfidera brand marketing team and former Thought Leader Liaison (a regionally-based marketing employee who coordinated with the brand teams to help plan consultant meetings and select consultants); and Dell Faulkingham, a former Director of the Tysabri brand marketing team; (2) five HCPs who attended Biogen's programs; (3) Biogen's marketing expert, Dennis Kowalski; and (4) Biogen's MS expert, Dr. Maria Houtchens.

   These witnesses will explain that at the beginning of the Relevant Period, all MS therapies were injected or infused.  That changed in 2010, when Novartis launched Gilenya, the first oral treatment for MS.  Soon after, in 2012, Genzyme launched another oral therapy, Aubagio, and Biogen launched its own oral therapy, Tecfidera, in 2013.  Biogen also introduced the Avonex Pen autoinjector in 2012 (a new method of administering Avonex), and introduced a new test, known as the anti-JCV antibody assay, that allowed HCPs to further assess the risk of a serious Tysabri side effect to determine whether Tysabri is an appropriate therapy for a particular patient.  The witnesses will testify that all these developments contributed to a dynamic and unpredictable market for MS treatment during the Relevant Period.  The state of the market required Biogen to regularly educate HCPs and promote its therapies in speaker programs, and to consult with HCPs about its marketing strategies in consultant programs.  Doctors will also testify that HCP education about these new therapeutic options at speaker programs led to better and more informed choices for patients.  Biogen also held patient-oriented speaker programs to educate patients about MS and the available treatment options.

   In connection with the changing state of the MS market, Relator alleges that Biogen knowingly and willfully paid kickbacks to doctors to ensure they continued prescribing Biogen's therapies when Novartis launched Gilenya in 2010.  The former executive who Relator

alleges masterminded this scheme, Mr. Kingsley, will refute Relator's allegations. Biogen's sales and marketing personnel will testify that the launch of Gilenya posed an unprecedented challenge to Biogen given that Gilenya is an oral medication and Biogen's then-existing therapies were administered through shots and infusions. To meet that challenge, Biogen held speaker programs both to educate HCPs and to maintain its share of voice in the marketplace to ensure it could compete with Novartis. Biogen also held consultant meetings because, given that Gilenya was an unprecedented oral therapy, Biogen needed to understand factors that could impact an HCP's decision to prescribe Gilenya over its own medications and to develop marketing strategies in response.

Relator also argues that Biogen knowingly and willfully paid kickbacks to doctors prior to and after the launch of Tecfidera in 2013 to ensure the success of that launch. The person who organized Biogen's consultant meetings prior to the launch of Tecfidera, Mr. Hoffman, will testify that Relator is wrong: Biogen received data from its clinical trials in advance of Tecfidera's launch and determined there was a need to obtain feedback on that data from HCPs in different regions of the country who are influenced by different training and patient demographics and who therefore may prescribe MS therapies differently. Biogen used that data to launch Tecfidera following its approval. Biogen also conducted consultant meetings after the launch of Tecfidera to determine how HCPs were prescribing the drug in practice.

**B.**   **Biogen's Speaker Programs Were Legitimate Educational and Promotional Events.**

Against the backdrop of the groundbreaking developments in MS treatment that occurred during the Relevant Period, former Biogen executives, compliance professionals, current and former Biogen regional directors who planned and executed speaker programs and HCPs who spoke for Biogen will testify that speaker programs were (and are to this day)

important tools for companies like Biogen to educate doctors about the critical treatment decisions they needed to make for their MS patients.  These witnesses will testify that this peer-to-peer teaching was (and is) both common and useful in clinical practice and the industry.

Biogen will introduce testimony from current and former Regional Directors who supervised and planned speaker programs, Jodi Holen, Chris Turchi and Mark Prater, about how those programs were executed.  These Regional Directors will confirm that, contrary to Relator's allegations, Biogen held speaker programs for the legitimate purposes of education and promotion of Biogen's MS drugs to HCP attendees, so that HCPs would be in a position to make the best choices for their patients.  They will also testify that:  (1) Biogen selected speakers based on their expertise and ability to present, not prescription volume; (2) speaker programs were held at venues conducive to education and promotion; (3) Biogen typically held speaker programs over dinner because that is the only practical way for HCPs to find time to attend; (4) Biogen employees took proactive steps to comply with meal caps and other policies; and (5) contrary to Relator's allegations, Biogen did not use patient-oriented speaker programs to drive referrals to the speakers' offices.

Biogen also will introduce testimony from its former Directors of U.S. Commercial Compliance, Sara Frank and Nereyda Garcia, who will testify that Biogen set policies regarding speaker programs and monitored the programs to ensure that those policies were followed and that non-compliant behavior was promptly remediated.  Biogen's compliance expert, Katie Norris, will testify about evolving industry standards concerning speaker program compliance practices during the Relevant Period, and Biogen will use her testimony to show that Biogen's Compliance Program met or exceeded those industry standards.

The evidence will also show that Biogen's speaker selection process became more centralized and efficient when the Speakers Bureau was restructured in 2013.  Becky Bailey Bristol, the marketing employee who led the restructuring of the Bureau, will testify that the restructuring put processes in place that made it easier to ensure that the best speakers were being selected and that underutilized or less effective speakers were removed from the Bureau in subsequent years.

Finally, Biogen will introduce testimony from doctors who spoke at and attended Biogen's speaker programs.  These doctors will deny Relator's allegations and confirm the educational importance of speaker programs for busy HCPs.  They will testify that, once HCPs were educated about Biogen's drugs, doctors could then decide whether to prescribe them to patients based on their medical judgment as to the benefit and risk of a drug for a particular patient.  They will also testify that no one at Biogen ever suggested that speaker fees or meals at speaker programs were being given to influence prescribing and that the payments and meals they received had nothing to do with their prescribing decisions.

**C.   Biogen's Consultant Meetings Served Legitimate Business Purposes and Helped Biogen Refine Its Research and Marketing Strategies.**

Current and former Biogen marketing employees—from senior executives to regional marketing employees—will testify that Biogen's consultant meetings were important, non-promotional events that Biogen, like other companies, used to obtain critical feedback from physicians concerning the marketplace, products, therapeutic areas, clinical practice and the needs of patients.

Biogen will introduce the testimony of Mr. Faulkingham, Mr. Hoffman and Ann Kressin, a Thought Leader Liaison.  These witnesses will testify that Biogen needed consultant meetings to gather feedback from HCPs, which Biogen then used to understand how to market

its products and to identify areas for research. These brand team members will explain that Biogen conducted national and regional consultant meetings to obtain different types of feedback from differently specialized HCPs in different regions of the country, and that Biogen held the minimum number of consultant meetings and used the minimum number of consultants necessary to obtain the feedback it sought. They will also testify that Biogen documented and used consultant feedback, and Biogen will provide evidence of examples of important feedback it received at consultant meetings. Mr. Hoffman and Ms. Kressin will also testify that Biogen selected consultants based on the expertise and competencies necessary to implement the legitimate business purposes of the meetings. These witnesses will confirm that Biogen did not hold consultant meetings to induce HCPs to prescribe or reward them for prescribing Biogen products.

Biogen's marketing employees and former Compliance Department employees, Ms. Frank and Ms. Garcia, will also testify that Biogen set policies regarding consultant meetings and monitored the programs to ensure that those policies were followed and that non-compliant behavior was promptly remediated. In particular, Biogen followed a needs assessment process wherein the employees requesting consultant meetings confirmed with Compliance and with Biogen's marketing executives that the meeting or meeting series they intended to hold would meet a legitimate business need and would comport with Biogen's compliance policies. Ms. Norris, Biogen's compliance expert, will testify about processes companies used to approve consulting engagements during the Relevant Period, and Biogen will use her testimony to show that Biogen's processes for assessing legitimate business need for and monitoring of consultant meetings were consistent with pharmaceutical industry compliance standards.

Biogen will also introduce testimony from HCPs who attended Biogen's consultant meetings during the Relevant Period.  These doctors will testify that they valued the opportunity to provide important feedback to Biogen.  They will speak to their experience consulting for other pharmaceutical companies and will testify that Biogen's consultant meetings were consistent with those of other pharmaceutical companies.  They will also testify that the venues at which Biogen held consultant meetings and the meals Biogen provided to consultants were incidental to the programs.  These doctors will explain that regional differences in MS treatment exist such that it was reasonable for Biogen to elicit feedback from different HCPs in different areas of the country.  Finally, these doctors will testify that they never made prescribing decisions because they received a consultant fee or meal, and that no one at Biogen suggested to them that consultant fees or meals were intended as an inducement to prescribe or reward for prescribing.

Biogen's MS expert, Dr. Houtchens, likewise will testify:  (1) Biogen solicited feedback from HCPs on critical topics; (2) feedback was solicited and provided at the Biogen consultant meetings she attended; (3) what characterizes a typical consultant meeting in the industry; (4) HCPs participating in consultant programs know that their primary role is to provide advice and guidance to pharmaceutical companies on particular topics; (5) given the complexity of MS care and the new medical developments during the Relevant Period, it was important for pharmaceutical companies to obtain feedback from HCPs; (6) in her experience, consultant fees and meals provided in connection with consultant meetings do not influence the prescribing decisions of HCPs; and (7) social and regional factors that influence MS care were an appropriate topic of study during the Relevant Period.

Finally, Biogen's marketing expert, Mr. Kowalski, will testify about standard industry practices concerning consultant meetings.  Based on Mr. Kowalski's testimony about practices in the pharmaceutical industry, Biogen will show that: (1) Biogen's consultant meetings were consistent with industry practices and served commercially reasonable purposes; (2) Biogen's selection of consultants was appropriate in numbers and based on their qualifications; (3) Biogen appropriately solicited feedback from consultants in different geographic regions; and (4) feedback from Biogen's consultant meetings informed its decisions and strategies consistent with standard industry practices.

### D.  Biogen Paid Fair Market Value for Speaking and Consulting Services.

Relator will argue at trial that Biogen knowingly and willfully paid kickbacks to HCPs to induce them to prescribe because the rates it paid HCPs were inconsistent with fair market value ("FMV"), as determined by Relator's FMV expert, Mark Scallon.

First, Biogen has argued that Mr. Scallon's testimony that three specific categories of rates Biogen paid to HCPs were inconsistent with FMV should be precluded for the reasons set forth in its Daubert motion to preclude his testimony.  (Doc. Nos. 513, 521.)

Second, employees of the third-party valuators Biogen engaged to generate FMV rates during the Relevant Period—Mark DeWyngaert, formerly of Huron Consulting Group, and Julie DeLong, formerly of Navigant Consulting, Inc.—will testify that the rates they provided and that Biogen used during the Relevant Period were FMV rates, and that the methodology used to develop those rates was standard in the industry and not in any way directed by Biogen.

Third, even if Relator could show that Biogen's rates somehow were inconsistent with FMV, Relator will be unable to show that Biogen knowingly and willfully paid kickbacks as a result.  Mr. DeWyngaert, Ms. DeLong, and Biogen's former Compliance employees Sara Frank and Nereyda Garcia, will testify that Biogen engaged and reasonably relied upon its FMV

valuators to create those rates, and that Biogen therefore believed it was paying FMV rates to HCPs.

E.    **Payments and Meals "Marked" Under Relator's Theory of Liability Were Not Kickbacks.**

Because he cannot show evidence of kickbacks, Relator purports to identify kickbacks by relying on 21 supposed criteria, or "markers," of alleged fraud.  These markers are discussed extensively in the parties' memoranda concerning their respective <u>Daubert</u> motions.  Under Relator's theory, if information recorded in a Biogen database shows that a speaker or consultant fee or a meal falls into one of Relator's 21 "marked" categories, that fee or meal is a kickback.  Relator will rely predominantly on his experts to attempt to persuade the jury that marked payments and meals in fact were kickbacks.

To rebut Relator's "marker" theory—in addition to the evidence described above, which shows that Biogen did not knowingly and willfully pay kickbacks at any program— Biogen will present the testimony of witnesses, including HCPs and Biogen's MS expert, who will testify about the legitimate nature of programs they attended that have been marked by Relator's markers.  Biogen will also present the testimony of Eric Gaier, a healthcare economist expert.  Dr. Gaier performed a regression analysis and found no statistically significant difference between the impact on prescribing of an HCP's attendance at a "marked" program (which Relator challenges as violating the AKS) as compared with attendance at an "unmarked" program (which Relator is not asserting violated the AKS).  That is, HCP attendance at both "marked" (challenged) and "unmarked" (unchallenged) programs is associated with a statistically identical modest increase in prescriptions of Biogen's MS drugs, consistent with the promotional and educational purpose of Biogen's programs.  Therefore, Biogen will use Dr. Gaier's findings to show that Relator has failed to prove that Biogen intended any payments or

meals to serve as kickbacks to induce prescriptions.  If HCPs did not write more prescriptions after receiving challenged payments and meals than after receiving non-challenged payments and meals, that suggests that Biogen did not knowingly and willfully provide the challenged payments or meals in order to induce prescriptions.  It simply makes no sense that Biogen would conduct unnecessary speaker and consultant programs for several years with the intent of inducing prescriptions if they were achieving essentially the same results from "unmarked" events.  Relator lacks any evidence that Biogen believed HCPs would change their clinical judgment or prescribing behavior for a meal or speaker or consultant fee.

## II.    The Evidence Will Show That No Prescriptions or False Claims Resulted From the Meals or Fees Biogen Provided at Its Programs.

As discussed above, to prove that a claim is false, Relator must prove which claims, if any, resulted from the alleged kickbacks.  See 42 U.S.C. § 1320a-7b(g).  Relator has not presented any evidence of how a payment or meal served as a bribe or caused even one prescription to be written for a patient who did not need it.  Indeed, Relator has admitted in response to Biogen's Requests for Admission that "at the trial of this action he does not intend to present evidence of the medical necessity of any prescription for a Covered Drug."  (Doc. No. 542-8 at 4)  In his motion in limine briefing, Relator likewise admitted that he "will not introduce any evidence of harm to patients resulting from Biogen's kickbacks."  (Doc. No. 567 at 26.)  As such, Relator will not argue, let alone introduce evidence, that even a single patient did not need the Biogen drug he or she was prescribed.

Relator lacks any evidence that HCPs changed their clinical judgment or prescribing behavior for a meal or speaker or consultant fee that Biogen provided.  Instead, based on the testimony of his expert Dr. Joseph Ross about literature regarding the impact of payments on prescribing in non-MS contexts (if Relator is permitted to introduce such testimony), Relator

will argue at trial that claims submitted for prescriptions written by HCPs within six or twelve months after those HCPs received alleged kickbacks are necessarily "tainted"—and are therefore false claims.  Biogen plans to offer Dr. Gaier's testimony to rebut any admitted taint period testimony of Dr. Ross.  Based on Dr. Gaier's testimony, Biogen will argue that no claims resulted from the alleged kickbacks because the alleged kickbacks did not cause any impact on prescribing that was statistically different than the impact of payments Relator does not challenge as kickbacks.

Apart from Dr. Gaier's regression analysis, doctors who received payments and meals Relator alleges to be kickbacks will testify that those payments and meals had no impact on their prescribing.  They will testify that they prescribe MS therapies based on their judgment of what therapies will work best for particular patients.  Biogen will also use this testimony to argue that Relator's alleged kickbacks did not result in any prescriptions, and therefore any false claims.

Even if there were claims resulting from alleged kickbacks (which Biogen disputes), Dr. Gaier also used his regression model in the alternative to isolate the prescriptions that could possibly have been effected by HCPs' attendance at marked events.  Dr. Gaier did this by comparing the total prescriptions written for 12 months after an alleged kickback to the prescriptions his model predicted would have been written anyway absent the challenged event attendances.  The resulting incremental prescriptions associated with challenged program attendances represent, at most, 14.7% of total prescriptions written by HCPs during the 12 months after they attended a marked program.  Therefore, Biogen will show that, even if the jury accepts Relator's theory that false claims were submitted, only 14.7% of the claims for which Relator asserts damages could possibly be false claims.

III.     **The Evidence Will Show that Biogen Did Not Proximately Cause False Claims To Be Submitted.**

        For Relator to establish proximate causation, "the unlawful behavior must be a 'substantial factor in bringing about [the] filing' of a false claim and the filing must be 'a normal consequence of the situation created by that scheme.'" Arnstein, 2019 WL 1245656, at *25 (quoting Schmidt, 386 F.3d at 244-45).  The anticipated evidence cited in Section II above also will show (1) that Biogen's meals and fees were not a substantial factor in the filing of any false claims, and (2) in the alternative, that the meals and fees only caused at most 14.7% of the claims for which Relator asserts damages to be submitted.  Additionally, Biogen will argue at trial, based on the testimony of its MS expert, Dr. Houtchens, that Relator cannot show that a kickback was a substantial factor in causing an HCP to prescribe Biogen's MS therapies to patients who were already receiving them.[2]

---

[2] As discussed in Biogen's Opposition to Relator's Motion for Partial Summary Judgment and in its Opposition to Relator's Motion in Limine No. 9 (Doc No. 488 at 35-38; Doc. No. 595 at 33-34), Biogen's position is that AKS violations are not per se material to the Government's payment decisions, and that the jury must conduct a further inquiry to determine whether any AKS violations were in fact material.  See Escobar, 579 U.S. at 194 (materiality standard is "demanding" and relators must prove more than that "the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment" or that "the Government would have the option to decline to pay if it knew of the defendant's noncompliance").  If permitted by the Court's pretrial rulings, Biogen will introduce evidence at trial to show:  (1) that the Government did not stop paying claims for Avonex, Tysabri and Tecfidera after learning of Relator's allegations in this very case; (2) that Relator disclosed information to the Government regarding the alleged false claims at issue in this litigation as early as November 18, 2011 and that, despite such knowledge and conducting a detailed investigation, the Government declined to intervene in the case.  These facts show that the conduct Relator challenges was not material to the Government's payment decisions.  See Arnstein, 2019 WL 1245656, at *34 (noting that summary judgment would be appropriate for defendant if "the Government conducted a detailed investigation and subsequently declined to take any action against the defendant," as in this case, then "the only reasonable conclusion was that the Government believed the claims meritless or would not have changed its calculus even if the allegations were true").

**IV.     Relator Cannot Prove that the Government Suffered Damages, and the Amount of Damages He Asserts Is Unsupported.**

As set forth above, the FCA provides that a defendant is responsible for "the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a)(1).  Relator must prove the amount of damages which the Government sustains because of the act of the defendant—that is, the difference in value between what the government was supposed to receive and what it actually received.  <u>Concilio de Salud</u>, 962 F.3d at 42; 31 U.S.C. § 3731(d).  This measure of damages is often described as a "benefit-of-the-bargain calculation."  <u>Concilio de Salud</u>, 962 F.3d at 42.

Relator's "markers" are arbitrary criteria that are not indicative of kickbacks; therefore, no damages should flow from HCPs attending "marked" events.  Even if the jury finds liability, however, Biogen will show at trial that the Government received the benefit of its bargain when it paid for prescriptions for patients who needed and received MS prescriptions, particularly because Relator concedes that he will not argue that any prescriptions of Biogen's drugs were not medically necessary.  (<u>See</u> Relator's Responses to Biogen's Requests for Admission, Doc. No. 542-8 at 4 ("[A]t the trial of this action he does not intend to present evidence of the medical necessity of any prescription for a Covered Drug."); Relator's Omnibus Motions <u>in Limine</u>, Doc. No. 567 at 26 (stating that Relator "will not introduce any evidence of harm to patients resulting from Biogen's kickbacks").)

Additionally, the evidence will show that Relator's calculations are highly inflated for a number of reasons.  Using Dr. Gaier's calculations, Biogen will show that damages should be reduced to account for the Government's cost of reimbursing for prescriptions patients would have received for non-Biogen MS products.  Because MS patients would be prescribed an MS drug regardless of any kickback, Biogen provided a benefit to the Government, and the

alleged net loss to the Government may be calculated as the difference between the cost the Government paid for that benefit and the cost it otherwise would have paid for that benefit from another pharmaceutical company.  Biogen will also show that damages should be reduced to account for Medicaid rebates and payments by third-party Medicaid plan sponsors.

## V.    Outstanding Motions and Jury Instructions in Dispute

Pursuant to Local Rule 16.5(f), Biogen respectfully requests rulings or instructions on the fully briefed and submitted motions and jury instructions referenced in the parties' Joint Pretrial Memorandum.  (Doc No. 598.)

## CONCLUSION

Biogen respectfully submits that Relator will be unable to prove his case by a preponderance of the evidence at trial, and is confident the jury will find for Biogen.

Dated: June 28, 2022
       Boston, Massachusetts

Respectfully submitted,

*/s/ Aaron M. Katz*
Aaron M. Katz
aaron.katz@ropesgray.com
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
(617) 951-7000

Evan R. Chesler (admitted *pro hac vice*)
Rachel G. Skaistis (admitted *pro hac vice*)
Michael P. Addis (admitted *pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
(212) 474-1000

*Counsel for Defendant Biogen Inc.*

<u>CERTIFICATE OF SERVICE</u>

I, Aaron M. Katz, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on June 28, 2022.

*/s/ Aaron M. Katz*
Aaron M. Katz